# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re: | Chapter 11 |
| JACKSON HOSPITAL & CLINIC, INC., *et al.*,[1] | Case No. 25-30256 |
| Debtors. | Joint Administration Requested |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Jackson Hospital & Clinic, Inc. ("Jackson Hospital") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion"). In support of this Motion, the Debtors submit the *Declaration of Allen Wilen in Support of Chapter 11 Petition and First Day Pleadings* (the "Wilen Declaration"), filed contemporaneously herewith. The Debtors further state as follows:

## PRELIMINARY STATEMENT[2]

1. By this Motion, the Debtors seek authorization to obtain postpetition financing and approval of their entry into a debtor-in-possession credit facility provided by Jackson Investment Group, LLC and/or its designees or its assignees. The DIP Facility (as defined herein) is a superpriority senior priming secured term loan facility consisting of $24.5 million of new money

---

[1] The Debtors in these chapter 11 cases, are: Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC.

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the DIP Term Sheet, the First Day Declaration, or the Interim Order, as applicable.

1

56602386 v1

term loan commitments (the "DIP Loans"), of which $10 million is proposed to be made available during the first 30 days of the cases.

2. The Debtors' access to the DIP Facility during these chapter 11 cases is critical not only to their restructuring efforts, but more importantly to their obligation to maintain the health and safety of their patients. Access to new-money financing will send a strong message to the Debtors' patients, vendors, employees, affiliated physicians, and contract counterparties that operations are funded and the impact on the Debtors' businesses and operations will be minimized. The DIP Orders (as defined herein) will give the Debtors the necessary funding and flexibility to continue the day-to-day operations of their businesses, maintain patient care, implement the anticipated sales of their hospital assets, and bring these chapter 11 cases to a value-maximizing conclusion. Inability to access the DIP Loans (as defined herein) will render the Debtors unable to continue to ensure the health and safety of their patients, and will negatively impact the Debtors' ability to provide clinical care, generate revenue, meet their existing trade obligations, and compensate employees.

3. To be clear, *without the incremental new-money financing anticipated to be provided under the DIP Facility, the Debtors will be forced to shutter the hospital and wind down all operations in the near term*. In the absence of the DIP Loans, the Debtors will be unable to satisfy any ongoing operations, including their outstanding and accrued obligations to employees, and will have no alternatives other than to wind down operations through state court processes or under chapter 7 of the Bankruptcy Code. The Debtors would be forced to immediately stop the intake of new patients and would work to transport their thousands of existing patients to other hospitals. At that point, the Debtors would likely not have the liquidity

2

to implement appropriate shut down procedures under applicable federal, state, and local regulatory requirements, which would both imperil patient safety and expose the Debtors to fines, sanctions, and criminal penalties.

4. The Debtors should be authorized to enter into the DIP Facility. Further, as described herein, the DIP Facility contains terms that are the most favorable available to the Debtors, are reasonable and market under the circumstances, and provide the Debtors with the urgent liquidity to (a) stabilize the Debtors' hospital operations, ensure continued patient care, and avoid immediate and irreparable harm arising from an imminent wind down as a result of the Debtors' critical liquidity position, (b) pay their employees who are essential to providing care to the Debtors' patients, (c) pay ordinary course operating expenses necessary to support their operations, and (d) provide a path forward for these chapter 11 cases to allow the Debtors to maximize the value of their assets and continue to provide critical care to their patients and the communities they serve. Further, the DIP Facility was evaluated by the Debtors' independent directors at Jackson Hospital, who have been overseeing the Debtors' restructuring efforts.

5. The Debtors have been, and remain, committed to evaluating all value-maximizing paths forward, both with respect to the DIP Facility and with respect to the terms of the restructuring transactions to be effectuated in these chapter 11 cases. In light of the facts and circumstances, at this time, the proposed DIP Facility provides the best financing available to the Debtors, will prevent an immediate shut down of the Debtors' operations, including those at the hospital, and allow the Debtors to continue their goal of effectuating value-maximizing restructuring transactions for

3

the benefit of their creditors.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

## RELIEF REQUESTED

6.     By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and, together with the Interim Order, collectively, the "DIP Orders"),[3] granting, among other things, the following relief:

(i)     authorizing Jackson Hospital & Clinic, Inc. (together with its affiliated Debtors, the "DIP Borrowers"), to obtain postpetition financing (the "DIP Loans") pursuant to a priming, superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain debtor-in-possession financing term sheet attached to the Interim Order as Exhibit 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), by and among the DIP Borrowers, Jackson Investment Group, LLC and/or its designees or its assignees (the "DIP Lender"), consisting of:

A.     new money term loans in an aggregate principal amount of $24.5 million from the DIP Lender, of which $10 million will be available immediately upon entry of the Interim Order (the "Initial Draws"), with the remainder to be available subject to and following entry of the Final Order (the "Delayed Draws"), in each case in accordance with the terms of the DIP Documents (as defined below) and any Approved Budget (as defined below);

(ii)    authorizing the Debtors to execute, deliver, and perform under the DIP Term Sheet and the other DIP Documents, the DIP Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Lender on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Lender, on account of the DIP Facility, as the same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors and the DIP Lender (collectively, the "DIP Documents");

---

[3] The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

56602386 v1

(iii) authorizing the Debtors to pay fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents;

(iv) granting to the DIP Lender, and authorizing the Debtors to incur valid, binding, enforceable, non-avoidable, and automatically and properly and fully perfected DIP Liens (defined below) in all DIP Collateral pursuant to sections 364(c)(2), (c)(3), and priming liens pursuant to section 364(d), to secure the DIP Loans and all obligations and indebtedness of any of the Debtors to the DIP Lender under the DIP Documents, including all interest accrued and accruing thereon, and all other amounts owing by the respective Debtors in respect thereof (collectively, the "DIP Obligations"), which DIP Obligations shall be subject and subordinate only to the Carve Out (defined below);

(v) granting to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors in respect of all DIP Obligations, with recourse to all prepetition and postpetition property of the Debtors;

(vi) granting automatically perfected liens, security interests and other adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code, from the Debtors' use, sale, or lease of the Prepetition Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising;

(vii) subject to entry of the Final Order, except to the extent of the Carve Out, waiving all rights to surcharge any DIP Collateral or Prepetition Collateral under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity;

(viii) subject to entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral for the benefit of any party other than the DIP Lender and (b) the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties;

(ix) vacating and modifying the automatic stay of section 362 of the Bankruptcy Code to the extent provided to permit the Debtors and their affiliates, the DIP Lender, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents and to deliver any notices of termination described below and as further set forth herein;

5

56602386 v1

(x)     scheduling the Final Hearing within 30 days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

(xi)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders and providing for the immediate effectiveness of the DIP Orders.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Middle District of Alabama (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *General Order of Reference Bankruptcy Matters from the United States District Court for the Middle District of Alabama*, dated and filed April 25, 1985, entered by the United States District Court for the Middle District of Alabama. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The legal predicates for the relief requested in this Motion are sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 4001-1 and 9013-1 of the Local Bankruptcy Rules for the Middle District of Alabama (the "Local Bankruptcy Rules").

9.      The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

6

10. Beginning on February 3, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

11. A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the First Day Declaration, filed contemporaneously herewith.

## SUMMARY TERMS OF THE DIP DOCUMENTS

12. In accordance with Bankruptcy Rule 4001(b)–(d), the chart below summarizes material terms of the DIP Facility.[4]

| Provision | Summary | Location |
|---|---|---|
| **DIP Borrowers** | Jackson Hospital & Clinic, Inc., an Alabama corporation, _et. al._[5] (the "Borrower" and together with all of the Borrower's existing and future, direct or indirect domestic or foreign subsidiaries and affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "Borrowers", each a "Loan Party" and collectively, the "Loan Parties"). | DIP Term Sheet, § 1 |

---

[4] The following summary of the terms of the DIP Facility is qualified entirely by the express terms of the referenced documents, including the DIP Term Sheet and the Interim DIP Order. If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control. Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Term Sheet or the Interim DIP Order, as applicable.

[5] Additional borrowers are listed on Schedule 1 to the DIP Term Sheet.

7

56602386 v1

| DIP Lender | Jackson Investment Group, LLC and/or its designees or its assignees. | DIP Term Sheet, § 2 |
|---|---|---|
| **Facility Type and Amount** | A non-amortizing priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $24,500,000 in term loan commitments (the "DIP Facility"; the DIP Lender's commitments under the DIP Facility, the "DIP Commitments"; and the loans under the DIP Facility, the "DIP Loans").<br><br>Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 of the DIP Term Sheet, the DIP Lender shall make available an aggregate amount of $10,000,000 of the DIP Loans and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 immediately upon entry of the Interim Order (the "Initial Draws", the date of such first Initial Draw shall be referred to herein as the "Closing Date"). The closing of definitive DIP Documents shall occur as soon after the first Initial Draw as reasonably possible but in any event no later than two (2) business days prior to the hearing to consider entry of the Final Order. | DIP Term Sheet, §§ 3–4 |
| **Use of Proceeds/Purpose** | The proceeds of the DIP Facility shall be used only for: working capital and other general corporate purposes, professional fees and expenses of administering the chapter 11 cases; fees and expenses payable under the DIP Facility; and interest and other amounts payable under the DIP. | DIP Term Sheet, § 10 |
| **Maturity Date** | The "Maturity Date" will be the earliest to occur of: (i) July 31, 2025; (ii) the effective date of any chapter 11 plan with respect to the Borrowers (a "Plan"); (iii) the consummation of any sale or other disposition of assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; (iv) the date of acceleration or termination following the occurrence of an Event of Default; (v) dismissal or conversion of the chapter 11 cases; and (vi) 45 days after the Petition Date, | DIP Term Sheet, § 7 |

56602386 v1

| | | |
|---|---|---|
| | unless the Final Order has been entered by the Bankruptcy Court on or before such date. | |
| **DIP Budget** | The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "Initial Budget") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "Budget").<br><br>The Budget shall be updated and provided to the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within 5 business days after the delivery by the Borrowers of any such update or amendment ("Updated Budget") and, (ii) to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five business day period, such Updated Budget shall become effective as the Budget. | DIP Term Sheet, § 21 |
| **Variance Reporting** | On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "Budget Variance"), between actual net operating cash flow for such period to projected net operating cash flow for such period | DIP Term Sheet, § 21 |

56602386 v1

| | | |
|---|---|---|
| | as set forth in the Budget on a cumulative 4 week rolling basis (each a "Measuring Period") and explaining in reasonable detail all material variances, it being understood that any Net Operating Variance (as defined below) solely with respect to net operating cash flow that exceeds 15% shall be material and shall constitute an Event of Default under the DIP Documents (each such report, a "Variance Report," which shall be in a form reasonably satisfactory to the DIP Lender). For the avoidance of doubt, net operating cash flow shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the chapter 11 cases.<br><br>For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative 4-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "Net Operating Variance"). For purposes herein, a "Permitted Variance" shall be limited to not greater than 15% for budget variances with respect to the Net Operating Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, the Bankruptcy Administrator fees, professional fees of the DIP Lender, and the Loan Parties, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Variance calculation. | |
| **Interest Rate** | The DIP Loans shall bear interest at a per annum rate equal to 14% payable in cash on the first day of each month in arrears (the "Non-Default Interest"). | DIP Term Sheet, § 8 |

56602386 v1

| | | |
|---|---|---|
| **Default Rate** | After the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at the per annum rate of 19%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. | DIP Term Sheet, § 8 |
| **Fees** | The Borrowers shall pay to the DIP Lender a commitment fee equal to 4.0% of the total amount of the DIP Commitments (the "Commitment Fee"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw.<br><br>The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 6.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the Interim Order (the "Exit Fee"). The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br><br>The Commitment Fee and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, the DIP Term Sheet shall automatically terminate and be of no further force and effect. | DIP Term Sheet, § 9 |

56602386 v1

| | | |
|---|---|---|
| **Priority and Security** | Subject to the Carve Out, all obligations of the Loan Parties under the DIP Documents and all obligations of the Loan Parties under the DIP Facility (the "DIP Obligations") shall be entitled to (a) senior secured priming lien and (b) superpriority claim status pursuant to section 364(c)(1) and section 364(d)(1) of the Bankruptcy Code, with priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "DIP Claims").<br><br>Subject to the Carve Out and the Permitted Prior Liens (as defined in Schedule 2 to the DIP Term Sheet), all DIP Obligations in respect of the DIP Facility shall be (collectively, the "DIP Liens"):<br><br>i.   pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the chapter 11 cases (which claims shall be payable from and have recourse to all DIP Collateral); and<br><br>ii.   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on the DIP Collateral; and<br><br>iii.   secured by a priming first lien on the DIP Collateral pursuant to section 364(d)(1) of the Bankruptcy Code. | DIP Term Sheet, §§ 12-13 |
| **Adequate Protection / Superpriority Expense Claims** | As adequate protection, solely to the extent of any Diminution of the Prepetition Secured Parties' asserted interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve Out, the Prepetition Secured Parties shall receive continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the | Interim Order ¶ 13 |

56602386 v1

| | | |
|---|---|---|
| | Carve Out, the DIP Liens, and Permitted Prior Liens (the "Adequate Protection Liens") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the Prepetition Collateral, and (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the chapter 11 cases or any Successor Case and shall be valid and enforceable against any trustee appointed in the chapter 11 cases or any Successor Case, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties. | |
| **Conditions Precedent to Effectiveness / Credit Extension** | Conditions precedent to the Initial Draw are as follows:<br><br>i. Entry of the Interim Order within 4 business days of the Petition Date, which order shall not be stayed or subject to appeal;<br><br>ii. Delivery of the Initial Budget acceptable to the DIP Lender in its reasonable discretion;<br><br>iii. All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to the DIP Term Sheet, the DIP Documents, or the Interim Order shall have been paid (provided that the Commitment Fee and the DIP Lender's legal fees and expenses shall be paid out of or offset against the proceeds of the Initial Draw);<br><br>iv. The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); | DIP Term Sheet, §§ 15-16 |

56602386 v1

<table>
<tr><td></td><td>

v. No Material Adverse Effect (as defined below) shall have occurred and be continuing;

vi. The Debtors shall be in compliance in all respects with the Interim Order;

vii. No Event of Default shall have occurred and be continuing under the DIP Term Sheet;

viii. No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender or the Interim Order; and

ix. The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw.

