# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| In the Matter of: | * | |
| | * | CASE NO.: 25-30256-CLH |
| JACKSON HOSPITAL & CLINIC, | * | |
| INC., et al., | * | |
| | * | CHAPTER 11 |
| Debtors. | * | Jointly Administered |

## GORDON REES SKULLY MANSUKHANI RESPONSE TO ORDER TO SHOW CAUSE

The law firm of Gordon Rees Skully Mansukhani, LLC ("Gordon Rees") submits this Response to the Order to Cassie D. Preston and Gordon Rees Skully Mansukhani, LLC to Appear and Show Cause as to Why Sanctions Should Not be Imposed:

Lawyers owe legal, professional, and ethical duties to the Court, the parties, their clients, opposing counsel, and the public. Among those are the duty to refrain from conduct which abuses the judicial process and the duty to ensure that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument to extend, modify, or reverse existing law, or to establish new law." Fed. R. Bankr. P. 9011(b)(2). Under Rule 9011(c)(1), "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Lawyers also owe duties under the Court's Local Rules and the Alabama Rules of Professional Conduct, including Rule

3.3(a)(1) which provides that "[a] lawyer shall not knowingly: make a false statement of material fact or law to a tribunal;…."

When a lawyer chooses to use artificial intelligence to research legal issues and then uses the results provided in court filings without independently verifying the existence and accuracy of the legal citations generated by artificial intelligence, these duties are violated. When lawyers are not candid with the Court in their filings and in their responses to questions from the Court, these duties are violated. That is unfortunately what happened here.

Gordon Rees is profoundly embarrassed by the events leading to the Show Cause Order, understands that such violations have caused parties and the Court to waste time and resources in addressing these violations, and sincerely apologizes to everyone affected. Gordon Rees recognizes that it is responsible for the actions of its attorneys and will accept whatever sanction the Court finds appropriate under these circumstances.

**Procedural Background**

Gordon Rees represented creditor Progressive Perfusion, Inc. ("Progressive") in this matter. Attorney Cassie Preston from Gordon Rees' Atlanta Office was the responsible attorney.[1]

---

[1] Ms. Preston is licensed in Georgia, but not Alabama. Therefore, she submitted a Motion to be admitted *pro hac vice* as counsel for Progressive, and her motion was later granted. [Docs. 131 and 183].

On June 17, 2025, Ms. Preston filed Progressive's "Motion to Determine Medicare Reimbursements Misappropriated By Debtor And Earmarked For Progressive Are Not Estate Property" (the "Constructive Trust Motion"). [Doc. 614]. The Constructive Trust Motion argued that the funds received by the Debtor as reimbursements from Medicare and other Third-Party Payors attributable to perfusion services provided by Progressive were misappropriated by Jackson Hospital, are held in a constructive trust for the benefit of Progressive, and are thus not part of the Debtors' estate. [Id.].

On June 18, Ms. Preston filed Progressive's "Motion to Compel the Designation of Progressive Perfusion, Inc. as a Critical Vendor and for Payment of the Outstanding Pre-Petition Debt" (the "Critical Vendor Motion"). [Doc. 617]. The Critical Vendor Motion argued that Progressive was a critical vendor and that the Debtors should be compelled to immediately pay Progressive for pre-petition obligations related to perfusion services Progressive had provided. [Id.].[2]

On July 11, the Debtors filed their response to the Critical Vendor and Constructive Trust Motions, urging the Court to deny them both. [Doc. 693]. On

---

[2] On June 19, Ms. Preston filed an Adversary Proceeding on behalf of Progressive to Determine Dischargeability, For Equitable Relief and to Recover Misappropriated Medicare funds. *Progressive Perfusion, Inc. v. Jackson Hospital and Clinic*, United States Bankruptcy Court, Middle District of Alabama, AP No. 25-0315.

July 14, Ms. Preston filed Progressive's Reply in support of the Critical Vendor and Constructive Trust Motions. [Doc. 706].

On July 15, the Court issued orders denying both the Constructive Trust Motion and the Critical Vendor Motion. [Docs. 712 and 713].