Certain customary conditions precedent to each subsequent draw, including:

i. execution and delivery of a credit agreement (the "DIP Credit Agreement") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with the DIP Term Sheet and otherwise in form and substance acceptable to the DIP Lender and the Loan Parties;

ii. delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its reasonable discretion;

iii. no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets;

</td><td></td></tr>
</table>

56602386 v1

| | | |
|---|---|---|
| | iv. the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); | |
| | v. the Borrowers shall have delivered to the DIP Lender a customary borrowing notice; | |
| | vi. the Debtors shall be in compliance in all respects with the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; | |
| | vii. no default or Event of Default shall have occurred and be continuing under the DIP Documents; | |
| | viii. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order or the Final Order, as applicable; | |
| | ix. since the Petition Date, other than the chapter 11 cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP | |

15

56602386 v1

| | | |
|---|---|---|
| | Document (each of the foregoing being a "Material Adverse Effect"); <br><br> x. the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured; <br><br> xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due; and <br><br> xii. a granting to the DIP Lender of a Priming Lien for all DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code. | |
| **Affirmative Covenants** | The DIP Documents shall contain usual and customary affirmative covenants and as are acceptable to the DIP Lender and the Borrowers. | DIP Term Sheet, § 19 |
| **Negative Covenants** | The DIP Documents shall contain usual and customary negative covenants as are acceptable to the DIP Lender and the Borrowers; provided that the DIP Documents will permit: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and reasonably acceptable to the DIP Lender. | DIP Term Sheet, § 20 |

16

56602386 v1

| | | |
|---|---|---|
| **Milestones** | The DIP Documents shall contain certain milestones (the "Milestones") relating to the chapter 11 cases, which may be extended by the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default:<br><br>    (i) Within 45 days after the Petition Date, the Debtors shall have filed a motion seeking an order the form and substance of which shall be reasonably satisfactory to the DIP Lender governing the solicitation of bids for the purchase (and an auction) of substantially all assets of the Debtors;<br><br>    (ii) Within 75 days after the Petition Date, the Bankruptcy Court shall have entered the order sought in (i) above.<br><br>    (iii) within 120 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the sale of substantially all of the Debtors' assets. | DIP Term Sheet, § 16 |
| **Postpetition Default** | • The DIP Documents shall contain customary events of default (collectively, "Events of Default") and acceptable to the DIP Lender and the Borrowers, including, without limitation:<br><br>i. Non-payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature;<br><br>ii. the entry of the Final Order shall have not occurred, subject to the availability of the Bankruptcy Court, within 45 days after the Petition Date: | DIP Term Sheet, § 25 |

17

56602386 v1

| | | | |
|---|---|---|---|
| | iii. | the failure of the Loan Parties to comply with any of the Milestones and the DIP Lender has not, in its sole discretion, extended such Milestone; | |
| | iv. | the dismissal of any of the chapter 11 cases or the conversion of any of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; | |
| | v. | non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the Interim order or the Final Order; | |
| | vi. | the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case without the prior written consent of the DIP Lender; | |
| | vii. | the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of Bankruptcy Code (other than a fee examiner) in the chapter 11 cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion; | |
| | viii. | the entry of an order in any of the chapter 11 cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which, individually or in the aggregate, exceeds $500,000; | |
| | ix. | the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having | |

56602386 v1

| | | |
|---|---|---|
| | priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve Out), or (c) otherwise adversely impacting the DIP Lender's liens and priority in the DIP Collateral as set forth in the DIP Term Sheet;<br><br>x. any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the chapter 11 cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;<br><br>xi. entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations;<br><br>xii. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender;<br><br>xiii. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender;<br><br>xiv. the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of | |

19

56602386 v1

| | | |
|---|---|---|
| | the DIP Liens, or (c) contest any material provision of any DIP Document; | |
| | xv. the Debtors file a Plan that is not in form and substance satisfactory to the DIP Lender, it being understood that a Plan will be satisfactory to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender to lend from a recognized lender or another source of funding sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations on the Plan effective date; | |
| | xvi. the Debtors file a motion seeking to settle a controversy or claim on account of the DIP Collateral without the prior written consent of the DIP Lender; | |
| | xvii. the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion; or | |
| | xviii. the Debtors shall fail to execute or deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in the DIP Term Sheet. | |
| **Remedies; Waiver or Modification of the Automatic Stay** | Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the chapter 11 cases including, without limitation, those remedies customarily available to a senior secured, | DIP Term Sheet, § 14 |

56602386 v1

| | | |
|---|---|---|
| | administrative expense claim of a debtor-in-possession lender, including, without limitation:<br><br>i.   declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws;<br><br>ii.  declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;<br><br>iii. charge interest at the default rate under the DIP Documents;<br><br>iv. declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the DIP Orders); or<br><br>v.   take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders. | |
| **Prepayments** | Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $1,000,000 of principal. | DIP Term Sheet, § 11 |

21

56602386 v1

| | | |
|---|---|---|
| **Fees and Expenses Indemnification** | The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof.<br><br>Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP and [_____], as counsel to the DIP Lender, and Resurgence Financial Services, LLC, as financial advisor to the DIP Lender, incurred in connection with the DIP Facility and the chapter 11 cases shall be paid on a current basis. | DIP Term Sheet, § 26 |
| **Releases, Waivers or Limitation on any Claim or Cause of Action** | The DIP Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility.<br><br>The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. | DIP Term Sheet, §§ 27–28 |
| **Avoidance Actions** | Effective upon entry of the Final Order, DIP Collateral shall include all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof. | DIP Term Sheet, § 12<br><br>Interim DIP Order, ¶ 5 |

56602386 v1

| | | |
|---|---|---|
| | Effective upon entry of the Interim Order, DIP Collateral shall include all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof. | |
| **Section 506(c) Waiver** | Subject to and effective only upon entry of the Final Order, the Debtors shall waive any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise. | DIP Term Sheet, § 22 |
| **Marshalling** | Subject to and effective only upon entry of the Final Order, the Debtors shall waive the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations shall be authorized and approved. | DIP Term Sheet § 22<br><br>Interim DIP Order, ¶ 31(b) |

13. The Debtors respectfully submit that the foregoing material terms are appropriate as necessary components of the agreement with the DIP Lender regarding the DIP Facility and the use of Prepetition Collateral (including Cash Collateral). As set forth in greater detail herein, granting the Debtors' requested relief is critical to patient care and the continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all stakeholders. Accordingly, the material provisions in the DIP Orders should be approved.

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

14. *The Indentures.* Jackson Hospital is a party to that certain (a) Amended and Restated Master Trust Indenture, dated as of December 1, 2015 (as amended, restated, amended and restated, supplemented or modified pursuant to its terms, the "Master Indenture"), with UMB Bank, N.A. ("UMB"), as successor trustee to Regions Bank, an Alabama banking corporation (in such capacity, the "Indenture Trustee") and (b) 2015 Supplemental Indenture, dated as of

56602386 v1

December 1, 2015 (as amended, restated, amended and restated, supplemented, or modified pursuant to its terms, the "2015 Indenture" and together with the Master Indenture, collectively, the "Indentures"), with the Indenture Trustee and The Medical Clinic Board of the City of Montgomery Alabama (the "Medical Clinic Board").[6] Pursuant to the Indentures, the Medical Clinic Board issued its Health Care Facility Revenue Bonds, Jackson Hospital & Clinic Series 2015 in the principal amount of $84,195,000 (the "Series 2015 Bonds").[7] The Series 2015 Bonds are Series 2015 Obligations of Jackson Hospital under the Master Indenture. The obligations under the Indentures (the "Existing Indenture Obligations") are evidenced by various agreements, instruments, and documents (collectively, the "Existing Indenture Documents") and secured by liens in (a) certain real property owned by the Medical Clinic Board and leased to Jackson Hospital and (b) certain personal property assets of Jackson Hospital, including without limitation, its accounts receivable.

15. ***The 2024 Bridge Facility***. The Debtors are parties to that certain (a) Credit Agreement, with ServisFirst Bank ("ServisFirst"), dated as of September 30, 2024 (as amended, restated, amended and restated, supplemented or modified pursuant to its terms, the "2024 Bridge Loan Agreement") and (b) Senior Note Purchase Agreement, dated as of November 5, 2024 (as amended, restated, amended and restated, supplemented, or modified pursuant its terms, the "2024 Bridge Note Purchase Agreement" and together with the 2024 Bridge Loan Agreement, the "2024

---

[6] The Medical Clinic Board is not a Debtor in these chapter 11 cases.

[7] The Medical Clinic Board has no personal liability for the repayment of the Prepetition Bonds or for any covenants, warranties or representation made by the Debtors or for any breach thereof by the Debtors

56602386 v1

Bridge Facility"), by and among the Debtors, the Medical Clinic Board, and UMB, in its capacity as noteholder representative and collateral agent. The obligations under the 2024 Bridge Facility (the "2024 Bridge Facility Obligations") are evidenced by various agreements, instruments, and documents (collectively, the "2024 Bridge Facility Documents" and together with the Existing Indenture Documents, the "Prepetition Credit Documents") and secured by liens in (a) certain real property owned by the Medical Clinic Board and leased to Jackson Hospital and (b) certain personal property assets of Jackson Hospital, including without limitation, its accounts receivable.

**THE DEBTORS' NEED FOR
THE DIP FACILITY AND ACCESS TO CASH COLLATERAL**

16. The Debtors are in an extremely precarious liquidity situation, and are facing an immediate wind down, either through state law processes or chapter 7 of the Bankruptcy Code. Without additional financing and the ability to use Cash Collateral, the Debtors will be unable to meet their next payroll cycle and will be required to commence shut down of their operations. The Debtors require immediate access to the proceeds of the DIP Facility to avoid this shutdown, which would imperil their ability to continue hospital operations and patient access to ongoing care. In the absence of additional new-money financing, the Debtors would immediately stop new patient intake, and would commence moving their thousands of patients to surrounding hospitals.

17. The proceeds of the DIP Facility will ensure the Debtors have sufficient liquidity to operate their businesses, meet employee payroll and working capital requirements, provide high-quality and life-saving care to their patients, and administer their estates in the ordinary course for the duration of these chapter 11 cases. Among other things, the Debtors intend to use the DIP Loans to: (a) meet payroll during the week of February 3, 2025, for their employees,

56602386 v1

including physicians, nurse practitioners, and physician assistants; (b) make payments to vendors and suppliers who provide critical goods and services that are necessary for the Debtors to operate the hospital; and (c) effectuate an efficient and value-maximizing sale or other divestiture of the hospital, which is anticipated to generate additional value for the Debtors' estates and their creditors. *Id.* The Debtors' advisors, with the assistance of the Debtors' management, have evaluated the Debtors' financing needs and funding alternatives. The Debtors' Initial DIP Budget is attached to the Interim Order as Exhibit 2.

18. The Debtors additionally require access to Cash Collateral, together with the incremental liquidity under the DIP Facility, to prudently manage their estates during this time— as well as to address any unforeseen contingencies in the event that they might occur. Funding under the DIP Facility will also instill confidence in the Debtors' patients, employees, and vendors as the Debtors focus on a "business as usual" message to these key counterparties and move quickly to complete any sales. To this end, the Debtors believe it is imperative that business counterparties understand and believe these chapter 11 cases are well-capitalized and positioned for success. Without access to the DIP Facility and Cash Collateral, the Debtors face an immediate shutdown of operations, which would involve the loss of a large number of jobs and the transfer of thousands of patients to other hospitals. The Debtors respectfully submit such an outcome undoubtedly constitutes a clear, immediate, and irreparable harm to these estates and their stakeholders.

## THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

19. The DIP Facility is the product of exhaustive, good-faith, arm's-length negotiations among the Debtors and the DIP Lender, each of which was represented by experienced counsel and financial advisors. The Debtors and their advisors actively negotiated

56602386 v1

the terms and provisions of the DIP Facility leading up to the Petition Date, including on material terms of the proposed financing, ultimately resulting in the deal embodied in the DIP Term Sheet.

20.     Based on extensive negotiations among the parties, the Debtors respectfully submit that the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.  The claim priority, liens, and other protections to be granted to the DIP Lender pursuant to the DIP Facility, were essential features of the facility, without which the DIP Lender would not have committed to provide funding for the Debtors, and are comparable to other debtor-in-possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

## THE DEBTORS' EFFORTS
## TO OBTAIN POSTPETITION FINANCING

21.     The Debtors considered a number of sources of potential debtor-in-possession financing, including internal sources of cash, existing lenders, and actual or potential transaction counterparties.  The Debtors and their advisors reached out to various stakeholders, government and regulatory departments, potential sale counterparties, and other related parties to address their capital needs through the provision of incremental financing or by supporting and accelerating transaction closings.  New-money financing was generally advertised as a protective advance for existing constituents or an advance on sale transaction proceeds.  As discussed below, no financing party was willing to provide financing to the Debtors on a junior or unsecured basis.

22.     In the months prior to the Petition Date, the Debtors engaged extensively with the Indenture Trustee and holders of the obligations under the Existing Indenture Obligations (collectively, the "Existing Indenture Secured Parties") and the holders of the 2024 Bridge Facility Obligations (collectively, the "2024 Bridge Facility Secured Parties" and together with the

56602386 v1

Existing Indenture Secured Parties, the "Prepetition Secured Parties"). None of these proposals were actionable.

23. In contrast, the DIP Facility offers the Debtors an aggregate of $24.5 million in new-money DIP financing, without needing to solve for the complicated bondholder structure of the Indentures. The proposed DIP Facility is, by a large margin, the best financing available to the Debtors' estates because *it is the only proposal that allows the Debtors to continue providing life-saving, critical care to their patients* while the Debtors work to reorganize and/or effectuate sales of their hospital assets to willing purchasers as going-concern operations. Entry into the DIP Facility will allow the Debtors to continue serving their patients daily, repair their strained relationships with key vendors that provide critical healthcare supplies and services, and move towards effectuating the going-concern sale of the hospital, with the overarching twin goals of protecting patient safety and bringing these chapter 11 cases to a value-maximizing conclusion for the Debtors' creditors.

24. The Debtors therefore submit that DIP Facility presents the best terms available to these estates within the totality of the circumstances of these chapter 11 cases.