On July 19, Ms. Preston filed Progressive's "Motion to Reconsider Order Denying Motion to Compel Turnover and Recognize Constructive Trust in Medicare Funds", asking the Court to reconsider its Orders denying the Constructive Trust and Critical Vendor Motions (the "Motion to Reconsider"). [Doc. 776].

On August 21, the DIP Lender filed its "Objection to Progressive Perfusion's Motion For Reconsideration and Request for Sanctions". [Doc. 842]. The Objection urged the Court to deny the Motion for Reconsideration and to impose sanctions against Ms. Preston and Gordon Rees under Rule 9011 and the Court's inherent power to sanction conduct abusing the judicial process because the Motion for Reconsideration "fabricates quotes from case law and statutes, mis-cites case law, and wildly misstate[s] issues and holdings of existing cases." [Id. at ¶ 24]. The DIP Lender suspected that the unchecked use of artificial intelligence was to blame. [Id. at ¶ 1]. In addition to whatever sanctions the Court found appropriate, the DIP Lender requested that its reasonable attorneys' fees and costs associated with its Objection be reimbursed. [Id. at ¶ 27].

Also on August 21, the Debtors filed their "Response to And Motion to Strike Progressive's Motion for Reconsideration Of Orders Denying Motion to Compel Turnover or to Recognize Constructive Trust in Medicare Funds". [Doc. 843]. In their Response, the Debtors called on the Court to strike Progressive's Motion to Reconsider in light of the "misuse and misrepresentation of case law, and in some cases, fabrication of quotation and case citations," but if not stricken, to deny the Motion to Reconsider for failing to satisfy the legal standard for reconsideration. [Id. at p. 1, 8]. The Debtors' Response pointed out that such errors are a strong indicator of the use of artificial intelligence. [Id. at p. 4, n.2].

On August 21, the Court set an August 26 hearing date to take up the DIP Lenders' Objection to Reconsideration and for Sanctions as well as the Debtors' Response to the Motion for Reconsideration and to Strike the Motion for Reconsideration. [Doc. 844]. On the day of the hearing, Ms. Preston filed a Supplemental Brief in Support of the Motion for Reconsideration (the "Supplemental Brief"). [Doc. 859]. Ms. Preston also filed a Joint Response to the DIP Lenders' Objection and Request for Sanctions and Debtors' Motion to Strike (the "Joint Response"). [Doc. 860]. In the Joint Response, Ms. Preston argued that sanctions require bad faith which was lacking and instead characterized the citation issues detailed in the DIP Lender and Debtors' Motions as inadvertent citation or paraphrasing errors. [Id. at p. 1-2]. The Joint Response went on to state that "[t]he

speculation of 'AI use' is unsupported. Citation errors do not justify punishment." [Id. at p.2]. Ms. Preston urged the Court to not allow its attention to be diverted by "focusing on clerical defects" but instead to focus on the merits of Progressive's arguments and "not speculation about 'fabricated' quotations." [Id. at p. 5].

At the outset of the hearing on August 26, the Court reminded Ms. Preston of her obligation to adhere to the Court's local rules, the Alabama Rules of Professional Conduct, the Alabama Standards for Imposing Lawyer Discipline and The American Bar Association Model Rules of Professional Conduct. [Exhibit 1 at p.17, lines 4-13]. After reminding her of these obligations, including the obligation to not make a false statement to the Court, Ms. Preston was asked:

> The Court: …Was generative artificial intelligence used at any point in the preparation of the motion to reconsider?
>
> Ms. Preston No, sir. I had a younger attorney start the motion. I finished it. I did not check the citations, to be frank with you, not to the degree that I should have....

[Id. at p. 17, lines 16-22].