## THE DIP FACILITY AND CASH COLLATERAL TERMS SHOULD BE APPROVED

I. **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents**.

25. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. As set out above, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an

56602386 v1

administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)–(b). The Debtors also negotiated vigorously, and at arm's length with the DIP Lender to secure the DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under section 364 for authority to enter into the DIP Facility.

**A.     Entering into the DIP Facility Is a Sound Exercise of Business Judgment.**

26.     The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility. If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining postpetition credit. *See, e.g., In re N. Bay Gen. Hosp., Inc.,* No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment).

27.     The business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the Debtors and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.),* 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code). To determine whether the business judgment test is met, "the court is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.,* No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). In considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor

56602386 v1

and the potential lender. *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003).

28.     Courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Estrada,* 16- 80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Barbara K. Enters., Inc.,* Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

29.     Prepetition Process. The Debtors undertook as thorough a prepetition marketing process under the circumstances. The Debtors' financing process considered prepetition bridge financing and DIP financing from a number of sources, including existing stakeholders, government and regulatory departments, and actual or potential transaction counterparties. The Debtors also engaged in hard-fought negotiations with the Prepetition Secured Parties for months on the provision of incremental new-money financing. Despite the Debtors' extensive negotiations with the Prepetition Secured Parties, the Debtors, in consultation with their advisors determined

30

that the Prepetition Secured Parties' proposal was not in the best interests of the Debtors, their estates, or their creditors. Ultimately, the Debtors determined that there was no better alternative financing other than that being offered by the DIP Lender. Accordingly, the Debtors and their advisors focused their efforts on negotiating the terms and provisions of the DIP Facility.

30. Milestones. The DIP Term Sheet contains certain milestones that the Debtors must meet throughout these chapter 11 cases. The milestones were negotiated by the Debtors and the DIP Lender as a condition to providing the DIP Facility and are the result of good-faith and arm's-length negotiations between the Debtors and the DIP Lender. The milestones provide the Debtors with sufficient time to effectuate the contemplated sale transactions while balancing the need for an expeditious resolution of these chapter 11 cases.

31. Economic Terms. The DIP Facility and the accompanying economic terms were the product of extensive, good-faith, arm's-length negotiations among the Debtors and the DIP Lender. The claim priority, liens, and other protections (including the waivers of section 506(c), waiver of marshalling, and granting of liens on Avoidance Actions (as defined in the Interim DIP Order) and the proceeds thereof upon entry of the Final Order), were essential features of the facility without which the DIP Lender would not have committed to provide funding for the Debtors. These protections are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtors. Accordingly, the Debtors have exercised sound business judgment in negotiating these protections.

32. The Debtors negotiated the DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors. The Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter

31

56602386 v1

11 cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis.**

33.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364. In addition, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

34.     The Debtors propose to grant the DIP Lender a priming first lien security interest on substantially all of the Loan Parties' assets (collectively, the "Priming Liens"), which shall be subject to and subordinate only to the Carve Out and Permitted Prior Liens. Therefore, the approval of the DIP Facility is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

> ### *i.   The Debtors Satisfy the Condition Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis.*

32

35. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

36. In determining whether to authorize financing under 364(c) of the Bankruptcy Code, courts will consider whether (i) the debtor's efforts to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep 't Stores, Inc.*, 115 B.R. at 39–40.

37. *First*, to show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). The Debtors have not been able to obtain unsecured credit or an alternative DIP financing on better terms than those reflected in the DIP Term Sheet, and there are no better offers available to the Debtors or before the Court at this time. The DIP Term Sheet was the sole financing proposal that

33

56602386 v1

would allow the Debtors to continue their going-concern operations for any reasonable period of time after the Petition Date.

38.     *Second*, the DIP Facility is necessary to preserve the Debtors' estates.   In the absence of DIP financing, the Debtors will be unable to pay their employees and vendors, and will be forced to begin shutting down the hospital.  The DIP Facility has been sized to provide the Debtors with liquidity to continue the operation of their businesses, including the hospital, maintain relationships with vendors, suppliers, and customers, satisfy wage and salary obligations for their employees, and continue to satisfy other working capital and operational needs during the chapter 11 cases.

39.     *Third*, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  The DIP Facility provides tens of millions of dollars more in new-money financing commitments than the Debtors only other DIP financing alternatives, on terms that are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

40.     In light of the foregoing, the Court should authorize the Debtors to provide the DIP Lender with superpriority administrative expense status in accordance with the DIP Term Sheet, as provided for in section 364(c)(1) of the Bankruptcy Code.

### ii. The Debtors Should Be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code.

41.     Section 364(d) provides that debtors may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the

56602386 v1

property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent, or (b) adequate protection exists for such priming lien. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

42. When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

- whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).

47. The Debtors submit that the priming of the liens held by the Prepetition Secured Parties (collectively, the "Prepetition Liens") by the DIP Liens should be approved by the Court.

56602386 v1

*First*, the Debtors were unable to find alternative financing that preserved the Debtors as going-concern operations. No potential financing party was willing to provide the Debtors with unsecured or junior secured financing. The Debtors have an extremely limited pool of unencumbered assets that was insufficient to attract potential financing counterparties. Additionally, in the face of a near-term potential shutdown of the Debtors' hospital operations, no counterparty was willing to assume the risk of extending credit on an unsecured or junior secured basis. The DIP Lender was not willing to extend the $24.5 million in new capital absent being provided priming liens on the DIP Collateral.

48. *Second*, the DIP Facility is necessary to preserve the Debtors' estates and continued operations. Without the DIP Loans, the Debtors face a shutdown of the hospital's operations beginning on February 6, 2025, at which point they will halt all new patient intakes and begin moving patients to other hospitals. Courts have also authorized financing involving priming liens to avoid imminent liquidation. *See, e.g., In re Erickson Inc.*, Case No. 16-34393 (HDH) (Bankr. N.D. Tex. Dec. 2, 2016); *In re Vitality Health Plan of California, Inc.*, Case No. 2:20-bk-21041-WB (Bankr. C.D. Cal. Oct. 21, 2021); *In re True Religion Apparel, Inc.,* Case No. 20-10941 (Bankr. D. Del. 2020); *In re Advanced Living Techs.,* Inc., No. 13-10313-HCM, 2013 WL 1857803 (Bankr. W.D. Tex. Apr. 30, 2013).

49. *Third*, the terms of the DIP Loans are eminently reasonable under the circumstances, and provide for financing on terms that are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

36

56602386 v1

50.    *Fourth*, the DIP Facility was negotiated at arm's length and in good faith.  The terms of the DIP Facility were the result of a thorough prepetition marketing process under the circumstances, and reflect a sound exercise of the Debtors' business judgment.

51.    *Last*, the Debtors are offering their Prepetition Secured Creditors adequate protection in the form of replacement liens on all assets of the Debtors (subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Prior Liens).  Further, the Prepetition Secured Creditors are expected to have significantly higher recoveries if the Debtors gain access to the DIP Facility.  The DIP Facility provides the Debtors with the funding necessary to pay employees and vendors, and continue their hospitals' operations while they pursue value-maximizing sale transactions.  In the absence of this incremental financing, the Debtors would not even have the option to pursue the planned sale transactions, which are expected to bring additional capital into the Debtors' estates.  The preservation, maintenance, and enhancement of the going-concern value of the Debtors that will result from the optionality provided by the DIP Loans will inure to the benefit of the Prepetition Secured Parties.

52.    Priming the Prepetition Secured Parties is appropriate under the circumstances because the Debtors' critical health care operations have one alternative in the absence of the DIP Facility: an immediate and destructive wind down of all operations as soon as February [•], 2025, either through state law processes or chapter 7 of the Bankruptcy Code.  Bankruptcy courts have authorized priming liens where patient health and safety was threatened. *See, e.g., In re Wadley Reg'l Med. Ctr.,* 2009 Bankr. LEXIS 5404 (Bankr. E.D. Tex. 2009); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.,* 2016 Bankr. LEXIS 4715 (Bankr. C.D. Cal. 2016); *In re Sun Healthcare Grp.,*

56602386 v1

*Inc.*, 245 B.R. 779, 782 (Bankr. D. Del. 2000), *aff'd,* No. 99-3199-MFW, 2002 WL 31155179 (D. Del. Sept. 27, 2002).

53. Specifically as it relates to the parties prepetition financing negotiations, the Debtors have found it extraordinarily difficult to source funding that was not supported by the Prepetition Secured Parties, who holds first liens on almost all of the Debtors' assets.

**C.      The Scope of the Carve Out Is Appropriate.**

54. The DIP Liens and the DIP Superpriority Claims, and the Adequate Protection Claims and Adequate Protection Liens are subject to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted. *See In re Ames Dep't Stores,* 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that funds are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory Committee.

**D.      Debtors Should Be Authorized to Pay Fees Required by DIP Documents.**

55. The Debtors have agreed to pay certain interest and fees in connection with the DIP Facility, which are integral to the financing package. The DIP Facility, including the fees and other economic terms of the DIP Facility, were all negotiated at arm's length. Under the circumstances, the terms of the DIP Facility, which include the fees payable in connection therewith, are the most favorable terms the Debtors could obtain. Furthermore, the Debtors submit that the interest payments and fees required by the DIP Facility are reasonable, comparable to

56602386 v1

other debtor in possession financings, and generally consistent with market terms for companies facing similar circumstances as the Debtors. The Debtors believe that under these circumstances, authorization to pay the fees is warranted.

**E.     The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e).**

56.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

57.     The Debtors are prepared to carry their burden that negotiations of the DIP Facility were conducted in good faith and at arm's length. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lender a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

**II.     The Debtors Should Be Authorized to Use Cash Collateral.**

58.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides:

39

56602386 v1

The trustee may not use, sell, or lease cash collateral…unless—

    A.    Each entity that has an interest in such cash collateral consents; or

    B.    The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

59. Here, the Debtors have satisfied the standards of section 363(c)(2) of the Bankruptcy Code. In light of the Pre-Petition Secured Parties oversecured collateral position, they will be adequately protected, which is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

**III.    Modification of the Automatic Stay Is Warranted.**

60. The relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the DIP Lender to exercise all rights and remedies, and to take certain actions without further order of or application to the Court, upon the occurrence of a DIP Termination Event (as defined in the Interim Order). Upon the occurrence of a DIP Termination Event, the DIP Lender may: (a) deliver a written notice (which may be via email) to counsel for the Debtors, the Bankruptcy Administrator, and counsel for the Creditors' Committee (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve Out Trigger Notice; (b) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the

40

56602386 v1

DIP Commitment) to the extent any such commitment remains; (c) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (d) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (e) charge default interest at the default rate set forth in the DIP Term Sheet; and (f) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

61. These provisions were part of the negotiations over the terms and conditions of the DIP Facility (including Cash Collateral). Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five days' notice (or otherwise extended by the Court) to allow the Debtors to seek other relief. Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

## IV. Immediate Access to Cash Collateral and the DIP Facility Should Be Approved.

62. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 40.

56602386 v1

63. Here, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly. As set forth in the First Day Declaration, the Debtors have an immediate need for additional liquidity through the DIP Facility and continued access to Cash Collateral in order to continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, provide the high-quality care their patients seek, and continue to satisfy other working capital and operational needs during the chapter 11 cases. Approval of the DIP Facility will not only provide essential funding, but should provide the Debtors with sufficient liquidity to execute a sale of the hospital, which should allow the Debtors to maximize value of their assets to the benefit of all key stakeholders and creditors by preserving the Debtors' going-concern value. Accordingly, the Debtors request the Court grant the interim relief requested herein to be effective immediately.

## EMERGENCY CONSIDERATION

64. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing process. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

42

56602386 v1

65.    The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

66.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE

56602386 v1

67.     The Debtors have provided notice of the filing of the Motion to: (i) the Bankruptcy Administrator for the Middle District of Alabama ; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to UMB, in its capacity as the Indenture Trustee; (iv) counsel to ServisFirst; (v) counsel to UMB, in its capacity as the noteholder representative and collateral agent under the 2024 Bridge Note Purchase Agreement; (vi) the Internal Revenue Service; (vii) the United States Attorney for the Middle District of Alabama; (viii) the Alabama Attorney General's Office; (ix) the Alabama Department of Public Health; (x) the City of Montgomery; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Bankruptcy Rule 2002 and Local Bankruptcy Rule 9013-1.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PREVIOUS REQUEST

68.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank.]*

56602386 v1

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: February 4, 2025

**BURR & FORMAN LLP**

s/ Derek F. Meek
Derek F. Meek
Marc P. Solomon
Burr & Forman LLP
420 20th Street North
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000

*Proposed Counsel for Debtors and Debtors-in-Possession*

56602386 v1

<u>Exhibit A</u>

[Proposed Interim Order]

56602386 v1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re: | Chapter 11 |
| JACKSON HOSPITAL & CLINIC, INC., *et al.*,[1] | Case No. 25-30256 |
| Debtors. | Joint Administration Requested |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, <u>AND (VI) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>") of Jackson Hospital & Clinic, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), seeking entry of an order (the "<u>Interim Order</u>"),

---

[1] The Debtors in these chapter 11 cases are: Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC.

56602386 v1

pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1 and 9013-1 of the Bankruptcy Local Rules for the Middle District of Alabama (the "Local Rules"), seeking entry of an interim order (together with all exhibits hereto, this "Interim Order") that, among other things:

i.  authorizes the Debtors, jointly and severally, to obtain a non-amortizing priming super-priority senior secured postpetition credit facility ("DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $24,500,000 (the "DIP Commitment") of which, upon entry of this Interim Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Term Sheet (as defined below) and this Interim Order, $10,000,000 (the "Interim Amount") shall be made available to the Debtors and may be drawn in one or more draws (in an aggregate minimum amount of $500,000 or multiples thereof), and the remainder of the DIP Commitment will, subject to and upon the date of entry of the Final Order (as defined below), be available through additional draws, in each case subject to the terms and conditions set forth in the DIP Term Sheet or, as applicable, a Debtor-in-Possession Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, including this Interim Order, the "DIP Documents"),[1] among the Debtors, as Borrowers, and Jackson Investment Group, LLC or its designees or assignees, as Lender (the "DIP Lender"), which DIP Credit Agreement shall be consistent with the terms set forth in the attached Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions attached hereto as Exhibit 1 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and this Interim Order, the "DIP Term Sheet");[2]

ii.  approves the terms of the DIP Term Sheet, and authorizes the Debtors to execute, deliver, and perform under the DIP Term Sheet and any other DIP Documents;

---

[1] Capitalized terms used but not otherwise defined herein have the meaning set forth in the Motion or the DIP Term Sheet, as applicable.