Before taking up the merits of the Motion to Reconsider, the Court then asked Ms. Preston if she would like to withdraw the Motion for Reconsideration. [Id. at p. 18, lines 4-5]. After indicating it was not inclined to allow Ms. Preston to substitute the Supplemental Brief as a substitute for the Motion to Reconsider, the Court

allowed Ms. Preston a short recess to confer with her client. [Id. at p. 18 line 9 through page 19, line 4]. The Court also specifically encouraged Ms. Preston to confer with the leadership of Gordon Rees during the recess. [Id. at p. 19, lines 4-6].[3] Upon returning from the recess, Ms. Preston withdrew both the Motion for Reconsideration and the Supplemental Brief. [Id. at page 19, line 20 through page 20, line 5]. The Court, concerned regarding the citations included in Progressive's filings, announced its intention to issue a separate show cause order regarding whether sanctions should be imposed against her and Gordon Rees. [Id. at p. 20, lines 7-13].

On August 28, the Court issued an Order to Cassie D. Preston and Gordon Rees To Appear and Show Cause As To Why Sanctions Should Not Be Imposed for making false statements of fact or law to the Court with respect to the Motion to Reconsider, the Supplemental Brief and the Joint Response. [Doc. 871]. Gordon Rees management first learned of these proceedings after the Court's Show Cause Order was entered on August 28. [Decl. of R. Giller, ¶ 8].

On September 5, the DIP Lender submitted its Motion for Sanctions Regarding Progressive Perfusion, Inc.'s Filings ("DIP Sanctions Motion"). [Doc. 898]. The DIP's Sanctions Motion was based not only on the Motion to Reconsider,

---

[3] Ms. Preston did not confer with Gordon Rees management as the Court encouraged her to do. [Decl. of R. Giller at ¶ 8].

but "even _**more**_ mis-citations, misstatements of existing case law…." in the Supplemental Brief and Joint Response. [Id. at ¶ 1] (emphasis in original). The DIP Sanctions Motion requested sanctions to at least include it being reimbursed for costs associated with the DIP Lender's Objection to the Motion to Reconsider and the DIP Sanctions Motion. [Id. at ¶ 2]. The DIP Sanctions Motion sought sanctions against Ms. Preston under 28 U.S.C. § 1927, and against Ms. Preston and Gordon Rees under the Court's inherent authority to sanction a party for conduct which abuses the judicial process and under Rule 9011 of the Federal Rules of Bankruptcy Procedure. The DIP Sanctions Motion requested reasonable attorneys' fees to date of $35,227.20. [Id. at §§s 35-37]. Gordon Rees later reached an agreement regarding the DIP Sanctions Motion and paid the DIP Lender the full amount sought - $35,227.20. [Decl. of R. Giller at ¶ 5].

On September 8, 2025, the Debtors filed their Motion For Sanctions against Progressive, Ms. Preston and Gordon Rees pursuant to 11 U.S.C. § 105(a), Rule 9011 of the Federal Rules of Bankruptcy Procedure, 28 U.S.C. § 1927, and the Court's inherent authority (the "Debtors' Sanctions Motion"). [Doc. 902].[4] The Debtors' Sanctions Motion was based on "repeated false and manufactured claims of authority cited in the Motion for Reconsideration, Supplemental Brief [], and Joint

---

[4] The Motion for Sanctions filed by the DIP Lender [Doc. 898] and the Debtors [Doc. 902] shall be referred to collectively hereinafter as the "Sanctions Motions."

Response…." [Id. at p. 2]. The Debtors' Sanctions Motion sought sanctions only in the form of attorneys' fees and costs against Progressive, Ms. Preston, and Gordon Rees, jointly and severally, for expenses incurred by the Debtors in connection with responding to the Motion to Reconsider and in preparing the Debtors' Sanctions Motion. [Id. at p. 21]. The Debtors' Sanctions Motion detailed legal fees of $20,494.00 incurred in responding to the Motion for Reconsideration and in drafting the Debtors Sanctions Motion. [Id. at ¶ 50 and Id. at Exhibit C]. Gordon Rees has tendered to Debtors' counsel a check for the full amount of legal fees sought in the Motion - $20,494.00. [Decl. of R. Giller, ¶ 5].

On September 9, Ms. Preston filed a Withdrawal of the Joint Response. [Doc. 906].