[2] References to the "DIP Term Sheet" herein shall be construed to encompass the other DIP Documents, if any, that the DIP Lender and the Debtors execute, deliver, or otherwise enter into before the entry of the Final Order.

iii.     authorizes the Debtors, on an interim basis, to issue, incur, and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including the Commitment Fee, the Exit Fee, and any other fees payable pursuant to the DIP Term Sheet), and all other obligations due or payable to or for the benefit of the DIP Lender under the DIP Term Sheet and the other DIP Documents (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.     authorizes and directs the Debtors, on an interim basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Term Sheet and this Interim Order to (a) fund the postpetition working capital needs of the Debtors pending the Final Hearing (as defined below); (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the DIP Term Sheet; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Term Sheet, the Approved Budget (as defined below), and this Interim Order;

v.     authorizes the Debtors to grant to the DIP Lender, on an interim basis, valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), and (b) liens in the DIP Collateral (as defined below) and all proceeds thereof, including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve Out and the Permitted Prior Liens;

vi.     authorizes the Debtors to grant to the Prepetition Secured Parties (as defined below), as adequate protection of their respective interest in the Prepetition Collateral (as defined below), valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the DIP Collateral, solely to the extent of any Diminution (as defined below) of the Prepetition Secured Parties' respective interest in the Prepetition Collateral, as more fully set forth in this Interim Order, subject and subordinate only to the Carve Out, the Permitted Prior Liens, the DIP Liens (as defined below), and DIP Superpriority Claims (as defined below), without waiver of the Debtors' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties;

vii.     authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order and the DIP Term Sheet;

56602386 v1

viii.    authorizes payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Term Sheet;

ix.    upon entry of the Final Order, a waiver of (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

x.    modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Term Sheet and this Interim Order, and authorizes the DIP Lender, upon the occurrence and continuation of an Event of Default (as set forth herein and in the DIP Term Sheet, including section 25 thereof), to deliver any notices and exercise rights and remedies, as contemplated in this Interim Order and the DIP Term Sheet;

xi.    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order; and

xii.    schedules a final hearing (the "Final Hearing") to consider final approval of the DIP Facility pursuant to a proposed final order (the "Final Order"), as set forth in the Motion and the DIP Term Sheet.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the (the "Wilen Declaration"), the DIP Term Sheet, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held before this Court on February [___], 2025 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation

56602386 v1

of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:[1]**

a.    **Petition Date**. Commencing on February 3, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

b.    **Debtors in Possession**. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c.    **Jurisdiction and Venue**. The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference Bankruptcy Matters from the United States District Court for the Middle District of Alabama*, dated and filed April 25, 1985. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d.    **Notice**. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Interim Order shall be required. The

---

[1] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

e. **Committee Formation**. As of the date hereof, the Bankruptcy Administrator for the Middle District of Alabama (the "Bankruptcy Administrator") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

f. **No Credit Available on More Favorable Terms**. Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without (i) granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims and (ii) granting the Adequate Protection Liens (as defined below), in each case subject and subordinate to the Carve Out and the Permitted Prior Liens, as set forth herein and in the DIP Term Sheet.

g. **Good Faith**. Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including the use of Cash Collateral) under the DIP Facility, as provided by the DIP Term Sheet, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express

reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in the DIP Term Sheet or this Interim Order, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical and essential components of the DIP Facility provided by the DIP Lender to the Debtors; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

h.    **Good Cause**. Good cause has been shown for the entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The relief requested in the Motion is in the best interest of the Debtors and their estates.

i.    **Need for Postpetition Financing and Use of Cash Collateral**. The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion. The financing provided pursuant to this Interim Order and the DIP Term Sheet and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) fund any obligations benefiting from the Carve Out; (iii) continue the orderly continuation of the operation of their businesses, in an effort to maintain the health and safety of their patients; (iv) maintain business relationships with customers, vendors, and suppliers; (v) make payroll for their employees, including providers essential for patient care; and (vi) satisfy other working capital and operational needs.

56602386 v1

j.    **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of this Interim Order; (ii) approval of the terms and conditions of the DIP Facility, the DIP Term Sheet, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Term Sheet; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to this Interim Order and the DIP Term Sheet in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Term Sheet will have the protections provided by section 364(e) of the Bankruptcy Code.

k.    **Priming of Prepetition Liens; Adequate Protection**.  As of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties under the Prepetition Credit Documents or other applicable law, and such obligations were secured by liens and security interests granted by the Debtors or otherwise arising under applicable law, including the "Existing Liens" and "Real Property Encumbrances" identified in Schedule 2 of the DIP Term Sheet, (all such liens and security interests, the "Prepetition Liens") on and in the assets of the Debtors to the extent set forth under the Prepetition Credit Documents or such applicable law (all such assets, the "Prepetition Collateral").  The priming of the security interests in and liens on the Prepetition Collateral and any other interests of the Debtors in property under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Term Sheet and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their business for the benefit of their estates and creditors, and the Debtors would not be able to obtain postpetition financing in a sufficient amount without granting such priming liens.  Consistent with the requirements of section 364(d) of the Bankruptcy Code, and without waiving the Debtors' or any other parties' right to assert any and

56602386 v1

all challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any decrease in the value of its interest, if any, in the Prepetition Collateral resulting from (i) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of the Chapter 11 Cases; (ii) the DIP Liens and the Carve Out pursuant to this Interim Order and the DIP Term Sheet; or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such actual diminution, collectively, "Diminution").

l.      **DIP Budget**. The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget attached hereto as Exhibit 2 (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet, the "Initial DIP Budget"). The Initial DIP Budget reflects, among other things, for the 13-week period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Term Sheet or the other DIP Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet) shall constitute, without duplication, an "Approved Budget"). The Initial DIP Budget has been prepared by the Debtors,

their management and their advisors, and the Debtors believe that the Initial DIP Budget is reasonable under the circumstances. The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of the DIP Term Sheet in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Interim Order.

m.      **Use of Cash Collateral and Proceeds of DIP Facility**. As a condition to the Debtors' entry into the DIP Term Sheet and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Term Sheet, and the Approved Budget (subject to Permitted Variances). Upon entry of this Interim Order, all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

n.      **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that its liens and superpriority claims shall be subject to payment of the Carve Out and the Permitted Prior Liens, upon entry of the Final Order, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

56602386 v1

o. **Requisite Authority**. Subject to entry of this Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Term Sheet and the other DIP Documents to which it is a party and to perform its obligations thereunder.

p. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the permitted use of Prepetition Collateral in accordance with this Interim Order and the DIP Term Sheet, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1. **Motion Granted**. The relief sought in the Motion is GRANTED on an interim basis as set forth herein. Entry into the DIP Term Sheet and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Term Sheet, including the Approved Budget (subject to Permitted Variances). All objections to the Motion to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2. **Authorization of the DIP Facility**. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Term Sheet and the other DIP

Documents (as applicable), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Term Sheet, and to execute, deliver, and perform (and to cause the Guarantors to execute, deliver, and perform) under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Term Sheet, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Term Sheet. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Term Sheet and this Interim Order, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Term Sheet), including, without limitation, the Commitment Fee and the Exit Fee, as well as any reasonable and documented fees and expenses of counsel to the DIP Lender, as set forth herein and in the DIP Term Sheet, subject to paragraph 26 of this Interim Order, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Term Sheet. Upon execution and delivery, the DIP Term Sheet and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. All provisions of the DIP Term Sheet are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Term Sheet and the other DIP Documents.

3. **DIP Obligations**. The DIP Term Sheet and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto, including

without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (the "Successor Case"). Upon entry of this Interim Order, the DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under the DIP Term Sheet and this Interim Order, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under the DIP Term Sheet and this Interim Order. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Term Sheet and the DIP Obligations. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as set forth in section 7 of the DIP Term Sheet) or as otherwise set forth in the DIP Term Sheet. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Term Sheet (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4. **Authorization to Borrow**. The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Term Sheet (and any

other DIP Documents) and to take such other and further acts as may be necessary, appropriate or desirable in connection therewith. Upon entry of this Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, in each case, in accordance with the DIP Term Sheet, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Term Sheet) without the need to seek further Court approval. The borrowing of DIP Loans under this Interim Order and the DIP Term Sheet shall permanently decrease the DIP Commitment and, once repaid, the DIP Loans incurred may not be re-borrowed.

5. **DIP Collateral**. The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all such Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by such Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records

56602386 v1

relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of Georgia) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all Avoidance Actions[1] and the proceeds thereof.

6. **Disposition of Collateral**. Notwithstanding anything otherwise provided herein, it shall be deemed an Event of Default under the DIP Term Sheet and, as applicable, the other DIP Documents if the Debtors sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order or the Approved Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender, which consent shall not unreasonably be withheld or delayed. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve Out and the lien priorities set forth herein and in the DIP Term Sheet, be used to immediately satisfy the DIP Obligations.

7. **DIP Liens**. To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender is hereby granted, on an interim basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security

---

[1] For the purposes of this Interim Order, "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Loan Parties or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

56602386 v1

interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to the Carve Out and Permitted Prior Liens:

a. **Liens Priming the Prepetition Liens**. Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable and automatically and fully perfected first-priority senior priming liens and security interests in all assets and interests in property of the Debtors that are subject to Prepetition Liens (including the Prepetition Collateral), regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to the Prepetition Liens;

b. **Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non-avoidable liens or security interests; and

c. **Liens Junior to Certain Other Liens**. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses 7(a) and 7(b)), junior only to the "Permitted Prior Liens" (as defined in Schedule 2 of the DIP Term Sheet).

Other than as set forth herein or in the DIP Term Sheet, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in

the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.

8. **DIP Superpriority Claims**. Subject to the Carve Out, immediately upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Cases and any Successor Case (collectively, the "DIP Superpriority Claims") for all DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors' or their estates in the Chapter 11 Cases and any Successor Case, as provided under section 364(c)(1) of the Bankruptcy Code, and which shall be senior to the rights of the Debtors, their estates, and their successors or other representatives to the extent permitted by law. The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof.

9. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet unless (a) all of the conditions precedent and other terms under the DIP Term Sheet and this Interim Order have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Term Sheet or the other DIP Documents (including this Interim Order) has occurred and is continuing.

10. **Use of DIP Facility Proceeds**. The Debtors shall be permitted to use DIP Loans under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP

Term Sheet. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

11. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Term Sheet, including the Approved Budget (subject to the Permitted Variances).

12. **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Interim Order and the DIP Term Sheet, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the DIP Termination Declaration Date.

13. **Adequate Protection for Prepetition Secured Parties**. As adequate protection, solely to the extent of any Diminution of the Prepetition Secured Parties' asserted interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve Out, the Prepetition Secured Parties shall receive continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve Out, the DIP Liens, and Permitted Prior Liens (the "Adequate Protection Liens") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the Prepetition Collateral, and (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or

56602386 v1

any Successor Case, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties.

14.     **Modification of DIP Term Sheet**.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet any non-material modifications of the DIP Term Sheet without further notice, motion or application to, order of or hearing before, this Court.  Any material modification or amendment to the DIP Term Sheet shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the Bankruptcy Administrator and the Prepetition Secured Parties; provided that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Term Sheet shall not require an order of this Court.  In the event of any inconsistency between this Interim Order and the DIP Term Sheet, this Interim Order shall control.

15.     **DIP Facility Reporting**.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Term Sheet and in accordance with the Approved Budget.  The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Term Sheet.

16.     **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any

56602386 v1

jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender and the Prepetition Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens and the Adequate Protection Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The DIP Lender and the Prepetition Secured Parties may, in their respective sole discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that a Prepetition Secured Party is, with respect to the DIP Collateral, a secured party under any Prepetition Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any Debtor's insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.

17. **Modification of Automatic Stay**. The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors, the DIP Lender,

and, as applicable, the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

18. **Proceeds of Subsequent Financing**. If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Term Sheet or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Term Sheet) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Term Sheet.

19. **Payments Held in Trust**. Except as expressly permitted in this Interim Order, the DIP Term Sheet, or otherwise ordered by this Court, including in respect of the Carve Out and the Permitted Prior Liens, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Term Sheet, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Interim Order, the DIP Term Sheet, or the applicable DIP Documents.

20. **Maintenance of DIP Collateral**. Until the payment in full of the DIP Obligations, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Term Sheet; and (b) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtors' cash-management systems and the DIP Term Sheet.

21. **Right to Credit Bid**. Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

22. **DIP Termination Event; Exercise of Remedies**.

    a. **DIP Termination Event**. For purposes of this Interim Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach or Event of Default under the DIP Term Sheet or this Interim Order, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitment in accordance with the terms of the DIP Term Sheet or the other DIP Documents.

56602386 v1

b. **Exercise of Remedies**. Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via email) to counsel for the Debtors, the Bankruptcy Administrator, counsel for the Prepetition Secured Parties, and counsel for the Creditors' Committee (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Term Sheet; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date

(such period, the "Waiting Period"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this DIP Order and the Approved Budget, solely to pay any expenses which are necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet); provided, however, that the professional fees and expenses of the Professional Persons (as defined below) shall be governed by paragraph 24 and subject to the Approved Budget.

d. **Rights and Remedies Following Termination Date**. Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Interim Order, the DIP Term Sheet, the other DIP Documents (if any), applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with

56602386 v1

the DIP Term Sheet, the other DIP Documents (if any), this Interim Order, and applicable law.