**Gordon Rees and its Response to the Use of Artificial Intelligence in General and Here in Particular**

Gordon Rees adopted and distributed to all firm lawyers its official policy regarding the use of artificial intelligence in June of 2023. [Exhibit 2]. Among other things, this initial AI Policy provided that "no finalized versions of any [AI prepared] materials shall be utilized or released outside the firm absent the prior verification of the accuracy of the same by the user…." [Id. at ¶ 2]. Had Ms. Preston followed the Firm's mandatory AI policy, this situation would have been avoided.

Though unaware of the events transpiring in this case, Gordon Rees updated and revised its AI Policy on July 30, 2025. [Exhibit 3]. Among other things, the

updated and revised AI Policy provided greater emphasis on key provisions, such as the provision which forbids the utilization or release of any artificial intelligence produced material absent prior verification of its accuracy. [Id., at ¶ 2].

Upon learning of this situation, Gordon Rees management implemented additional steps to help ensure that similar mis-uses of artificial intelligence are not repeated. On September 19, Gordon Rees adopted a new Cite Checking Policy which requires that prior to any brief being filed, it is checked in its entirety to determine: "(1) whether the cases are still good law; and (ii) whether the citations are accurate, in the correct form, and reflect what the cases actually say." [Exhibit 4]. Gordon Rees also implemented additional education and training on the risks of using artificial intelligence, its updated AI Policy, and the new Cite Checking Policy. [Decl. of R. Giller, ¶ 17]. That training included training for all partners during the Gordon Rees annual firm retreat two weeks ago as well as additional training to be held at each Gordon Rees office. [Id.].

Gordon Rees also undertook an internal investigation to determine if any other filings by Ms. Preston contained suspected artificial intelligence hallucinations.[5] A

---

[5] When artificial intelligence applications generate legal citations to cases which do not exist or cite to existing cases which do not contain an alleged quotation or otherwise do not support the proposition of law for which they are cited, such events are commonly referred to as "hallucinations". *See Wadsworth v. Walmart, Inc.*, 348 F.R.D. 489, 493 (D. Wyo. 2025) (recognizing that "[a] hallucination occurs when an AI database generates fake sources of information.")

partner identified all court filings prepared by Ms. Preston during her tenure at the firm to determine which contained legal citations. [Decl. of R. Giller at ¶ 11]. Those filings were then cite checked through Westlaw to determine if any included citations were suspected artificial intelligence hallucinations. [Id.]. Other than a filing made in a Georgia State Court case that was brought to the attention of Gordon Rees management on September 11, 2025,[6] no other issues were identified. [Id.].

**Sanctions for Relying on Unverified Citations Generated by Artificial Intelligence**

Courts faced with situations where an attorney has relied on unverified citations generated by artificial intelligence that turned out to be hallucinations overwhelmingly, if not universally, have recognized that such conduct is sanctionable. *See, e.g., Mata v. Avianca, Inc*., 678 F. Supp. 3d 443 (S.D. NY 2023) (imposing sanctions under Rule 11 and the Court's inherent authority where lawyers submitted an opposition to a motion to dismiss which contained hallucinated legal citations provided by ChatGPT); *In re Martin*, 670 B.R. 636 (N.D. Ill. 2025) (imposing sanctions under Bankruptcy Rule 9011 where lawyer used hallucinated legal citations provided by ChatGPT in a filing without independently verifying their existence or accuracy); *Versant Funding LLC v. Teras Breakbulk Ocean Navigation*

---

[6] Decl. of C. Shultz, ¶ 8.

*Enters., LLC*, 2025 U.S. Dist. LEXIS 98418 (S.D. Fla. May 20, 2025) (imposing sanctions under Rule 11, the Court's inherent authority, and 28 U.S.C. §1927 where lawyers submitted a filing containing a hallucinated legal citation obtained from artificial intelligence without independently verifying it); *Jackson v. Auto-Owners Ins. Co.*, 2025 U.S. Dist. LEXIS 133070 (M.D. Ga. Jul. 14, 2025) (imposing sanctions under Rule 11 where lawyer used artificial intelligence as the source for nine hallucinated case citations found in a court filing he submitted).