23. **No Waiver by Failure to Seek Relief.** The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the DIP Term Sheet, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Term Sheet, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order, the DIP Term Sheet shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

24. **Carve Out.**

    a. **Priority of Carve Out.** The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders.

    b. **Carve Out.** The term "Carve Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Bankruptcy Administrator under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 ("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the

56602386 v1

Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or persons or firms retained by the Creditors' Committee pursuant to sections 328 or 1103 of the Bankruptcy Code or the patient care ombudsman in these Chapter 11 Cases (if any) (together with the Debtor Professionals, the "Professional Persons"), at any time before or on the first calendar day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the "Pre-Trigger Date Fees"), subject to the Approved Budget and any limits by the DIP Orders, provided that Professional Persons may carry forward budgeted but unused disbursements set forth in the Approved Budget for any week for use in any subsequent week; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" or the "Carve Out Cap"); provided, however, that for the purposes of the foregoing, any plan success fee, financing fee, transaction fee, or other similar contingency fee shall not be included in the Post Carve Out Trigger Notice Cap and shall be paid, to the extent allowed,

56602386 v1

pursuant to any confirmed plan in these Chapter 11 Cases; provided, further, that nothing herein shall be construed to impair the ability of the DIP Lender to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds. In the event that Allowed Professional Fees exceed or are expected to exceed the amounts provided in the Approved Budget, the parties will negotiate in good faith (but without further obligation) regarding a proposed amendment to the Approved Budget to address such additional Allowed Professional Fees. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the Bankruptcy Administrator, counsel to the Prepetition Secured Parties, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Loans under and as such terms are defined in the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

c. **Carve Out Trigger Notice Reserve**. The Debtors shall deposit the Pre-Trigger Date Fees in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Carve Out Trigger Notice Reserve") prior to any and all other claims. The Carve Out Trigger Notice Reserve shall be funded on a weekly basis, and shall contain an amount equal to the amount of fees reflected in the Approved Budget for Professional Persons from the Closing Date through the weekly date of funding.

56602386 v1

d. **Carve Out Draw**. Subject to exhaustion of the DIP Commitments, the Debtor shall be permitted to draw on the DIP Facility in the amount of the Carve Out less the Carve Out Trigger Notice Reserve, notwithstanding any default, Event of Default, or the occurrence of a Trigger Date. Any Carve Out Trigger Notice shall be deemed a consent by the DIP Lender to the Debtor depositing Cash Collateral or DIP Facility proceeds into the Carve Out Trigger Notice Reserve in an amount equal to the sum of the Post-Carve Out Trigger Notice Cap and any budgeted Pre-Trigger Date Fees reflected in the Approved Budget through the date of the Carve Out Trigger Notice that have not been deposited in the Carve Out Trigger Notice Reserve.

e. **Payment of Allowed Professional Fees Prior to the Trigger Date**. Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

f. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of

any fees and/or expenses of Professional Persons of any of the Debtors, the Creditors' Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses.

25. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Term Sheet as such become due, including, without limitation, the Commitment Fee (which shall be fully earned and allowed upon entry of this Interim Order and paid in full in cash from the proceeds of the "Initial Draw," as that term is defined in the DIP Term Sheet), the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). Upon entry of this Interim Order, the DIP Fees are approved, on a final basis, and are deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet without the need for any further order of this Court. The DIP Fees shall be part of the DIP Obligations.

26. **DIP Lender's Professionals' Fees**. Professionals for the DIP Lender (Kilpatrick Townsend & Stockton LLP, [_____], and Resurgence Financial Services, LLC, collectively, the "DIP Lender's Professionals"), shall provide summary copies of any invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product

56602386 v1

doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the Bankruptcy Administrator and counsel to the Creditors' Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than the Disputed Invoiced Fees (as defined below). Any objections raised by the Debtors, the Bankruptcy Administrator or the Creditors' Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within 10 days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least 10 days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the Closing Date, the Debtors shall pay fees and expenses of the DIP Lender's Professionals incurred prior to such date, without the need to first deliver a copy of its invoice as provided for herein. No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27. **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors

and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Term Sheet or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

28. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Case, and the entry of this Interim Order shall be deemed to constitute a timely filed proof of claim. Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in the Chapter 11 Cases or Successor Case shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) a proof of claim or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.

29. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve Out and Other Funds**. Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out may not be used, directly or indirectly, by any of the Debtors, the Creditors' Committee or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection

56602386 v1

therewith) in connection with (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) using or seeking to use Cash Collateral without the permission of the DIP Lender or selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender or as permitted by the DIP Term Sheet; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender; (d) seeking to amend or modify any of the rights granted to the DIP Lender under this Interim Order or the DIP Term Sheet, including seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (f) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (g) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (h) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Term Sheet; provided, however, that, upon an Event of Default or DIP Termination Event, nothing herein shall limit the Debtors' right to move for an order of the Court authorizing the use of Cash Collateral absent the DIP Lender's consent.

30.     **Releases**.  Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants,

56602386 v1

accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Term Sheet and the other DIP Documents; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

31. **Waivers**.

    a. **Limitation on Charging on Expenses**. Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

    b. **No Marshaling**. Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Term Sheet.

32. **No Lender Liability**. In determining to make any loan (whether under the DIP Term Sheet or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans. Furthermore, nothing in this Interim Order shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

33. **Limitation of Liability**. Nothing in this Interim Order, the DIP Term Sheet, the Prepetition Credit Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

34. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35. **Insurance Proceeds and Policies**. The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

36. **No Waivers or Modifications of Interim Order**. The Debtors have agreed not to and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

37. **Binding Effect of this Interim Order**. Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Creditors' Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

38. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan.

39. **Survival**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or

(d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and the DIP Term Sheet, and the adequate protection provided to the Prepetition Secured Parties pursuant to this Interim Order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Case, following dismissal of any of the Chapter 11 Cases or any Successor Case, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

40. **Necessary Actions**. The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Interim Order and the DIP Term Sheet.

41. **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(4), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42. **Interim Order Controls.** In the event of any conflict between or among the terms or provisions of this Interim Order and the DIP Term Sheet, the terms and provisions of this Interim Order shall govern and control.

43. **Headings.** All paragraph headings used in this Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

44. **Retention of Jurisdiction.** This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Term Sheet or this Interim Order.

45. **Final Hearing.** The final hearing (the "Final Hearing") on the Motion shall be held on [●] (prevailing Central Time) in the United States Bankruptcy Court for the Middle District of Alabama, Courtroom [●], One Church Street, Montgomery, AL 36104. Any objections or responses to entry of a final order on the Motion shall be filed on or before February [●], 2025, at 4:00 p.m. (prevailing Central Time) and served on the following parties: (a) the Debtors; (b) proposed attorneys for the Debtors, Burr & Forman, 420 North 20th Street, Suite 3400, Birmingham, AL 35203, Attn: Derek F. Meek (dmeek@burr.com) and [_____]; (c) attorneys for the DIP Lender, Kilpatrick Townsend & Stockton, LLP, 1100 Peachtree Street NE, Suite 2800, Atlanta, GA 30309, Attn: Paul M. Rosenblatt (prosenblatt@ktslaw.com) (and [_____]; (d) the Bankruptcy Administrator, Middle District of Alabama, One Church Street, Montgomery, AL 36104, Attn: Ms. Danielle K. Greco (danielle_greco@almba.uscourts.gov); and (e) counsel to any official committee appointed in these chapter 11 cases (collectively, the "Notice Parties"). In the event no objections to entry of a

56602386 v1

final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

46. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

47. Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

48. All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

# # # END OF ORDER # # #

Order drafted and submitted by:

**BURR & FORMAN LLP**

_____
Derek F. Meek
Marc P. Solomon
Burr & Forman LLP
420 20th Street North
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
dmeek@burr.com
msolomon@burr.com

*Proposed Counsel for Debtors and
Debtors-in-Possession*

**Exhibit 1 – DIP Term Sheet**

**Exhibit 2 – Initial DIP Budget**

56602386 v1

<u>Exhibit 1</u>

DIP Term Sheet

56602386 v1

**February 3, 2025**

**Jackson Hospital & Clinic, Inc.**
**$24,500,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order with respect to the DIP Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (as defined below), the terms of the Interim Order or the Final Order, as applicable, shall govern.**

| 1. | *Borrowers* | • Jackson Hospital & Clinic, Inc., an Alabama corporation, *et. al.*[1] (the "**Borrower**" and together with all of the Borrower's existing and future, direct or indirect domestic or foreign subsidiaries and affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", each a "**Loan Party**" and collectively, the "**Loan Parties**"). The Loan Parties are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**", and the Borrower and its applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the Middle District of Alabama (the "**Bankruptcy Court**") on or around February 3, 2025 (the actual date of commencement, the "**Petition Date**"). |
|---|---|---|
| 2. | *DIP Lender* | • Jackson Investment Group, LLC and/or its designees or its assignees. |
| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $24,500,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**").<br><br>• The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed.<br><br>• Initial net proceeds of the DIP Loans shall be funded in accordance with Budget.<br><br>• Subsequent DIP Loan proceeds to be funded into the Borrowers' DIP Bank Account maintained at Regions Bank and the Loan Parties shall |

---

[1] Additional borrowers are listed on **Schedule 1.**
US2008 31010073 4

1

| | | |
|---|---|---|
| | | obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 15 business days of the entry of the Final Order subject to a 15-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; provided that the Carve-Out (as defined below) shall be funded as described in the Interim Order. The Borrowers' shall permit only the DIP Loan proceeds to be maintained in the DIP Bank Account, segregated from all other funds and utilized only in accordance with the terms and conditions of the DIP Documents. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of $10,000,000 of the DIP Loans and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the "**Initial Draws**", the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). The closing of definitive DIP Documents shall occur as soon after the first Initial Draw as reasonably possible but in any event no later than two (2) business days prior to the hearing to consider entry of the Final Order. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order (as defined below) and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below).<br><br>• Each Draw shall be made (in an aggregate minimum amount of $500,000 (and multiples thereof) upon two (2) business days' written notice, up to the aggregate amount of the undrawn DIP Commitments at any time prior to two (2) business days before the DIP Termination Date (as defined below); provided that the first Initial Draw shall be in the amount of $10,000,000 and deemed requested in accordance with the terms of this Term Sheet, and funded within one (1) business day following the entry of the Interim Order and shall not require any further advance written notice but shall require a customary notice of borrowing. |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[2] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of: |

---

[2] For purposes hereof, the term "Payment in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall

2

|  |  | i. | July 31, 2025; |
| --- | --- | --- | --- |
|  |  | ii. | the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
|  |  | iii. | the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
|  |  | iv. | the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents; |
|  |  | v. | dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
|  |  | vi. | 45 days after the Petition Date (or such later date as agreed to by the DIP Lender) or as dictated by the availability of the Bankruptcy Court, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
|  |  | <ul><li>The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow the Draws and shall terminate any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.·</li><li>For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date.</li></ul> |
| 8. | *Interest Rate* |  | <ul><li>The DIP Loans shall bear interest at a per annum rate equal to 14% payable in cash on the first day of each month in arrears (the "**Non-Default Interest**").</li><li>Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at the per annum rate of 19%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears.</li></ul> |
| 9. | *Commitment Fee, Exit Fee and Other Fees* |  | <ul><li>The Borrowers shall pay to the DIP Lender a commitment fee equal to 4.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw.</li><li>The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 6.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry</li></ul> |

---

have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

3

Case 25-30256   Doc 10   Filed 02/04/25   Entered 02/04/25 01:21:54   Desc Main
Document      Page 88 of 116

|  |  | of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the Interim Order (the "**Exit Fee**"). The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP Obligations; <u>provided</u>, <u>however</u>, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |
|---|---|---|
|  |  | • The Commitment Fee and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, this Term Sheet shall automatically terminate and be of no further force and effect. |
| 10. | ***Use of Proceeds*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and 15% permitted variances as set forth below: |
|  |  |    i.    working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable if such subsidiaries are Loan Parties under the DIP Documents; |
|  |  |    ii.    professional fees and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; |
|  |  |    iii.    fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee and legal fees and expenses of the DIP Lender (including fees and expenses incurred prior to the Closing Date); and |
|  |  |    iv.    interest and other amounts payable under the DIP Facility. |
|  |  | • Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in the Chapter 11 Cases, or any trustee or examiner appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity: |
|  |  |    i.    in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation: |
|  |  |       a.    against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP |

4

| | | Liens (as defined below), or DIP Claims (as defined below); or |
|---|---|---|
| | | b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders (as defined below), the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;<br><br>ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, as applicable, each in accordance with the DIP Documents and the Interim Order or the Final Order, as applicable; <u>provided, however</u>, that this shall not apply to (x) objections to the Final Order and (y) any challenge to whether a DIP Termination Event has occurred and/or the propriety of the DIP Lender's termination of the DIP Commitments and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder;<br><br>iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or<br><br>iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | *Voluntary Prepayments* | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $1,000,000 of principal. |
| 12. | *Security* | • As security for the DIP Obligations, subject to the Carve-Out, each Loan Party shall grant to the DIP Lender a priming first lien security interest |

5

| | | |
|---|---|---|
| | | ("**Priming First Lien**") on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Loan Party and its estate, real (both leasehold and fee) or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables (including healthcare insurance receivables), chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties (including, without limitation, all right, title and interest in the real properties set forth on **Schedule 3**), all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all rights, title and interest in the "Blue Cross Blue Shield" settlement and any related recovery together with all books and records relating to the foregoing, all rights, title and interest in the "opioid settlement" and any related recovery together with all books and records relating to the foregoing, all governmental and private grants, all claims, rights, interests, proceeds, products, accessions, additions, improvements, substitutions, rents and profits, and books and records, of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of Georgia) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof (collectively, the "**DIP Collateral**"). <br><br> • Negative pledge on all assets of the Loan Parties subject to permitted liens to be agreed upon by the Final Order. <br><br> • In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, deposit account control agreements and leasehold mortgages) reasonably requested by DIP Lender. |
| 13. | *Priority and Security* | • Subject to the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be |

6

|     |          |   |
|-----|----------|---|
|     |          | entitled to (a) senior secured priming lien and (b) superpriority claim status pursuant to section 364(c)(1) and section 364(d)(1) of the Bankruptcy Code, with priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**"). <br><br> • Subject to the Carve-Out and the Permitted Prior Liens (as defined in **Schedule 2**), all DIP Obligations in respect of the DIP Facility shall be: <br><br>     i.    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and <br><br>    ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on the DIP Collateral; and <br><br>   iii.    senior secured priming first liens on the DIP Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code. <br><br> • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the Interim Order and Final Order, as applicable. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, leasehold mortgages or other agreements. |
| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the Chapter 11 Cases including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, including, without limitation: <br><br>     i.    declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; <br><br>    ii.    declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; <br><br>   iii.    charge interest at the default rate under the DIP Documents; <br><br>   iv.    declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the Orders); or |