Judge Manasco in the Northern District recently issued a ruling in a case where attorneys submitted two motions which included five hallucinated citations obtained from artificial intelligence. *Johnson v. Dunn*, 2025 U.S. Dist. LEXIS 141805 (N.D. Ala. July 23, 2025). The lawyers admitted that the citations resulted from the unverified use of legal citations generated by ChatGPT, which was a violation of their firm's AI policy.

Following discovery of the problem, the law firm internally reviewed all Alabama Federal and Eleventh Circuit filings for two years that involved the lawyers at issue to determine if other similar citation issues existed. *Id.* at *27. No other hallucinated citations were identified. *Id.*

After the issue arose, the law firm sent a reminder to all lawyers to verify the accuracy of all legal citations, its AI committee began working on a comprehensive AI policy, and had plans to conduct additional firm-wide training on the appropriate

use of artificial intelligence.  *Id.* at *29 – 30.  The firm also adopted a prefiling protocol requiring review of all legal authority in any document to confirm its existence, accuracy, and relevance.  *Id.*

Judge Manasco found that the conduct at issue was sanctionable under the Court's inherent authority.  As to the lawyers whose names appeared on the filings at issue, the Court issued a public reprimand, ordered them to provide a copy of the Order to their law partners as well as all clients, opposing counsel, and the presiding judges in all cases where they are counsel of record, disqualified them from further participation in the *Johnson* case, and referred the matter to the Alabama State Bar and any other general Bar counsel where they were licensed.  *Id.* at *62-63.

Moving to the law firm, the Court recognized that it had been proactive, with an AI policy in place since 2023.  *Id.* at *42.  The firm also had an AI committee that was working on an updated policy.  *Id.* at *42-43.  Once this issue came to light, the firm reminded all lawyers of the firm's policy, planned additional and firm-wide training on artificial intelligence, and updated its policies, including the inclusion of a new pre-filing policy.  *Id.* at *43-44.  Judge Manasco found that the law firm's actions reflected that it understood the seriousness of the situation and responded accordingly, expending resources to investigate other citations.  *Id.* at *44.  Judge Manasco ultimately held that "[the law firm] acted reasonably in its efforts to prevent this misconduct and doubled down on its precautionary and responsive measures

when its nightmare scenario unfolded." *Id.* at *46. Finding no bad faith on the part of the law firm, Judge Manasco released it from further disciplinary proceedings.[7] *Id.* at *46-47.

**Conclusion**

Gordon Rees again apologizes to the Court and all affected parties and counsel for the events which required the DIP Lender and the Debtors to file Motions for Sanctions and the Court to enter a Show Cause Order. Gordon Rees recognizes that it is ultimately responsible for the acts of Ms. Preston and for that reason accepted responsibility for paying all requested attorneys' fees of the Debtors and DIP Lender. It also investigated the issues involving Ms. Preston and took, and is in the process of taking, steps designed to ensure that such conduct does not happen again. The firm also stands ready to take such other steps as the Court might instruct to avoid such conduct in the future. If this Court determines that Gordon Rees nonetheless should be sanctioned, given the seriousness of the matter involved here, the law firm will understand the basis of the Court's decision.

---

[7] Unlike the case here, the issue in *Johnson* arose in the context of a discovery dispute, which meant that Rule 11 did not apply. *Id.* at * 39.

DATED this 23rd day of October, 2025.

    /s/ J. David Martin
Robert D. Segall
J. David Martin
Copeland, Franco, Screws & Gill, P.A.
444 S. Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101-0347
T: 334/834-1180  F: 334-834-3172
Email: segall@copelandfranco.com
       martin@copelandfranco.com
**Attorneys for Gordon Rees Scully Mansukhani, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2025, I electronically filed the above and foregoing instrument with the Court using the CM/ECF, which will send electronic notification of such filing to all parties who have appeared and requested electronic notice.

    /s/ J. David Martin
Of Counsel