7

| | | |
|---|---|---|
| | | v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the Orders. |
| 15 | *Conditions Precedent to Initial Draw* | • Subject to the availability of the Bankruptcy Court, entry of the Interim Order within 4 business days of the Petition Date, which order shall not be stayed or subject to appeal;<br><br>• Delivery of the Initial Budget acceptable to the DIP Lender in its reasonable discretion;<br><br>• All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet, the DIP Documents, or the Interim Order shall have been paid (<u>provided</u> that the Commitment Fee and the DIP Lender's legal fees and expenses shall be paid out of or offset against the proceeds of the Initial Draw);<br><br>• The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);<br><br>• No Material Adverse Effect (as defined below) shall have occurred and be continuing;<br><br>• The Debtors shall be in compliance in all respects with the Interim Order;<br><br>• No Event of Default shall have occurred and be continuing under this Term Sheet;<br><br>• No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order; and<br><br>• The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw. |
| 16. | *Conditions Precedent to Availability of Other Draws; Milestones* | • The Bankruptcy Court shall have entered a Final Order approving the DIP Facility not later than 45 days following the Petition Date, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the DIP Lender.<br><br>• In addition, the DIP Documents shall contain such conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:<br><br>    i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and |

Case 25-30256 Doc 10 Filed 02/04/25 Entered 02/04/25 01:21:54 Desc Main Document Page 93 of 116

| | | | otherwise in form and substance acceptable to the DIP Lender and the Loan Parties; |
| | | ii. | delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its reasonable discretion; |
| | | iii. | no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
| | | iv. | the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
| | | v. | the Borrowers shall have delivered to the DIP Lender a customary borrowing notice; |
| | | vi. | the Debtors shall be in compliance in all respects with the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
| | | vii. | no default or event of default shall have occurred and be continuing under the DIP Documents; |
| | | viii. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order or the Final Order, as applicable; |
| | | ix. | since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
| | | x. | the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured; |

9

|   |   |   |
|---|---|---|
|  |  | <ul><li>xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due; and</li><li>xii. a granting to the DIP Lender of a Priming First Lien for all DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code.</li></ul><ul><li>The DIP Documents shall contain the following milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default:<ul><li>(i) Within 45 days after the Petition Date, the Debtors shall have filed a motion seeking an order the form and substance of which shall be reasonably satisfactory to the DIP Lender governing the solicitation of bids for the purchase (and an auction) of substantially all assets of the Debtors;</li><li>(ii) Within 75 days after the Petition Date, the Bankruptcy Court shall have entered the order sought in (i) above.</li><li>(i) within 120 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the sale of substantially all of the Debtors' assets.</li></ul></li></ul> |
| 17. | *Documentation* | • The DIP Documents and all other definitive financing documentation (including the Orders) with respect to the DIP Facility shall be satisfactory to the DIP Lender in its sole discretion. For the avoidance of doubt, DIP Documents (other than this Term Sheet and the Interim Order) shall be documented prior to entry of the Final Order. |
| 18. | *Representations and Warranties* | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility.<br><br>• Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date except for liens set forth on Schedule 2 attached hereto and no Loan Party will grant or consent to liens, security interests or encumbrances on or after the Petition Date except to the extent expressly permitted by the DIP Documents. |
| 19. | *Affirmative Covenants* | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers. |

10

| | | |
|---|---|---|
| 20. | *Negative Covenants* | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers; <u>provided</u> that the DIP Documents will permit: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and reasonably acceptable to the DIP Lender. |
| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**").<br><br>• The Budget shall be updated and provided to the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within 5 business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, (ii) to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five business day period, such Updated Budget shall become effective as the Budget.<br><br>• On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Variance (as defined below) solely with respect to net operating cash flow that exceeds 15% shall be material and shall constitute an Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the |

11

| | | |
|---|---|---|
| | | avoidance of doubt, net operating cash flow shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases. |
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative 4-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15% for budget variances with respect to the Net Operating Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Variance calculation. |
| 22. | *Interim Order* | • The interim order approving the DIP Facility, which shall be in form and substance acceptable to the DIP Lender and its counsel (the "**Interim Order**"), shall, among other things, authorize and approve:<br><br>i. the Initial Draws;<br><br>ii. the making of the DIP Loans;<br><br>iii. the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br><br>iv. the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described herein under the heading "Indemnification and Reimbursement of Expenses" by the Debtors;<br><br>v. the payment of the Commitment Fee upon the Closing Date and the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Commitment Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order; and<br><br>vi. upon entry of the Final Order, the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | *Final Order* | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order) and otherwise in |

Case 25-30256   Doc 10   Filed 02/04/25   Entered 02/04/25 01:21:54   Desc Main
Document     Page 97 of 116

| | | |
|---|---|---|
| | | form and substance reasonably acceptable to the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, the total amount of the DIP Commitments, and the payment of the Exit Fee, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order. |
| 24. | *Carve-Out* | • The liens and security interests in the DIP Collateral, and the superpriority administrative claims shall be subject in all respects to the Carve-Out, which shall be defined in the Orders and shall be on customary terms.<br><br>• The Carve-Out will include a covenant requiring the funding of a weekly segregated escrow account for professional fees (including earned transaction fees), with separate accounts for professional fees of the Debtors' professionals and Committee professionals. |
| 25. | *Events of Default* | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type and acceptable to the DIP Lender in its sole discretion, including, without limitation:<br><br>  i.  Non-payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature;<br><br>  ii.  the entry of the Final Order shall have not occurred, subject to the availability of the Bankruptcy Court, within 45 days after the Petition Date;<br><br>  iii.  the failure of the Loan Parties to comply with any of the Milestones and the DIP Lender has not, in its sole discretion, extended such Milestone;<br><br>  iv.  the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;<br><br>  v.  non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the Interim Order or the Final Order;<br><br>  vi.  the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case without the prior written consent of the DIP Lender;<br><br>  vii.  the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee |

13

|  |  |  | examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion; |
|  |  | viii. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties, the fair market value of which, individually or in the aggregate, exceeds $500,000; |
|  |  | ix. | the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens and priority in the DIP Collateral as set forth in this Term Sheet; |
|  |  | x. | any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
|  |  | xi. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations; |
|  |  | xii. | the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender; |
|  |  | xiii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
|  |  | xiv. | the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) |

14

|  |  | challenge the validity and enforceability of the DIP Liens, or (c) contest any material provision of any DIP Document; |
|---|---|---|
|  |  | xv. the Debtors file a Plan that is not in form and substance satisfactory to the DIP Lender in its sole discretion, it being understood that a Plan will be satisfactory to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender to lend from a recognized lender or another source of funding sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations on the Plan effective date; |
|  |  | xvi. the Debtors file a motion seeking to settle a controversy or claim on account of the DIP Collateral without the prior written consent of the DIP Lender; |
|  |  | xvii. the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion; or |
|  |  | xviii. the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet. |
| 26. | *Indemnification and Reimbursement of Expenses* | • The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. <br><br> • Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP and [_____] as counsel to the DIP Lender, and Resurgence Financial Services, LLC, as financial advisor to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 27. | *Release* | • The Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| 28. | *Waivers* | • The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit- |

15

| | | bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
|---|---|---|
| 29. | *Press Releases* | • Neither party shall issue a press release that mentions the other party's name (or its representatives, affiliates or related parties' names) without first obtaining that party's written consent. |
| 30. | *Governing Law* | • Georgia (and to the extent applicable, the Bankruptcy Code). |

Case 25-30256   Doc 10   Filed 02/04/25   Entered 02/04/25 01:21:54   Desc Main
Document     Page 101 of 116

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

Jackson Hospital & Clinic, Inc., as a Borrower

By: _____
      Name: Allen Wilen
      Title: Chief Restructuring Officer

Jackson Investment Group, LLC., as DIP Lender

By: _____
      Name:
      Title:

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

Jackson Hospital & Clinic, Inc., as a Borrower

By: _____
    Name:
    Title:

Jackson Investment Group, LLC., as DIP Lender

By: _____
    Name: Richard L. Jackson
    Title: CEO

*[Signature Page to Term Sheet]*

# Schedule 1 – Borrowers

| Borrower/Debtor | State of Organization |
|---|---|
| Jackson Hospital and Clinic, Inc. | Alabama |
| JHC Pharmacy, LLC | Alabama |

## Schedule 2 – Petition Date Liens

As of the Petition Date, the Debtors' rights and interests in their respective properties and assets are subject to the liens evidenced, secured or perfected by the instruments listed below. The inclusion of any lien, claim, encumbrance, agreement or other instrument in this Schedule shall not be deemed an admission of the validity, perfection, or priority thereof, or the amount secured thereby. For purposes of this Schedule 2:

**Parties:**

"JHC" means Jackson Hospital & Clinic, Inc.
"MCB" means the Medical Clinic Board of the City of Montgomery, Alabama
"UMB" means UMB Bank, N.A.
"SF" means ServisFirst Bank

**Real Properties:**

"MTI Property" means the hospital buildings, medical office buildings, administrative office buildings, parking decks and other real property and facilities comprising the campus of Jackson Hospital.

"Hospital Buildings" means certain medical office and administrative buildings located on the campus of Jackson Hospital comprised of (i) the 1801 Pine Street Building, (ii) the Park Place Building, and (iii) the Goode Building.

"Parking Lot" means the parking lot located at the southwest corner of Mulberry Street and Park Place, on the campus of Jackson Hospital.

"Taylor Road" means approximately 29.33 acres of vacant land located on Taylor Road in Montgomery, Alabama.

A.  **Mortgages recorded in the Office of the Judge of Probate of Montgomery County, Alabama (the "Probate Office"):**

1.  Mortgage and Security Agreement dated as of December 1, 2015, by MCB and JHC in favor of UMB (as Master Trustee) relating to $84,195,000 Direct Debt Obligation, Series 2015, of JHC (the "MTI Debt"), recorded in the Probate Office in RLPY Book 4789, at Page 123, encumbering the MTI Property (the "UMBMT Accommodation First Mortgage - MTI").

2.  Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC recorded in the Probate Office in REAL Book 6215, at Page 201, encumbering the Taylor Road property, in Pari Passu with the SF PP First Mortgage – Taylor Road (the "UMBCA PP First Mortgage – Taylor Road").

3. Mortgage, Assignment of Rents and Security Agreement dated as of September 30, 2024, by JHC in favor of SF securing a $3,500,00 loan recorded in the Probate Office in REAL Book 6198, at Page 631, encumbering the Taylor Road property, in Pari Passu with the UMBCA PP First Mortgage – Taylor Road (the "SF PP First Mortgage – Taylor Road").

4. Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 30, 2024, by JHC in favor of UMB (as Master Trustee) as additional security for the MTI Debt, recorded in the Probate Office in REAL Book 6198, at Page 678, encumbering the Taylor Road property (the "UMBMT Second Mortgage – Taylor Road").

5. Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by MCB and JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC recorded in the Probate Office in REAL Book 6215, at Page 178, encumbering the Hospital Buildings, in Pari Passu with the SF PP First Mortgage – Hospital Buildings, as amended by that certain Amendment to Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as of January 7, 2025 recorded in the Probate Office in REAL Book 6247, at Page 400 (the January Amendment to UMBCA PP Accommodation First Mortgage – Hospital Buildings and Parking Lot") (as so amended, the "UMBCA PP Accommodation First Mortgage – Hospital Buildings and Parking Lot").

6. Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of September 30, 2024 by MCB and JHC in favor of SF securing a $3,500,000 loan and a $12,000,000 loan, recorded in the Probate Office in REAL Book 6198, at Page 654, encumbering the Hospital Buildings (the "SF PP Accommodation First Mortgage – Hospital Buildings"), as amended by that certain Amendment to Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of November 4, 2024 recorded in the Probate Office in REAL Book 6217, at Page 8, in Pari Passu with the UMBCA PP First Mortgage- Hospital Buildings (as amended, the "SF PP Accommodation First Mortgage – Hospital Buildings and Parking Lot").

7. Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of September 30, 2024, by MCB and JHC in favor of UMB (as Master Trustee) as additional security for the MTI Debt, recorded in the Probate Office in REAL Book 6198, at Page 696, encumbering the Hospital Buildings (the "UMBMT PP Accommodation Second Mortgage – Hospital Buildings").

8. Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by MCB and JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC, recorded in the Probate Office in REAL Book 6215, at Page 220, encumbering the MTI Property, in Pari Passu with the SF Second Mortgage – MTI, as amended by that certain Amendment to Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of January 7, 2025 recorded in the Probate Office in REAL Book 6247,

at Page 392 (the "January Amendment to UMBCA Accommodation Second Mortgage – MTI") (the "UMBCA PP Accommodation Second Mortgage – MTI").

9. Second Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as November 4, 2024, from MCB and JHC in favor or SF securing the $3,5000,000 loan and the $12,000,000 loan, recorded in the Probate Office in REAL Book 6217, at Page 13, encumbering the MTI Property, in Pari Passu with the UMBCA PP Second Mortgage – MTI (the "SF PP Accommodation Second Mortgage – MTI").

10. Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024 by MCB and JHC in favor of UMB (as Master Trustee) relating to the MTI Debt, recorded in the Probate Office in REAL Book 6215, at Page 246, encumbering the Parking Lot, in Pari Passu with the SF Second Mortgage – MTI (the "UMBMT Accommodation Second Mortgage – Parking Lot").

**B.** **UCC Fixture Filings recorded in the Probate Office:**

1. UCC Number 377048 listing JHC as debtor and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3511, with respect to the Taylor Road property.

2. UCC Number 377050 listing JHC as debtor and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3520, with respect to the Taylor Road property.

3. UCC Number 376731 listing JHC as debtor and SF as secured party, recorded October 10, 2024, in the Probate Office in UCC Book 2024, at Page 2763, with respect to the Hospital Buildings.

4. UCC Number 377047 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3505, with respect to the Hospital Buildings and the Parking Lot.

5. UCC Number 376732 listing JHC as debtor and UMB as secured party, recorded October 10, 2024, in the Probate Office in UCC Book 2024, at Page 2771, with respect to the Hospital Buildings.

6. UCC Number 377046 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3497, with respect to the MTI Property.

7. UCC Number 377049 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3515, with respect to the Parking Lot.

**C.**     <u>**UCC Personal Property Financing Statements**</u>

See Schedule 2-A attached hereto and made a part hereof.

**D.**     <u>**Permitted Prior Liens**</u>

None.

## <u>Schedule 2-A - UCC Personal Property Financing Statements</u>

See Attached

**JACKSON HOSPITAL & CLINIC, INC.**

| | | | | | |
|---|---|---|---|---|---|
| | | JACKSON HOSPITAL & CLINIC, INC. - ALABAMA | | | |
| UCC # | UCC File Date | Debtor Name | Secured Party | Collateral | Comments |
| 12-0631353 | 12/5/2012 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama | OptumHealth Bank, Inc. | Equiment in Omnicell Invoice Nos. 90156724 & 90156725 | Lapsed?  CS - 10/24/22, but no intervening CS |
| 12-0631360 | 12/5/2012 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama | OptumHealth Bank, Inc. | Equiment in Omnicell Invoice Nos. 90156726 & 90156727 | Lapsed?  CS - 10/24/22, but no intervening CS |
| 14-7334613 | 5/6/2014 | Jackson Hospital & Clinic, Inc. | Dell Financial Services L.L.C. | Leased computer equipment | CS - 04/04/19 & 3/27/24 |
| 17-7597565 | 11/30/2017 | Jackson Hospital & Clinic, Inc. | AmerisourceBergen Drug Corporation | All of Debtor's personal property, including Accounts, Inventory, Equipment, and General Intangibles | CS - 8/17/22 |
| 19-7344392 | 7/12/2019 | Jackson Hospital & Clinic, Inc. | ServisFirst Bank | All pledged revenues, mortgaged property, and other collateral as provided in the A&R Master Trust Indenture dated 12/1/15, as amended by Series 2019 Supplemental Indenture dated 7/12/19 | CS - 2/14/24 |
| 19-7463299 | 9/12/2019 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama; Jackson Surgery Center, LLC | Regions Bank | Properties and Interests in Schedule I, which are covered by the Accommodation Mortgage, Assignment of Leases and Security Agreement dated 9/11/19 | CS - 3/18/24 |
| 19-7463315 | 9/12/2019 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama; Jackson Imaging Center, LLC | Regions Bank | Properties and Interests in Schedule I, which are covered by the Accommodation Mortgage, Assignment of Leases and Security Agreement dated 9/11/19 | CS - 8/2/24 |
| 19-7567643 | 11/15/2019 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales Corporation | All equipment financed or leased by SP under Short Form Lease Agmt No. 0110056670 | CS - 10/22/24 |
| 20-0126780 | 3/13/2020 | Jackson Hospital & Clinic, Inc. | De Lage Landen Public Finance LLC | All equipment financed or leased by SP under Contract No. 100-10250966 | |
| 20-7009842 | 1/8/2020 | Jackson Hospital & Clinic, Inc. | Globus Medical North America, Inc. | Exhibit A (Various Globus Equipment) | AMD - 12/4/24 - Restate Collateral as Excelsius GPS & related instrumentation |
| 20-7851494 | 12/22/2020 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales Corporation | All equipment financed or leased by SP under Equipment Schedule 001 to MLA 2110120003 | |
| 21-0203579 | 5/3/2021 | Jackson Hospital & Clinic, Inc. | Leasing Associates of Barrington, Inc. | Specific equipment under Agreement No. 14286000 dated 12/21/20 | ASS - 8/31/21 - Assigned to Wintrust Asset Finance Inc. |
| 21-7078882 | 2/22/2021 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales, LLC | All equipment financed or leased by SP under Equipment Schedule 003 to MLA 2110120003 | |
| 21-7292782 | 5/25/2021 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | Regions Bank | Exhibit A & B (various personal property, including accounts and goods, located, situated, or affixed on or used in connection with the EX. B real property ) | TS - 12/27/24 |
| 22-0084078 | 2/22/2022 | Jackson Hospital & Clinic, Inc. | Olympus America Inc. | Equipment Listing; Master Agreement No. 0012129, Schedule 010 | |
| 22-7425924 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40431 | |
| 22-7425947 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40472 | |

| | | | | | |
|---|---|---|---|---|---|
| 22-7425953 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40487 | |
| 22-7425976 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40389 | |
| 22-7426040 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40435 | |
| 22-7426056 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40486 | |
| 22-7426062 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40476 | |
| 22-7426079 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40481 | |
| 22-7426085 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40461 | |
| 22-7426091 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40473 | |
| 22-7426101 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40418 | |
| 22-7426147 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40375 | |
| 22-7426153 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40465 | |
| 22-7426176 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900289 | |
| 22-7426182 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900448 | |
| 22-7426199 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900225 | |
| 22-7426221 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900421 | |
| 22-7426244 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900326 | |
| 22-7426273 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900314 | |
| 22-7426280 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900148 | |
| 22-7426306 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900490 | |
| 22-7426335 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900061 | |
| 22-7426341 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900300 | |
| 22-7426358 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900486 | |
| 22-7426364 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900322 | |
| 22-7426387 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900360 | |
| 22-7543874 | 9/14/2022 | Jackson Hospital & Clinic, Inc. | Sysmex America, Inc. | Leased equipment under Lease Agreement No. 51029257 dated 5/13/22 | |
| 22--7708561 | 12/13/2022 | Jackson Hospital & Clinic, Inc. | LEAF Capital Funding LLC | Sophos Licensing | |
| 23-7046679 | 2/3/2023 | Jackson Hospital & Clinic, Inc. | Xerox Financial Services | One - New Xerox MULTIPLE OTHERS 192529 | |
| 24-0397113 | 11/6/2024 | Jackson Hospital & Clinic, Inc. | UMB Bank, N.A., as Collateral Agent | All assets | |
| 24-0397120 | 11/6/2024 | Jackson Hospital & Clinic, Inc. | UMB Bank, N.A., as Collateral Agent | All assets | |
| 24-7087286 | 2/28/2024 | Jackson Hospital & Clinic, Inc. | Spinal Elements, Inc. | All inventory of products, cash, cash equivalents, all accounts, including all operating accounts, depository accounts, and all property contained therein | |
| 24-7100210 | 3/6/2024 | Jackson Hospital & Clinic, Inc. | Baycap LLC | Schaerer Coffee Art, S/N 24A0081753; NCP Optional 9 Month PM; Softener SEB Initial | |

| File Number | Date | Debtor | Secured Party | Collateral Description | Notes |
|---|---|---|---|---|---|
| 24-7140568 | 3/27/2024 | Jackson Hospital & Clinic, Inc. | Premier Imaging Medical Systems | Two (2) Insight Enhanced GE Legacy System SN: EN-5052-03 & SN: EN-5054-03 and any and all other equipment acquired with the proceeds of the Loan | |
| 24-7314280 | 6/13/2024 | Jackson Hospital & Clinic, Inc. | Regions Bank, as Master Trustee | Exhibit A ("Pledged Revenues") | |
| 24-7429659 | 8/5/2024 | Jackson Hospital & Clinic, Inc. | Med One Capital Funding, LLC | 10 Alaris System PCA Modules - 8120; 10 Guardrails Pontr-of-Care Software for PCA Modules | |
| 24-7497573 | 9/6/2024 | Jackson Hospital & Clinic | Intuitive Surgical, Inc. | 1 da Vinci Xi Surgical System with Single Console FireFly Fluorescence Imaging Enabled; 1 da Vinci Xi Integrated Table Motion upgrade | |
| 24-7558451 | 10/9/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | ServisFirst Bank | Exhibits A, B, and C (Project Site and Improvements, Leasehold Estate and Options, Personal Propery and Fixtures, Condemnation Awards and Insurance Proceeds, Leases and Rents, Funds, and Others - The Medical Buildings) | |
| 24-7558468 | 10/9/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | UMB Bank, N.A. | Exhibits A & B (personal property and fixtures related to the Medical Buildings) | |
| 24-7619489 | 11/13/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | ServisFirst Bank | Exhibits A (Project Site and Improvements, Leasehold Estate and Options, Personal Propery and Fixtures, Condemnation Awards and Insurance Proceeds, Leases and Rents, Funds, and Others - 12 Parcels) | AMD - 11/13/24 - Added to Real Property description |
| 25-7005521 | 1/3/2025 | Jackson Hospital & Clinic, Inc. | Capta Health Partners, LLC | Lien descried in Master Services Agreement dated April 10, 2024 | |

## Schedule 3 – Real Property

See Attached

| Parcel Number | Owner Name | Property Address | Type | Sq ft. | Tax Appraisal Value | Notes |
|---|---|---|---|---|---|---|
| 09092910089494000 | JACKSON HOSPITAL AND CLINIC INC | TAYLOR RD | VACANT | 1,276,308 | $ 4,395,080 | Encumbered ["Taylor Road"] |
| 09092910080006000 | JACKSON HOSPITAL AND CLINIC INC | HALCYON PARK DR | VACANT | 13,068 | 104,500 | Encumbered ["Taylor Road"] |
| 10041710480005000 | JACKSON HOSPITAL AND CLINIC INC | 2117 CHESTNUT ST | VACANT | 8,732 | 30,600 | Unencumbered. |
| 10041710490012000 | JACKSON HOSPITAL AND CLINIC INC | 2019 CHESTNUT ST | VACANT | 7,500 | 11,300 | Unencumbered. |
| 10041710490013000 | JACKSON HOSPITAL AND CLINIC INC | 2023 CHESTNUT ST | VACANT | 7,500 | 11,300 | Unencumbered. |
| 10041720220022000 | JACKSON HOSPITAL AND CLINIC INC | 1812 LAKE ST | VACANT | | 8,500 | Unencumbered. |
| 10041720220023000 | JACKSON HOSPITAL AND CLINIC INC | 1800 LAKE ST | BUILDING | 8,450 | 172,600 | Unencumbered. |
| 10041730030001000 | JACKSON HOSPITAL AND CLINIC INC | FOREST AVE | PARKING LOT | 9,900 | 203,300 | Unencumbered. |
| 10041730030002000 | JACKSON HOSPITAL AND CLINIC INC | 1620 GLENN PALMER AVE | PARKING LOT | 14,433 | 115,500 | Unencumbered. |
| 10041730030003000 | JACKSON HOSPITAL AND CLINIC INC | GLENN PALMER AVE | PARKING LOT | 5,500 | 37,700 | Unencumbered. |
| 10041730030004000 | JACKSON HOSPITAL AND CLINIC INC | GLENN PALMER AVE | PARKING LOT | 12,763 | 86,800 | Unencumbered. |
| 10041710360002000 | JACKSON HOSPITAL AND CLINIC INC | 1115 MULBERRY ST | PARKING LOT | 7,500 | 37,500 | Unencumbered. |
| 10041710360004000 | JACKSON HOSPITAL AND CLINIC INC | 1127 MULBERRY ST | PARKING LOT | 7,500 | 37,500 | Unencumbered. |
| 10041740040008000 | JACKSON HOSPITAL AND CLINIC INC | 2024 CHESTNUT ST | BUILDING | 7288 | 586,500 | Unencumbered. |
| 10041730030005000 | JACKSON HOSPITAL AND CLINIC INC | FOREST AVE | VACANT | 2,970 | 23,800 | Unencumbered. |
| 10041720080010000 | JACKSON HOSPITAL AND CLINIC INC | 724 PUTNAM ST | VACANT | | 8,000 | Unencumbered. |
| 10041740040008001 | JACKSON HOSPITAL AND CLINIC INC | 2030 CHESTNUT ST | BUILDING | 5,068 | 290,500 | Unencumbered. |
| 10083440801038007 | JACKSON HOSPITAL AND CLINIC INC | 3228 MEADOW WALK LN | BUILDING | | 106,600 | Unencumbered. |
| 10041710100007000 | JACKSON HOSPITAL AND CLINIC INC | 2107 HIGHLAND AV | VACANT | | 8,000 | Unencumbered. |
| 09092910080006001 | JACKSON HOSPITAL AND CLINIC INC | 7150 HALCYON PARK DR | BUILDING | 94,960.00 | 3,215,080 | SOLD |
| 10041710360093000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1121 MULBERRY ST | PARKING LOT | 7,500.00 | 203,600 | Unencumbered. |
| 10041710360005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 2019 POPLAR ST | PARKING LOT | 7,500.00 | 11,300 | Unencumbered. |
| 10041710360006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 2023 POPLAR ST | PARKING LOT | 7,470 | 11,200 | Unencumbered. |
| 10041710490009000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1223 MULBERRY ST | PARKING LOT | 7,500 | 54,700 | Unencumbered. |
| 10041710491010000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1227 MULBERRY ST | PARKING LOT | 7,500 | 54,700 | Unencumbered. |
| 10041720170004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 821 FOREST AVE | VACANT | 29,904 | 179,400 | Unencumbered. |
| 10041720200001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1872 CHERRY ST | HELIPAD | 20,625 | 82,500 | Unencumbered. |
| 10041720210002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1825 PARK PL | BUILDING | 77,101 | 308,400 | JIC, encumbered. |
| 10041720210007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1833 PARK PL | VACANT | 11,525 | 57,600 | Unencumbered. |
| 10041720220011000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1818 LAKE ST | VACANT | | 9,900 | Unencumbered. |
| 10041720220004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 909 OLIVE ST | VACANT | | 3,900 | Unencumbered. |
| 10041720220005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 915 OLIVE ST | BUILDING | | 5,800 | Unencumbered. |
| 10041720220006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 921 OLIVE ST | BUILDING | | 10,700 | Unencumbered. |
| 10041720220007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 920 HAMPTON ST | VACANT | 8229 | 41,400 | Unencumbered. |
| 10041720220008000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1714 LAKE ST | VACANT | 13,620.00 | 81,700 | Unencumbered. |
| 10041720230044000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 926 OLIVE ST | VACANT | 7,258 | 50,800 | Unencumbered. |
| 10041720250001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | FOREST AVE | PARKING LOT | | 198,600 | Unencumbered. |
| 10041720260011000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1725 PARK PL | BUILDING | 95,832.00 | 3,383,700 | JSC, encumbered. |
| 10041720270010000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1110 MULBERRY ST | PARKING LOT | 62,478.00 | 462,800 | Encumbered ["Parking Lot"] |
| 10041720270014000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1801 HOLLY ST | PARKING LOT | | 24,300 | Encumbered ["Parking Lot"] |
| 10041720270005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1805 HOLLY ST | PARKING LOT | | 24,300 | Encumbered ["Parking Lot"] |
| 10041720270006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1809 HOLLY ST | PARKING LOT | | 34,100 | Encumbered ["Parking Lot"] |
| 10041720270007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1813 HOLLY ST | PARKING LOT | 8,250.00 | 34,100 | Encumbered ["Parking Lot"] |
| 10041720280011000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1138 MULBERRY ST | PARKING LOT | | 82,500 | Encumbered ["Parking Lot"] |
| 10041720280081000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1111 OLIVE ST | BUILDING | | 6,960,400 | Encumbered ["Park Place Building"] |
| 10041720280003000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1750 PARK PL | BUILDING | | 55,300 | Encumbered ["1801 Pine Street Building"] Jackson Clinic building |
| 10041720280005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1755 HOLLY ST | PARKING LOT | | 48,100 | Encumbered ["Park Place Building"] |
| 10041720280007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1763 HOLLY ST | PARKING LOT | | 47,200 | Encumbered ["Park Place Building"] |
| 10041720280081000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1767 HOLLY ST | PARKING LOT | 9,750.00 | 121,700 | Encumbered ["Park Place Building"] |
| 10041720290001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1716 PARK PL | BUILDING and PARKING LOT | 70,074.00 | 482,100 | Encumbered by the mortgage securing the bonds |
| 10041720290002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1704 PARK PL | PARKING LOT | | 128,500 | Encumbered by the mortgage securing the bonds. |
| 10041720300001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1235 FOREST AVE | BUILDING | | 15,918,100 | Encumbered by the mortgage securing the bonds. |
| 10041720310001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1725 PINE ST | BUILDING | | 237,500 | Encumbered by the mortgage securing the bonds. |
| 10041720320001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1202 MULBERRY ST | PARKING LOT | | 48,800 | Encumbered ["1801 Pine Street Building"] |
| 10041720320002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | PINE ST | BUILDING | | 5,360,400 | Encumbered ["1801 Pine Street Building"] Jackson Clinic building |
| 10041730020007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1710 PINE ST | BUILDING | | 6,292,200 | Hospital Parking Deck, encumbered by the mortgage securing the bonds |
| 10041730020008000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | FOREST AVE | BUILDING | | 31,893,400 | Encumbered. [Includes the "Goode Building." Balance encumbered by the mortgage securing the bonds.] |
| 10041730020089001 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1301 FOREST AVE | BUILDING | | 937,800 | Encumbered by the mortgage securing the bonds. |
| 10041730020089009 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1301 MULBERRY ST | BUILDING | 6,911 | 764,400 | Encumbered by the mortgage securing the bonds. |
| 10041740040013000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1301 MULBERRY ST | BUILDING | | 986,400 | Unencumbered |
| | | | | | $ 85,185,700 | |
| | | | | | $ 21,624,200 | Unencumbered Total Not Including Goode Building |

Exhibit 2

Initial DIP Budget

56602386 v1

Case 25-30256    Doc 10    Filed 02/04/25    Entered 02/04/25 01:21:54    Desc Main Document    Page 116 of 116

**Jackson Hospital & Clinic, Inc.**
*Projected Weekly Cash Flow Forecast (as of 2/3/2025)*

DRAFT ATTORNEY CLIENT PRIVILEGE
SUBJECT TO REVIEW

| | Post Filing | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | Forecast |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | Total |
| Week Beg. | 02/04/2025 | 02/09/2025 | 02/16/2025 | 02/23/2025 | 03/02/2025 | 03/09/2025 | 03/16/2025 | 03/23/2025 | 03/30/2025 | 04/06/2025 | 04/13/2025 | 04/20/2025 | 04/27/2025 | | Weeks 1 - 13 |
| Week Ending | 02/08/2025 | 02/15/2025 | 02/22/2025 | 03/01/2025 | 03/08/2025 | 03/15/2025 | 03/22/2025 | 03/29/2025 | 04/05/2025 | 04/12/2025 | 04/19/2025 | 04/26/2025 | 05/03/2025 | | |

| RECEIPTS | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | | |
| Deposits | $ 3,400,000 | $ 4,150,000 | $ 4,450,000 | $ 4,450,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | $ 4,150,000 | | $ 53,800,000 |
| UPL Funding | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| Surgery Center Dividends | - | - | - | - | - | - | - | 1,000,000 | - | - | - | - | - | | 1,000,000 |
| Revenue Enhancements | 550,870 | 550,870 | 550,870 | 629,562 | 629,562 | 629,562 | 629,562 | 629,562 | 805,938 | 805,938 | 805,938 | 805,938 | 569,850 | | 8,594,020 |
| Total Receipts | $ 3,950,870 | $ 4,700,870 | $ 5,000,870 | $ 5,079,562 | $ 4,779,562 | $ 4,779,562 | $ 4,779,562 | $ 5,779,562 | $ 4,955,938 | $ 4,955,938 | $ 4,955,938 | $ 4,955,938 | $ 4,719,850 | | $ 63,394,020 |

| DISBURSEMENTS | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| AP Spending | $ (1,700,000) | $ (1,700,000) | $ (1,900,000) | $ (1,700,000) | $ (1,700,000) | $ (1,700,000) | $ (1,900,000) | $ (1,700,000) | $ (1,700,000) | $ (1,700,000) | $ (1,700,000) | $ (1,900,000) | $ (1,700,000) | | (22,700,000) |
| Critical Vendors | - | - | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | - | - | - | | (2,000,000) |
| Utilities | (400,000) | - | (750,000) | - | (400,000) | - | - | - | (400,000) | - | - | - | (400,000) | | (2,350,000) |
| Salaries, Wages, and Payroll Taxes | (7,293,478) | (1,257,938) | (4,142,153) | (1,257,938) | (4,683,099) | (1,257,938) | (4,142,153) | - | (5,941,037) | - | (5,400,091) | - | (8,010,469) | | (43,386,293) |
| Surgery Center Payroll Reimbursement | 150,000 | - | 150,000 | - | 150,000 | - | 150,000 | - | 150,000 | - | 150,000 | - | 150,000 | | 1,050,000 |
| Imaging Center Payroll | - | (65,000) | - | (65,000) | - | (65,000) | - | (65,000) | - | (65,000) | - | (65,000) | - | | (390,000) |
| Payroll Reductions | 114,742 | 114,742 | 114,742 | 138,004 | 138,004 | 138,004 | 138,004 | 138,004 | 177,505 | 177,505 | 177,505 | 177,505 | 150,004 | | 1,894,273 |
| Payroll Tax Reductions | 43,760 | 43,760 | 43,760 | 52,631 | 52,631 | 52,631 | 52,631 | 52,631 | 67,696 | 67,696 | 67,696 | 67,696 | 57,208 | | 722,426 |
| Retirement Withholdings | (148,000) | - | (148,000) | - | (148,000) | - | (148,000) | - | (148,000) | - | (148,000) | - | (148,000) | | (1,036,000) |
| Program Payroll Deductions | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| BCBS Health Insurance | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | (167,300) | | (2,174,900) |
| Imaging Center Expenses | - | - | (80,280) | (36,000) | - | - | (80,280) | - | (36,000) | - | - | (80,280) | (36,000) | | (348,840) |
| Patient Refunds | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| IT Licensing | - | - | - | (18,655) | - | - | - | (18,655) | - | - | - | (18,655) | - | | (55,964) |
| Insurance | (830,422) | (1,977) | (121,460) | (177,172) | - | (1,977) | (121,460) | - | (110,314) | - | (5,532) | (121,460) | (874,532) | | (2,366,307) |
| Revenue Cycle Vendors | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | | (507,000) |
| Food Services | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | | (975,000) |
| Sales Tax | (383,370) | (63,000) | - | - | - | (63,000) | - | - | - | - | (63,000) | - | - | | (572,370) |
| Contingency Fund | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | | (1,625,000) |
| Other Expense Reductions | 114,063 | 114,063 | 114,063 | 254,583 | 254,583 | 254,583 | 254,583 | 254,583 | 336,458 | 336,458 | 336,458 | 336,458 | 269,167 | | 3,230,104 |
| Total Operating Disbursements | $ (10,739,006) | $ (3,221,650) | $ (7,375,629) | $ (3,465,845) | $ (6,992,181) | $ (3,298,996) | $ (6,452,975) | $ (1,994,736) | $ (8,259,992) | $ (1,839,641) | $ (6,991,263) | $ (2,010,035) | $ (10,948,923) | | (73,590,871) |

| Cash Flow from Operations | $ (6,788,136) | $ 1,479,219 | $ (2,374,759) | $ 1,613,717 | $ (2,212,618) | $ 1,480,566 | $ (1,673,412) | $ 3,784,826 | $ (3,304,054) | $ 3,116,297 | $ (2,035,326) | $ 2,945,902 | $ (6,229,073) | | $ (10,196,851) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Non-Operating Receipts | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Liquidation of Investment Funds | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| Total Non-Operating Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |

| Non-Operating Disbursements / Restructuring Costs | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CRO/CEO - EisnerAmper | $ - | $ - | $ - | (600,000) | $ - | $ - | $ - | (600,000) | $ - | $ - | $ - | $ - | (600,000) | | $ (1,800,000) |
| Professional Fees - Debtor | - | - | - | (760,000) | - | - | - | (760,000) | - | - | - | - | (760,000) | | (2,280,000) |
| Professional Fees - DIP Lender | (500,000) | - | - | (200,000) | - | - | - | (200,000) | - | - | - | - | (200,000) | | (1,100,000) |
| Professional Fees - UCC | - | - | - | (50,000) | - | - | - | (50,000) | - | - | - | - | (50,000) | | (150,000) |
| DIP Commitment Fee | (980,000) | - | - | - | - | - | - | - | - | - | - | - | - | | (980,000) |
| Bankruptcy Administrator | - | - | - | - | - | - | - | (50,000) | - | - | - | - | (250,000) | | (250,000) |
| Investment Banker Fees | - | - | - | (50,000) | - | - | - | (50,000) | - | - | - | - | (50,000) | | (150,000) |
| Claims Agent | - | - | - | (75,000) | - | - | - | (75,000) | - | - | - | - | (75,000) | | (225,000) |
| Patient Care Ombudsman | - | - | - | (25,000) | - | - | - | (25,000) | - | - | - | - | (25,000) | | (75,000) |
| Extraordinary Capital Expenditures | - | - | - | - | - | - | (1,250,000) | - | - | - | - | - | - | | (1,250,000) |
| Estimated Debt Service | - | - | - | (116,295) | - | - | - | - | (175,919) | - | - | - | (227,718) | | (519,931) |
| Total Non-Operating Disbursements | $ (1,480,000) | $ - | $ - | $ (1,876,295) | $ - | $ - | $ (1,250,000) | $ (1,760,000) | $ (175,919) | $ - | $ - | $ - | $ (2,237,718) | | $ (8,779,931) |

| Net Weekly Cash Flow | $ (8,268,136) | $ 1,479,219 | $ (2,374,759) | $ (262,578) | $ (2,212,618) | $ 1,480,566 | $ (2,923,412) | $ 2,024,826 | $ (3,479,973) | $ 3,116,297 | $ (2,035,326) | $ 2,945,902 | $ (8,466,791) | | $ (18,976,782) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $ 500,000 | $ 200,000 | $ 1,679,219 | $ - | $ - | $ - | $ 1,480,566 | $ - | $ 2,024,826 | $ - | $ 3,116,297 | $ 1,080,971 | $ 4,026,873 | | $ 500,000 |
| Net Weekly Cash Flow | (8,268,136) | 1,479,219 | (2,374,759) | (262,578) | (2,212,618) | 1,480,566 | (2,923,412) | 2,024,826 | (3,479,973) | 3,116,297 | (2,035,326) | 2,945,902 | (8,466,791) | | (18,976,782) |
| Additional Funding Need | 7,968,136 | - | 695,540 | 262,578 | 2,212,618 | - | 1,442,846 | - | 1,455,146 | - | - | - | 4,439,918 | | 18,476,782 |
| Weekly Ending Cash | $ 200,000 | $ 1,679,219 | $ - | $ - | $ - | $ 1,480,566 | $ - | $ 2,024,826 | $ - | $ 3,116,297 | $ 1,080,971 | $ 4,026,873 | $ - | | $ - |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $ 500,000 | $ 200,000 | $ 1,679,219 | $ 304,460 | $ 1,041,882 | $ 1,041,882 | $ 2,522,449 | $ 1,041,882 | $ 3,066,709 | $ 1,041,882 | $ 4,158,179 | $ 2,122,853 | 5,068,756 | | $ 500,000 |
| Plus: DIP Loan Proceeds | 7,968,136 | - | 1,000,000 | 1,000,000 | 2,212,618 | - | 1,442,846 | - | 1,455,146 | - | - | - | 4,439,918 | | $ 19,518,664 |
| Net Weekly Cash Flow | (8,268,136) | 1,479,219 | (2,374,759) | (262,578) | (2,212,618) | 1,480,566 | (2,923,412) | 2,024,826 | (3,479,973) | 3,116,297 | (2,035,326) | 2,945,902 | (8,466,791) | | (18,976,782) |
| Ending Cash - Cumulative | $ 200,000 | $ 1,679,219 | $ 304,460 | $ 1,041,882 | $ 1,041,882 | $ 2,522,449 | $ 1,041,882 | $ 3,066,709 | $ 1,041,882 | $ 4,158,179 | $ 2,122,853 | $ 5,068,756 | $ 1,041,882 | | $ 1,041,882 |

| Estimated Debt Service - DIP Loan | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ - | $ 7,968,136 | $ 7,968,136 | $ 8,968,136 | $ 9,968,136 | $ 12,180,754 | $ 12,180,754 | $ 13,623,600 | $ 13,623,600 | $ 15,078,747 | $ 15,078,747 | $ 15,078,747 | 15,078,747 | | |
| Additional Draw | 7,968,136 | - | 1,000,000 | 1,000,000 | 2,212,618 | - | 1,442,846 | - | 1,455,146 | - | - | - | 4,439,918 | | |
| Ending Balance | 7,968,136 | 7,968,136 | 8,968,136 | 9,968,136 | 12,180,754 | 12,180,754 | 13,623,600 | 13,623,600 | 15,078,747 | 15,078,747 | 15,078,747 | 15,078,747 | 19,518,664 | | |
| Interest Calculation | | | | $ 116,295 | | | | | $ 175,919 | | | | $ 227,718 | | |