# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

In re

JACKSON HOSPITAL & CLINIC, INC., *et al.*,

Debtors.[1]

Case No. 25-30256-CLH
Chapter 11
Jointly Administered

## MEMORANDUM OPINION AND ORDER REGARDING SANCTIONS AGAINST CASSIE D. PRESTON AND GORDON REES SKULLY MANSUKHANI, LLP

On August 28, 2025, the Court entered its Order to Cassie D. Preston and Gordon Rees Skully Mansukhani, LLP to Appear and Show Cause as to Why Sanctions Should Not Be Imposed [Doc. No. 871] (the "Show Cause Order").

At the hearing on the Show Cause Order on October 28, 2025, Gordon Rees Skully Mansukhani, LLP (the "Firm") was represented by Robert D. Segall and J. David Martin. In attendance on behalf of the Firm were its Chief Legal Officer, Ronald A. Giller, and the Managing Partner of its Atlanta Office, Chad Shultz. Ms. Preston attended the hearing and was represented by Wallace D. Mills.

Based on the pleadings of record, the declarations submitted by Mr. Giller and Mr. Shultz, the arguments and representations of counsel, the statements of Mr. Giller and Ms. Preston at the hearing, and for the reasons below, the Court determines that with respect to the Firm, no additional sanctions are necessary or appropriate, provided that the Firm takes the additional steps regarding Firm-wide training outlined herein. The Court determines that with respect to Ms. Preston, sanctions in the form of a formal reprimand and revocation of Ms. Preston's *pro hac vice* admission to this Court, together with limited circulation of this Memorandum Opinion and Order, are necessary and appropriate, as detailed below.

---

[1] Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure, the cases of Jackson Hospital & Clinic, Inc. (the "Hospital") and JHC Pharmacy, LLC (the "Pharmacy," and together with the Hospital, the "Debtors") are being jointly administered, with 25-30256 being the lead case. (Case No. 25-30256, Doc. 49).

**JURISDICTION**

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered by United States District Court for the Middle District of Alabama on April 25, 1985. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2).

**BACKGROUND RELEVANT TO THE SHOW CAUSE ORDER**

**A. The Relationship Between the Debtors and Progressive Perfusion, Inc.**

On February 3, 2025 (the "Filing Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[2] Prior to the Filing Date, the Hospital and Progressive Perfusion, Inc. ("Progressive") were parties to a contract under which Progressive provided specialized services to the Hospital during open-heart surgeries and other major cardiovascular procedures. *See* Transcript of July 8, 2025, Hearing [Doc. 758], at pp. 10-12.[3] In May 2024, the Hospital terminated the contract with Progressive because the Hospital's cardiovascular surgeon left the Hospital, such that the Hospital no longer needed Progressive's services. *Id.* Progressive has not provided services to the Hospital since May 2024. *Id.*

**B. Ms. Preston's Admission *Pro Hac Vice***

On March 7, 2025, Ms. Preston filed her Motion for Entry of Order Admitting Cassie D. Preston to Appear *Pro Hac Vice* [Doc. 183] (the "Preston Admission Motion"). Admissions to this

---

[2] All references to the "Code" or the "Bankruptcy Code" are to 11 U.S.C. §§ 101-1532.

[3] On July 8, 2025, the Court held a hearing on the Supplemental Notice and Disclosure Regarding Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (II) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [Doc. 637] (the "Supplemental Notice"). In two pleadings filed by Ms. Preston, Progressive objected to the Supplemental Notice, asserting constructive trust arguments largely identical to the arguments in Progressive's other pleadings. *See* Doc. 654 and Doc. 660. At the hearing, counsel for the Debtors proffered the testimony of the Debtors' Chief Restructuring Officer, Allen Wilen. Ms. Preston was present and did not object to the proffer. The proffer was admitted into evidence. Excerpts from the July 8, 2025, transcript, as referenced here and later in this Memorandum Opinion and Order, are collectively attached as Exhibit A.

Court are governed by Rule 2090-1 of the Local Rules of the United States Bankruptcy Court for

the Middle District of Alabama (the "Local Bankruptcy Rules"), which provides in relevant part:

> (e) All attorneys who appear in this Court shall be deemed to be familiar with and
> shall be governed by these Local Rules and applicable rules of professional
> conduct. Such attorneys shall be subject to the disciplinary powers of the Court.
> Attorneys should conduct themselves with civility and in a spirit of cooperation to
> reduce unnecessary cost and delay.

Rule 2090-1 of the Local Bankruptcy Rules incorporates by reference Rule 83.1 of the Local Rules

of the United States District Court for the Middle District of Alabama (the "Local Rules"), which

provides in relevant part:

> (g) Standards for Professional Conduct; Obligations. Attorneys admitted to practice
> before this Court shall adhere to this Court's Local Rules, the Alabama Rules of
> Professional Conduct, the Alabama Standards for Imposing Lawyer Discipline,
> and, to the extent not inconsistent with the preceding, the American Bar Association
> Model Rules of Professional Conduct. Attorney misconduct, whether or not
> occurring in the course of an attorney/client relationship, may be disciplined by
> disbarment, suspension, reprimand, monetary sanctions, removal from this Court's
> roster of attorneys eligible for practice before this Court, or such other sanction as
> the Court may deem appropriate.

On March 12, 2025, the Court entered its Order Granting Motion to Appear *Pro Hac Vice* [Doc.

208] (the "Preston Admission Order").

### C. The Progressive Payment Motions

On June 17, 2025, Progressive filed its Motion to Determine that Medicare

Reimbursements Misappropriated by Debtor and Earmarked for Progressive Perfusion, Inc. are

Not Property of the Estate [Doc. 614] (the "Constructive Trust Motion"). On June 18, 2025,

Progressive filed its Motion to Compel the Designation of Progressive Perfusion, Inc. as a Critical

Vendor and for Payment of the Outstanding Pre-Petition Debt [Doc. 617] (the "Motion to Compel

Critical Vendor Treatment," and together with the Constructive Trust Motion, the "Progressive

Payment Motions"). On July 11, 2025, the Debtors filed the Debtors' Response to Progressive

Perfusion's (I) Motion to Compel the Designation of Progressive Perfusion, Inc. as a Critical

3

Vendor and for Payment of the Outstanding Pre-Petition Debt; and (II) Motion to Determine that Medicare Reimbursements Misappropriated by Debtor and Earmarked for Progressive Perfusion, Inc. are Not Property of the Estate. [Doc. 693]. On July 14, 2025, Progressive filed Progressive Perfusion, Inc.'s Reply to Debtors' Response to Motion to Compel Designation as Critical Vendor and to Motion to Determine that Misappropriated Medicare Reimbursements are Not Property of the Estate. [Doc. 706].

The Court heard the Progressive Payment Motions and related pleadings on July 15, 2025. At the hearing, counsel for the Debtors incorporated by reference the July 8, 2025, proffer of the testimony of Allen Wilen, the Chief Restructuring Officer of the Debtors. No parties objected to the proffer, and no parties presented any other evidence at the hearing.

The Court questioned Ms. Preston in detail about regulations cited in the Progressive Payment Motions, pointing out that these regulations did not stand for the legal propositions for which Progressive had cited them. *See* Transcript of July 15, 2025, Hearing [Doc. 760], at pp. 18-22.[4] Ms. Preston acknowledged that the regulations she cited did not explicitly create a constructive trust or – for that matter – speak at all to the obligations of a hospital to pay its vendors in any specific manner. *Id.* Ms. Preston asserted that case law supported Progressive's position, and the Court asked for cases specifically holding that payments the Debtors received through Medicare were earmarked or held in trust for Progressive under the regulations cited. *Id.* No such cases were cited in the Progressive Payment Motions or at the hearing.

This was not the first time the Court called to Ms. Preston's attention its concerns with the authorities cited in Progressive's pleadings. At the hearing on July 8, 2025, the Court noted that the regulations cited in Progressive's other pleadings – found at Doc. 654 and Doc. 660 – did not

---

[4] Excerpts from the July 15, 2025, transcript, as referenced here and later in this Memorandum Opinion and Order, are collectively attached as Exhibit B.

impose a trust. *See* Transcript of July 8, 2025, Hearing [Doc. 758], at pp. 21-22.[5] Ms. Preston cited

*In re Columbia Gas System, Inc.*, 997 F.2d 1039 (3rd Cir. 1993), in support of her position. *Id*. at

p. 21. When the Court noted that the *Columbia Gas* opinion stood only for the general proposition

that constructive trusts may be imposed in bankruptcy, Ms. Preston disagreed, stating that the

opinion was specific to Medicare. *Id.* at p. 22. The *Columbia Gas* opinion has nothing to do with

Medicare, as the debtor in that case engaged in the transportation and resale of natural gas. *See*

997 F.2d at 1051.[6]

Based on the evidence and arguments presented at the July 15, 2025, hearing, the Court

entered its Order Denying Motion to Determine that Medicare Reimbursements Misappropriated

by Debtor and Earmarked for Progressive Perfusion, Inc. are Not Property of the Estate [Doc. 712]

and its Order Denying Motion to Compel Designation of Progressive Perfusion, Inc. as a Critical

Vendor and for Payment of the Outstanding Pre-Petition Debt. [Doc. 713].

**D. The Motion to Reconsider**

On July 29, 2025, Progressive filed its Motion for Reconsideration of Orders Denying

Motion to Compel Turnover or to Recognize Constructive Trust in Medicare Funds [Doc. 776]

(the "Motion to Reconsider"), which the Court set for hearing on August 26, 2025. In response to

the Motion to Reconsider, Jackson Investment Group, LLC (the "DIP Lender") filed The DIP

Lender's (i) Objection to Progressive Perfusion, Inc.'s Motion for Reconsideration and (ii) Request

for Sanctions [Doc. 842] (the "DIP Lender Objection"), and the Debtors filed the Debtors'

---

[5] *See* Exhibit A.

[6] Even to the extent Ms. Preston misunderstood the Court's point regarding the applicability of the case, the Court made it abundantly clear that it was asking for regulations and case law directly supporting Progressive's position that, in bankruptcy, Medicare payments are held by a hospital in constructive trust for the hospital's vendors. This is because in the context of bankruptcy, the "[i]mposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly." *In re Behring Intern., Inc*., 61 B.R. 896, 902 (Bankr. N.D. Tex. 1986). Accordingly, "courts generally will require that nonbankruptcy grounds for imposing a constructive trust 'be so clear, convincing, strong and unequivocal as to lead to but one conclusion.'" *Matter of Vacuum Corp.*, 215 B.R. 277, 281-82 (Bankr. N.D. Ga. 1997) (internal citation omitted).

Response to and Motion to Strike Progressive Perfusion's Motion for Reconsideration of Orders Denying Motion to Compel Turnover or to Recognize Constructive Trust in Medicare Funds [Doc. 843] (the "Debtors' Response").

Both the DIP Lender Objection and the Debtors' Response compiled summaries of numerous citations in the Motion to Reconsider that: did not stand for the proposition for which they were cited; did not contain the quotes attributed to them in the Motion to Reconsider; or did not exist at all. [Doc. 842], at pp. 8-13; [Doc. 843], at pp. 15-21. Likewise, both the Debtors and the DIP Lender suggested that the Motion to Reconsider bore the markers of the use of artificial intelligence. [Doc. 842], at pp. 1-2; [Doc. 843], at pp. 7-8. The concerns raised in the DIP Lender Objection and Debtors' Response were consistent with the Court's concerns, which arose when the Court – having become skeptical of the authorities cited in Progressive's pleadings – independently cite-checked the Motion to Reconsider.

### E. The Supplemental Brief and Joint Response

On August 26, 2025, less than ninety minutes prior to the hearing on the Motion to Reconsider, Progressive filed its Supplemental Brief in Support of Motion for Reconsideration [Doc. 859] (the "Supplemental Brief") and Progressive Perfusion, Inc.'s Joint Response to the DIP Lender's Objection and Request for Sanctions and Debtor's Motion to Strike [Doc. 860] (the "Progressive Response"). In these filings, Progressive obdurately clung to the positions it had staked out in the Progressive Payment Motions and the Motion to Reconsider. Moreover, in the Supplemental Brief and Progressive Response, Progressive continued to miscite authorities, and it even recycled a fabricated quote from the Motion to Reconsider. *See* The DIP Lender's Motion for Sanctions Regarding Progressive Perfusion, Inc.'s Filings [Doc. 898] (the "DIP Lender's Motion for Sanctions"), at pp. 5-6; Debtors' Motion for Sanctions [Doc. 902] (the "Debtors' Motion for Sanctions"), at pp. 25-26.

6

### F. The Hearing on the Motion to Reconsider

At the outset of the hearing on the Motion to Reconsider, the Court communicated to Ms. Preston its concerns with the authorities Progressive had cited. *See* Transcript of August 26, 2025, Hearing [Doc. 891], at pp. 16-17.[7] The Court noted the applicability of the Local Rules in connection with the Preston Admission Motion and the Preston Admission Order, which subjected Ms. Preston to the Alabama Rules of Professional Conduct (the "Alabama Ethics Rules"). *Id.* at p. 17. The Court reminded Ms. Preston that under Alabama Ethics Rule 3.3(a), a lawyer shall not knowingly make a false statement of material fact or law to a tribunal. *Id.* Against that backdrop, the Court asked Ms. Preston, "Was generative artificial intelligence used at any point in the preparation of the Motion to Reconsider?" *Id.* Ms. Preston replied, "No, sir." *Id.* She then stated that she had a younger attorney start the motion and that she finished it without checking the citations to the degree that she should have. *Id.*

The Court asked Ms. Preston whether she would like to withdraw the Motion to Reconsider. *Id.* at p. 18. Ms. Preston inquired as to whether the Supplemental Brief could be substituted for the Motion to Reconsider, and the Court declined to do so. *Id.* The Court offered to recess to allow Ms. Preston to confer with her client and management of the Firm. *Id.* at pp. 18-19. After the recess, Ms. Preston announced that Progressive would withdraw the Motion to Reconsider and the Supplemental Brief. *Id.* at pp. 19-20. The Court told the parties that an order to appear and show cause to Ms. Preston and the Firm was forthcoming, with a hearing to be set within the next 30-45 days. *Id.* at pp. 21-22. The Court further advised that if a party sought relief in connection with Progressive's filings, they should do so in a manner that facilitated a hearing on the same day as the hearing on the order to appear and show cause. *Id.* at pp. 23, 27-28.

---

[7] Excerpts from the August 26, 2025, transcript, as referenced here and later in this Memorandum Opinion and Order, collectively are attached as Exhibit C.

# THE SHOW CAUSE ORDER, MOTIONS FOR SANCTIONS, AND HEARING

## A. The Show Cause Order

In the Show Cause Order, the Court described the conduct it found problematic, namely the "pervasive inaccurate, misleading, and fabricated citations, quotations, and representations of legal authority in the Motion to Reconsider." [Doc. 871]. The Court directed Ms. Preston and the Firm to appear before the Court on October 7, 2025, and to "show cause, if any cause exists, as to why they should not be sanctioned under Rule 9011 of the Federal Rules of Bankruptcy Procedure, Rule 2090-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Alabama, 11 U.S.C. § 105(a), the Court's inherent authority, the Alabama Standards for Imposing Lawyer Discipline, or Alabama Rule of Professional Conduct 3.3, for making false statements of fact or law to the Court with regard to the Progressive Filings." *Id.*

## B. The DIP Lender's Motion for Sanctions

The DIP Lender's Motion for Sanctions was filed on September 5, 2025. [Doc. 898]. The DIP Lender sought entry of an order granting sanctions against the Firm and Ms. Preston under 28 U.S.C. § 1927, the Court's *sua sponte* Rule 11 powers, and the inherent authority of the Court. [Doc. 898], at p. 1. The DIP Lender noted that the Motion to Reconsider contained fabrications, mis-citations, and misstatements of existing case law. *Id.* at pp. 1-2. It also pointed out that even though the DIP Lender and the Debtors had highlighted these problems in their objections to the Motion to Reconsider, Progressive "doubled down" by filing the Supplemental Brief and the Progressive Response, which contained "even more mis-citations, misstatements of existing case law, and remarkably used the same fabricated quote, but now attributed to a different irrelevant case." *Id.* at p. 2. The DIP Lender sought recovery of legal fees totaling $35,227.20 in connection with the Motion to Reconsider, Supplemental Brief, Progressive Response, and DIP Lender's Motion for Sanctions. *Id.* at p. 13.

8

Case 25-30256    Doc 1182    Filed 11/20/25    Entered 11/20/25 15:26:23    Desc Main
Document      Page 8 of 130

### C. The Debtors' Motion for Sanctions

The Debtors' Motion for Sanctions was filed on September 8, 2025.[8] [Doc. 902]. The Debtors sought entry of an order imposing sanctions against the Firm and Ms. Preston under 28 U.S.C. § 1927, Bankruptcy Rule 9011, 11 U.S.C. § 105(a), and the inherent authority of the Court. [Doc. 902], at p. 1. The Debtors noted that the Motion to Reconsider: contained incorrectly or falsely attributed holdings in numerous reported decisions; cited to quotations that do not appear in cases; and in at least two instances, cited to a case that does not match a citation. *Id*. at pp. 1-2. The Debtors asserted that they were forced to expend estate resources to determine the validity of the authority cited in the Motion to Reconsider and to file the Debtors' Response. *Id*. Like the DIP Lender, the Debtors pointed out that even after these issues were raised, Progressive filed the Supplemental Brief and the Progressive Response, which contained "additional incorrect citations and misstatements of case law." *Id*. at p. 2. The Debtors sought recovery of legal fees totaling $20,494.00 in connection with the Motion to Reconsider and the Debtors' Motion for Sanctions. *Id.* at p. 14.

### D. The Motion to Continue

On September 23, 2025, Robert D. Segall and J. David Martin filed notices of appearance on behalf of the Firm. [Doc. 945] and [Doc. 946]. Also on that day, the Firm filed its Motion to Continue Show Cause Hearing and Hearing on Motions for Sanctions [Doc. 948] (the "Motion to Continue"). In the Motion to Continue, the Firm sought a thirty-day continuance of the hearing on the Show Cause Order and on the DIP Lender's Motion for Sanctions and the Debtors' Motion for Sanctions (together, the "Motions for Sanctions"). The Firm asserted that the continuance would allow the Firm to investigate the facts and respond accordingly to the Court, as well as attempt to

---

[8] The chart attached to the Debtors' Motion for Sanctions, which summarizes the issues associated with Progressive's citations, is attached as Exhibit D.

resolve the Motions for Sanctions. [Doc. 948], at p. 2. The Court set the Motion to Continue for hearing on September 30, 2025.

On October 3, 2025, the Court entered its Order Granting Motion to Continue Show Cause Hearing and Hearing on Motions for Sanctions and Resetting Hearing [Doc. 1002] (the "Continuance Order"). The Continuance Order reset the hearing on the Show Cause Order and the Motions for Sanctions for October 28, 2025. It also directed the Firm and Ms. Preston to file, by October 23, 2025, a status report regarding any settlement negotiations related to the Motions for Sanctions, as well as responses to the Show Cause Order and the Motions for Sanctions.

**E. The Firm's Status Report and Response**

Pursuant to the Continuance Order, on October 23, 2025, the Firm filed its Status Report on Pending Motions for Sanctions [Doc. 1073] (the "Status Report"). In the Status Report, the Firm stated that it agreed to pay – and had paid – the DIP Lender the full amount of attorneys' fees sought in the DIP Lender's Motion for Sanctions. [Doc. 1073], at p. 1. In connection with that payment, the DIP Lender agreed not to seek further fees related to the prior filings that were withdrawn or with respect to attendance at the hearing on the Show Cause Order or the Motions for Sanctions, provided that the agreement did not apply to future filings or the renewal of withdrawn motions. *Id.* The Firm also stated that it had sent to the Debtors the full amount of the fees and expenses sought in the Debtors' Motion for Sanctions, which counsel for the Debtors was holding pending the hearing. *Id*. at p. 2.

Also on October 23, 2025, the Firm filed the Gordon Rees Skully Mansukhani Response to Order to Show Cause [Doc. 1074] (the "Firm Response"). To the Firm's credit, it squarely and unequivocally conceded that under Bankruptcy Rule 9011, it was responsible for the conduct of its attorneys. [Doc. 1074], at p. 1-2. The Firm further acknowledged its lawyers' duties under the Local Bankruptcy Rules and the Alabama Ethics Rules, and it admitted that one of its lawyers

10

violated those duties. *Id*. It expressed its willingness to accept "whatever sanction the Court finds appropriate under these circumstances." *Id.* at p. 2.

The Firm described several steps it had taken regarding its employees' use of artificial intelligence, both before and after the Show Cause Order. On June 28, 2023, the Firm adopted and distributed its official policy regarding the use of artificial intelligence (the "Original AI Policy"). *Id*. at p. 9. Among other things, the Original AI Policy: prohibited use of programs using artificial intelligence without pre-approval by the Firm's information technology department; provided that "no finalized versions of any [AI prepared] materials shall be used outside the firm absent prior verification of the accuracy of the same by the user"; required users to be mindful of avoiding any biases that might be imbedded in the program and prohibited users from "engaging in any unlawful or unethical activity in connection with same"; required that the "utmost care must be taken to protect the confidentiality, proprietary nature and privacy of the firm's clients and their information"; and prohibited employees from charging clients for work product created by artificial intelligence. *Id*. at p. 60.

On July 30, 2025, without knowledge of the issues beginning to surface in this case, the Firm updated its policy on artificial intelligence (the "Updated AI Policy"). *Id*. at p. 63. The Updated AI Policy included a link to a list of allowed and disallowed artificial intelligence technologies, bolstered the provision regarding client confidentiality, simplified the provision regarding client billing, and emphasized that the requirement to verify the accuracy of materials to be released outside the Firm applied not only to the user but also "by another individual acting on his/her behalf." *Id*. at p. 63.

After learning of the Show Cause Order, the Firm undertook additional remedial and preventive measures. On the remediation side, the Firm paid the fees sought in the Motions for Sanctions – totaling $55,721.20 – without haggling with the DIP Lender and the Debtors or

11

otherwise forcing a contested hearing. *Id*. at p. 73. The Firm also conducted an internal investigation to determine whether any of Ms. Preston's other filings contained "suspected artificial intelligence hallucinations." *Id*. at p. 74. This investigation consisted of the Firm's information technology department pulling a list of all documents Ms. Preston prepared since joining the Firm, which totaled approximately 2700 documents. *Id*. A partner at the Firm then reviewed each of those documents to identify court filings containing legal citations. *Id*. The partner then cite-checked the filings, revealing a case in Georgia in which it was called to the court's attention that Ms. Preston included an artificial intelligence-generated hallucination. *Id*. at p. 74-75. Mr. Shultz took over that case and settled the issues raised regarding the use of artificial intelligence. *Id*. at p. 71. The Firm also assigned a partner to serve as co-counsel with Ms. Preston on every case she previously was handling by herself, and the newly assigned partners have reviewed each case in detail. *Id*.

In terms of additional preventive measures, on September 19, 2025, the Firm adopted a policy to supplement the Updated AI Policy, this one focused on cite-checking (the "Cite Checking Policy"). *Id*. at p. 76. The Cite Checking Policy makes it mandatory for all attorneys in the Firm to check pleadings "in their entirety for (i) whether the cases are still good law; and (ii) whether the citations are accurate, in the correct form, and reflect what the cases actually say." *Id*. The Cite Checking Policy clarifies that the duty to cite-check – or confirm that another lawyer on the file has performed a cite-check – is non-delegable. *Id*.

In addition to implementing the Cite Checking Policy, the Firm conducted training on the Updated AI Policy and the Cite Checking Policy at its partner retreat in mid-October, bringing in an outside speaker to discuss the risks of using artificial intelligence and using this case as a cautionary tale. *Id*. at p. 77. Additional efforts were made through the Firm's regional oversight

partners and office managing partners to ensure all lawyers were made aware of the Updated AI Policy, the Cite Checking Policy, and the events of this case. *Id*. at p. 77.

### F. Ms. Preston's Response

On October 23, 2025, Wallace D. Mills filed a Notice of Appearance as attorney for Ms. Preston. [Doc. 1075]. Mr. Mills also filed Cassie Preston's Response to Order to Show Cause [Doc. 1076] (the "Preston Response"). Ms. Preston accepted responsibility for her actions, explaining that she took on the representation of Progressive in this case at the request of a close personal and family friend. [Doc. 1076], at p. 1. She explained that she "allowed her loyalty and desire to help her friend override the fact that she does not have a great deal of experience in the types of matters which were at issue before this Court." *Id*. She admitted that she "did not have the time necessary to spend on the case to compensate for the obvious learning curve." *Id*. at p. 2.

Ms. Preston admitted that she misled the Court on August 26, 2025, when she represented that generative artificial intelligence was not used in preparing the Motion to Reconsider. *Id.* at p. 2. She stated that she did not personally use generative artificial intelligence to prepare the Motion to Reconsider, but she was aware it was used by someone other than an associate at the Firm, contrary to her previous representations. *Id*. She expressed a willingness to share further information on this issue in an *ex parte* hearing or in a document filed under seal. *Id.* She freely conceded, however, that she was responsible for the Motion to Reconsider, which she signed and filed. *Id*.

While not seeking to excuse her actions, Ms. Preston described turmoil in her personal and financial life that contributed to her struggle to maintain her case load, including her representation of Progressive in this case. *Id*. at p. 3. She was reluctant to share details in writing or in public at the hearing on the Show Cause Order, but she expressed a willingness to share those details in an *ex parte* hearing or in a document filed under seal. *Id*.

13

**G. The Hearing on the Motions for Sanctions and the Show Cause Order**

At the hearing on October 28, 2025, the Court first took up the Motions for Sanctions. The Court confirmed that the parties considered the DIP Lender's Motion for Sanctions to be settled by the Firm's payment of the DIP Lenders' attorneys' fees, subject to the condition that the settlement did not apply to any future filings by Progressive or to any withdrawn motions that are subsequently renewed. *See* Transcript of October 28, 2025, Hearing [Doc. 1152], at pp. 17-18[9]; [Doc. 1097]. The Court also confirmed that the parties considered the Debtors' Motion for Sanctions to be settled by the Firm's payment of the Debtors' attorneys' fees, together with the stipulated dismissal of Progressive's adversary proceeding against the Debtors and the additional condition that Ms. Preston would not be involved in the case going forward. *Id*. at 18-20; [Doc. 1097].

With the Firm having resolved the Motions for Sanctions, the Court then offered the Firm an opportunity to address the Show Cause Order. Mr. Segall's presentation to the Court on behalf of the Firm generally was consistent with the Firm Response. He pointed out that the Firm recognized the seriousness of the matter, and that Mr. Giller had travelled from New Jersey and Mr. Shultz had traveled from Georgia to be available for questions from the Court. *Id*. at 21-22. Mr. Segall described the steps the Firm had taken both before and after the Show Cause Order to address the use of artificial intelligence and the need for proper cite-checking. *Id*. at 22-27.

In response to a question from the Court, Mr. Giller confirmed that in the past three years, no attorney at the Firm had been sanctioned or reprimanded by any other state or federal court for misciting legal authorities, including, but not limited to, hallucinated cases that may have been generated through artificial intelligence. *Id*. at p. 28. In response to another question from the

---

[9] Excerpts from the October 28, 2025, transcript, as referenced here and later in this Memorandum Opinion and Order, collectively are attached as Exhibit E.

14

Court, Mr. Giller stated that there was no specific record of Ms. Preston acknowledging the Original AI Policy or the Updated AI Policy. *Id*. at p. 29. Mr. Giller stated that over the past year the Firm has developed a mechanism to track signed acknowledgments of updated policies, and he believed acknowledgments were tracked by the Firm's risk department. *Id*. at p. 30. With respect to training, Mr. Giller stated that the training session at the partner retreat was not recorded, but the messaging from that training session was delivered to the managers, who then took that messaging back to the Firm's offices. *Id*. at pp. 30-31.

The Court also inquired as to whether the Firm had any policy regarding the delegation of client referrals to attorneys with specialized knowledge and expertise. The Firm did not have a formal policy, but Mr. Giller stated that in the offices he oversees, attorneys are discouraged from taking on matters in which they do not have experience. *Id*. at pp. 33-34. Mr. Giller pointed out that Ms. Preston's representation of Progressive started out in state court, and she continued to represent Progressive in this case. *Id.* at p. 34. Mr. Segall emphasized Ms. Preston's regret that she did not seek assistance once it became a matter of bankruptcy law. *Id*.

The Court then afforded Ms. Preston an opportunity to address the Show Cause Order. Mr. Mills first spoke on behalf of Ms. Preston, reiterating the position in the Preston Response that Ms. Preston does not make any excuses for the pleadings she filed on behalf of Progressive or for her misrepresentation to the Court on August 26, 2025. *Id*. at p. 36. In response to questions from the Court, Ms. Preston acknowledged that she had limited bankruptcy experience. *Id*. at pp. 39-40. She also stated that while she normally would cite-check legal authorities using Westlaw, she did not do so with respect to the Motion to Reconsider. *Id*. at p. 40. She reviewed the Firm's handbook when she started with the Firm, but she did not recall everything in it. *Id*. at p. 41.

Mr. Mills referenced a potential *ex parte* hearing in which Ms. Preston could provide information as to the use of artificial intelligence in the pleadings, as well as Ms. Preston's personal

15

circumstances. *Id.* at pp. 36-37. Progressive's recently retained lawyer, Joel D. Connally, raised concerns related to the attorney-client privilege, which ultimately were resolved by Mr. Connally being permitted to participate in the *ex parte* hearing and by limiting the discussion in the *ex parte* hearing to Ms. Preston's personal circumstances. *Id*. at pp. 41-42. During the *ex parte* hearing, Ms. Preston described events in her personal life that the Court recognizes would take a significant toll on anyone. The Court is empathetic to Ms. Preston's personal circumstances and certainly understands how those events made it difficult for Ms. Preston to devote the necessary time and attention to her legal practice.

## LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A. Ethics Implications

By operation of Local Rule 83.1, as made applicable by Local Bankruptcy Rule 2090-1, the ethics implications associated with the Motion to Reconsider, Supplemental Brief, and Joint Response are relevant to the Show Cause Order. While Alabama Ethics Rule 3.3(a)(1), which deals with candor to the Court, is central in this case, the Court finds that deficiencies under Alabama Ethics Rules 1.1 and 3.1 also can – and did – lead to sanctionable conduct.

### 1. Alabama Ethics Rule 1.1[10]

In terms of competence, the threat to attorneys using generative artificial intelligence platforms powered by large language models is two-fold. First, danger exists that the attorney does

---

[10] Because the Preston Admission Motion states that Ms. Preston is licensed in Georgia, the Court is including a comparison of the Georgia Rules of Professional Conduct to the Alabama Ethics Rules. Georgia Rule of Professional Conduct 1.1 provides:

> A lawyer shall provide competent representation to a client. Competent representation as used in this rule means that a lawyer shall not handle a matter which the lawyer knows or should know to be beyond the lawyer's level of competence without associating another lawyer who the original lawyer reasonably believes to be competent to handle the matter in question. Competence requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

GA. R. PROF'L CONDUCT R. 1.1 (2000).

not understand how the technology functions, believing that the output is real instead of "realistic-*looking*." *See In re Martin*, 670 B.R. 636, 649 (Bankr. N.D. Ill. 2025) ("Instead, these AI platforms look at legal briefs in their training model and then create output that *looks like* a legal brief by 'placing one most-likely word after another' consistent with the prompt it received.") (emphasis in original) (internal citation omitted). An attorney's failure to understand this concept can lead to catastrophic results in court.

Second, even if the attorney understands how large language models function, the output of a large language model depends heavily on the prompt, which in turn requires the attorney to have a foundational understanding of the legal issue at hand. In other words, a prompt based on an incorrect assumption about the law – or a bias toward a particular result – may steer the attorney further away from not only any actual legal authority but also any plausible legal arguments supporting the attorney's position. One professor, Terrence Sejnowski, posits that these models reflect the intelligence and biases of their users, much like the Mirror of Erised in *Harry Potter and the Sorcerer's Stone*:

> [T]he Mirror of Erised reflects the deepest desires of the those that look into it, never yielding knowledge or truth, only reflecting what it believes the onlooker wants to see. Chatbots act similarly, Sejnowski says, willing to bend truths with no regard to differentiating fact from fiction – all to effectively reflect the user.

*AI Chatbot ChatGPT Mirrors Its Users to Appear Intelligent*, SALK INSTITUTE FOR BIOLOGICAL STUDIES, https://www.salk.edu/new-release/ai-chatbot-chatgpt-mirrors-its-users-to-appear-intelligent/ (last visited Nov. 20, 2025).

Because of these dangers, an attorney's use of generative artificial intelligence implicates Alabama Ethics Rule 1.1, which provides, in relevant part: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill,

thoroughness, and preparation reasonably necessary for the representation." ALA. R. PROF'L CONDUCT R. 1.1 (2012). The Comment to Alabama Ethics Rule 1.1 offers helpful guidance:

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.

ALA. R. PROF'L CONDUCT R.1.1 cmt. (2012). While generative artificial intelligence may serve as a helpful tool, it cannot replace an attorney's "requisite knowledge and skill in a particular matter," which only can be acquired through diligent preparation and study. Generative artificial intelligence, without foundational knowledge of the legal matter at hand or the guidance of "a lawyer of established competence," is not a safe shortcut.

Unfortunately, Ms. Preston took that shortcut. She admitted that her bankruptcy experience was limited and that she lacked the time necessary to compensate for the steep learning curve associated with representing Progressive in this case. Although the Firm has a Bankruptcy, Restructuring, and Creditors' Rights group, Ms. Preston did not consult members of that group while representing Progressive in this case. As a result, Ms. Preston filed multiple pleadings in this case – and in a separate adversary proceeding related to this case – that misapplied provisions of the Bankruptcy Code or were unsupported by relevant case law.

The impact of the lack of foundational knowledge was compounded by using generative artificial intelligence when preparing the Motion to Reconsider, Supplemental Brief, and Progressive Response. While it is unclear whether Ms. Preston was aware of the limitations of generative artificial intelligence and its tendency to create "realistic looking" instead of actual legal authorities, the result was a lack of competent representation that has needlessly consumed scarce resources in this case. Progressive mitigated some of the harm by withdrawing the Motion to

Reconsider, the Supplemental Brief, and, eventually, the Progressive Response. Even so, the cost in time and money to the Court and other parties to the case cannot be measured fully.

    2.  <u>Alabama Ethics Rule 3.1</u>[11]

    Generative artificial intelligence also has the dangerous potential to "supercharge" vexatious litigation, given how quickly it can produce a realistic looking legal argument to support an attorney's position. Alabama Ethics Rule 3.1(a) provides:

> In his representation of a client, a lawyer shall not file a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

ALA. R. PROF'L CONDUCT R. 3.1 (2012). The Comment to Alabama Ethics Rule 3.1 is instructive: "The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure." ALA. R. PROF'L CONDUCT R. 3.1 cmt. (2012).

    A prime example of the intersection of generative artificial intelligence and abuse of legal procedure can be found in *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341 (S.D. Fla. 2025). In *ByoPlanet*, counsel admitted to repeatedly using generative artificial intelligence and failing to check its outputs in eight related cases. *ByoPlanet Int'l, LLC*, 792 F. Supp. 3d at 1347. Over the span of about three months, counsel filed over fifteen pleadings containing hallucinated cases and quotations. *Id*. at 1347-51. Many of these pleadings came after counsel was put on notice

---

[11] Georgia Rule of Professional Conduct 3.1 provides:

> In the representation of a client, a lawyer shall not: (a) file a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another; (b) knowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law.

GA. R. PROF'L CONDUCT R. 3.1 (2000).

that his use of generative artificial intelligence was leading to hallucinations. *Id*. at 1349. Shockingly, one such pleading containing hallucinated quotations was the response to an order to show cause regarding the use of fabricated case citations. *Id*. at 1350.

As with the filings in *ByoPlanet*, Progressive's filings in this case evidence an abuse of legal procedure, with some filings being plagued with hallucinated citations and quotations. By the Court's count, Progressive has filed ten pleadings in this case, all essentially revolving around the legal theory that certain Medicare payments received by the Debtors were held in constructive trust for the benefit of Progressive.[12] In pleadings or during hearings, parties in interest repeatedly challenged this theory. At least two times – at the hearings on July 8 and July 15 – the Court specifically called out citations in Progressive's pleadings that did not directly support the legal theory Progressive was pushing.

Rather than stand down, Ms. Preston filed the Motion to Reconsider, Supplemental Brief, and Progressive Response, all of which contained mis-citations of law, hallucinated cases, hallucinated quotations, or some combination of the three. While the Court has not scrutinized each of the prior seven Progressive filings to determine whether generative artificial intelligence was used, the fact remains that with the three most recent pleadings, Ms. Preston rapidly multiplied the litigation using generative artificial intelligence, implicating Alabama Ethics Rule 3.1.

---

[12] Motion to Determine that Medicare Reimbursements Misappropriated by Debtor and Earmarked for Progressive Perfusion, Inc. are Not Property of the Estate [Doc. 614]; Motion to Compel the Designation of Progressive Perfusion, Inc. as a Critical Vendor and for Payment of the Outstanding Pre-Petition Debt [Doc. 617]; Creditor Progressive Perfusion, Inc.'s Motion Objecting to Proposed Sale of Estate Assets Pursuant to 11 U.S.C. § 363 with Brief in Support [Doc. 618]; Adversary Case 25-03015 [Doc. 620]; Objection to Use of Newly Discovered Account Containing Reimbursements and Motion to Segregate Trust or Earmarked Funds Not Property of the Estate [Doc. 654]; Limited Objection of Progressive Perfusion, Inc. to Use of Funds from Undisclosed Account and Reservation of Rights [Doc. 660]; Progressive Perfusion, Inc.'s Reply to Debtors' Response to Motion to Compel Designation as Critical Vendor and to Motion to Determine that Misappropriated Medicare Reimbursements are Not Property of the Estate [Doc. 706]; Motion for Reconsideration of Orders Denying Motion to Compel Turnover or to Recognize Constructive Trust in Medicare Funds [Doc. 776]; Supplemental Brief in Support of Motion for Reconsideration [Doc. 859] (the "Supplemental Brief"); and Progressive Perfusion, Inc.'s Joint Response to the DIP Lender's Objection and Request for Sanctions and Debtor's Motion to Strike [Doc. 860].

As explained in the Preston Response and relayed at the hearing on the Show Cause Order, Ms. Preston was motivated by her close personal connections with Progressive's owner and his family. Her recalcitrance, as reflected in the positions taken in Progressive's pleadings and at hearings, almost certainly was fueled by a profound sense of loyalty to her close friends. That said, attorneys must not allow their personal feelings to cloud their professional judgment, and Ms. Preston crossed a line when she resorted to making use of arguments and authorities generated by artificial intelligence.

3.  Alabama Ethics Rule 3.3[13]

Alabama Ethics Rule 3.3(a) provides that "[a] lawyer shall not knowingly: (1) Make a false statement of material fact or law to a tribunal." ALA. R. PROF'L CONDUCT R. 3.3(a)(1) (2012). The Comment crystallizes the concept of Rule 3.3(a)(1): "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." ALA. R. PROF'L CONDUCT R. 3.3 cmt. (2012).

It is unclear whether Alabama Ethics Rule 3.3(a)(1) is violated when an attorney uses generative artificial intelligence in pleadings but fails to verify the accuracy of the citations and quotations generated. *See Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1260 (N.D. Ala. 2025). The question is whether the attorney can be found to have "knowingly" made a false representation simply by failing to cite-check a pleading generated through a large language model. This conduct could be considered negligent or reckless, but maybe not "knowing."

---

[13] Georgia Rule of Professional Conduct 3.3(a)(1) is identical to Alabama Ethics Rule 3.3(a)(1).

Here, however, Ms. Preston admitted she violated Alabama Ethics Rule 3.3(a)(1). At the August 26, 2025, hearing, the Court reminded Ms. Preston of Alabama Ethics Rule 3.3 before asking her, "Was generative artificial intelligence used at any point in the preparation of the Motion to Reconsider?" Ms. Preston replied, "No, sir." As admitted in the Preston Response and at the hearing on the Show Cause Order, this representation to the Court was false, and Ms. Preston knew it was false. [Doc. 1076], at p. 1. She explained that she became defensive and "was not fully truthful out of fear," and "understood very quickly that this was a poor decision." *Id*. The Court takes Ms. Preston at her word that this was the reason she lied, but the Court asked the question to give her an opportunity to come clean and contain the damage caused by Progressive's pleadings. Ms. Preston choose to forgo that opportunity, in violation of Alabama Ethics Rule 3.3(a)(1).

## B. Sanctions

### 1. 28 U.S.C. § 1927

Attorneys can be sanctioned under Title 28 of the United States Code, Section 1927 if they unreasonably and vexatiously multiply proceedings in any case. *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010). "An attorney multiplies the proceedings unreasonably and vexatiously only when the attorney's conduct is so egregious that it is tantamount to bad faith." *Id*. (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)) (internal quotations omitted). A determination of bad faith is appropriate when an attorney "knowingly or recklessly pursues a frivolous claim" or "engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Id.*; *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003).

Courts in this Circuit have found bad faith and imposed Section 1927 sanctions where attorneys used artificial intelligence to draft and file pleadings without ensuring the accuracy of the case citations and principles of law. *See, e.g.*, *ByoPlanet Int'l, LLC*, 792 F. Supp. 3d at 1357-58 (imposing Section 1927 sanctions for the use of artificial intelligence-generated hallucinated

22

cases and fabricated quotations that caused the parties and the court to spend significant resources to determine the accuracy of the citations); *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Enters., LLC*, No. 17-CV-81140, 2025 WL 1440351, at *5 (S.D. Fla. May 20, 2025) (same).

In this case, the Court finds that Ms. Preston's filings constituted egregious conduct evidencing bad faith, as she engaged in litigation tactics that needlessly obstructed the progress of the Debtors' cases. *See Peer*, 606 F.3d at 1314. However, the Firm voluntarily paid the entirety of the attorneys' fees sought by the DIP Lender and the Debtors in the Motions for Sanctions – totaling $55,721.20 – such that neither the Firm nor Ms. Preston can be found to have further liability under 28 U.S.C. § 1927.

### 2. Inherent Authority

The Court possesses the inherent power to sanction a party "for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). Courts can use their inherent authority to impose sanctions ranging from the award of fees to suspending or disbarring lawyers to outright dismissal of a case. *Id.* at 45; *In re Snyder*, 472 U.S. 634, 643 (1985).

"Inherent powers must be exercised with restraint and discretion," and "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. To exercise its inherent authority, a court must find that the party acted in bad faith. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("Our circuit has linked inherent power sanctions with subjective bad faith[.]").

23

"[I]n the absence of direct evidence of subjective bad faith, this [subjective bad faith] standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1124-25. Recklessness alone does not satisfy the subjective bad-faith standard; instead, the standard requires something more, such as recklessness plus a frivolous argument. *Id*. at 1225-26; *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

Under this inherent authority, courts can "sanction the misuse of AI when it affects the Court's docket, case disposition, and ruling." *Versant Funding LLC*, 2025 WL 1440351, at *3. Courts have found that a party acts in subjective bad faith when the party submits a brief without verifying the validity of arguments or existence of cases cited therein. *See Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 350 (E.D.N.Y. 2025).

In *ByoPlanet*, the district court awarded sanctions for counsel's continued submissions to the court using artificial intelligence without checking the accuracy of cases and citations, despite being on notice that the use of artificial intelligence resulted in hallucinated cases and quotations. 792 F. Supp. 3d at 1349. In that case, the court found subjective bad faith, holding that counsel's behavior was egregious given that: (1) counsel was already on notice of hallucinated cases and quotations; and (2) after counsel was on notice, he used hallucinated cases and quotations in direct response to a motion to dismiss and an order to show cause regarding his misrepresentations and hallucinated cases and quotations. *Id*.

Like the lawyer in *ByoPlanet,* Ms. Preston was put on notice that the Motion to Reconsider contained fabricated quotes, mis-citations, and misstatements of existing case law. Despite this notice, Ms. Preston filed the Supplemental Brief and Progressive Response, which contained more mis-citations, misstatements of existing case law, and the re-use of a fabricated quote now attributed to a new case. The Court rejects Ms. Preston's assertion in the Progressive Response

24

that the Motion to Reconsider contained "at most, citation or paraphrasing errors." Even if the Court accepted that assertion, the subsequent misrepresentations of law in the Supplemental Brief and Progressive Response are so egregious that it could only be construed as to have been committed in bad faith. Therefore, sanctions are appropriate against Ms. Preston under the Court's inherent authority.

With respect to the Firm, the Court finds that it took reasonable steps both before and after the issuance of the Show Cause Order to address the inherent risk associated with the use of generative artificial intelligence for legal research and writing. It implemented the Original AI Policy in June 2023 and the Updated AI Policy in July 2025. Once it learned of the Show Cause Order, it expended significant financial and human resources to remediate the harm caused in this case and to prevent future violations. Without limitation, the Firm: paid over $55,000.00 in attorneys' fees to the DIP Lender and the Debtors; used Firm lawyers to investigate other filings by Ms. Preston and to provide supervision in her cases; implemented the Cite Checking Policy; and conducted additional training of its attorneys regarding the responsible use of generative artificial intelligence. Accordingly, the Court concludes that the Firm has not acted in bad faith with respect to the events that unfolded in this case, such that sanctions under the Court's inherent authority are not necessary or appropriate with respect to the Firm.

3.  Bankruptcy Rule 9011

Rule 9011 of the Federal Rules of Bankruptcy Procedure provides in relevant part:

> (b) Representations to the Court. By presenting to the court a petition, pleading, written motion, or other document – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party is certifies that, to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument to extend, modify, or reverse existing law, or to establish new law . . . .

FED. R. BANKR. P. 9011(b)(2).

"Rule 11 imposes a duty on attorneys to certify that they have conducted a *reasonable inquiry* and have determined that any papers filed with the court are well grounded in fact, [and] legally tenable." *Benjamin*, 779 F. Supp. 3d at 347 (quoting *Park v. Kim*, 91 F.4th 610, 614 (2d Cir. 2024)) (emphasis in original). "At the very least, the duties imposed by Rule 11 require that attorneys read, *and thereby confirm the existence and validity of*, the legal authorities on which they rely." *Id.* (quoting *Park*, 91 F.4th at 615) (emphasis in original).

Lawyers who cite case law that is either hallucinated by artificial intelligence or otherwise made up violate their duties under Rule 11. *See, e.g.*, *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-CV-281, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024) (sanctioning attorney who filed a response "without reading the cases cited, or even confirming the existence or validity of the cases included therein"); *Mata v. Avianca*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023) ("A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law.") (citation omitted).

Lawyers also violate Rule 11 when they mis-cite the holdings of a case or mis-quote from judicial opinions. *See United States v. Hayes*, 763 F. Supp. 3d 1054, 1067 (E.D. Cal. 2025); *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1347 (Fed. Cir. 2003) (affirming Rule 11 sanctions against attorney for misquoting and failing to quote fully from judicial opinions in a motion for reconsideration she signed and filed); *see also iParametrics, LLC v. Howe*, 522 F. App'x 737, 739 (11th Cir. 2013) (upholding Rule 11 sanctions for filing a factually and legally inaccurate writ of execution where the lawyer "could readily have discovered and corrected his pleadings, but instead his misrepresentations went undetected for over a year").

Courts addressing fake citations generated by artificial intelligence have imposed various forms of Rule 11 sanctions upon the offending attorneys, including monetary sanctions, referrals

26

to a disciplinary body for proceedings, CLE training requirements, and *pro hac vice* revocations. *See Benjamin*, 2025 WL 1195925, at *6 (collecting cases). Where Rule 11 sanctions are to be imposed, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." FED. R. BANKR. P. 9011(c)(1).

With the Motions for Sanctions having been resolved, Bankruptcy Rule 9011 applies in this case only with respect to the Show Cause Order. FED. R. BANKR. P. 9011(c)(3). In the Eleventh Circuit, to exercise its *sua sponte* Rule 11 powers, a court must find that the party acted in bad faith. *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). In a court-initiated proceeding under Rule 11, the court must apply a standard "akin to contempt" *Id.* The Eleventh Circuit has "not elaborated on the 'akin to contempt' standard." *McDonald v. Emory Healthcare Eye Ctr.,* 391 F. App'x 851, 853 (11th Cir. 2010).

The Eleventh Circuit has not determined whether the "akin to contempt" standard requires subjective bad faith. *Kaplan*, 331 F.3d at 1256. However, if an attorney's conduct meets the subjective bad faith standard, such conduct also necessarily satisfies the "akin to contempt" standard, and, as noted above, subjective bad faith can be inferred from conduct that is so egregious that it could only be committed in bad faith. *Purchasing Power*, 851 F.3d at 1223.

As described above, Ms. Preston repeatedly presented to the Court pleadings that contained fabricated quotes, mis-citations, and misstatements of existing case law, even after being put on notice of the infirmities of these papers by the DIP Lender, the Debtors, and the Court. By signing, filing, and later advocating these pleadings, Ms. Preston repeatedly violated Bankruptcy Rule 9011, as she admitted she had not performed an inquiry sufficient to certify that the legal contentions therein were warranted by existing law or by a nonfrivolous argument for the extension of the law.

27

The artificial intelligence-generated misrepresentations of law in the Motion to Reconsider, Supplemental Brief, and Progressive Response represent conduct so egregious that it could only be construed as to have been committed in bad faith. *See Purchasing Power*, 851 F.3d at 1223. Therefore, sanctions are appropriate against Ms. Preston. The Court notes, however, that Ms. Preston accepted the Court's invitation to withdraw the Motion to Reconsider and Supplemental Brief, such that monetary sanctions may not be awarded under Bankruptcy Rule 9011. *See* FED. R. BANKR. P. 9011(c)(2)(B). The Court determines it is appropriate to impose a nonmonetary sanction on Ms. Preston under, without limitation, Bankruptcy Rule 9011(c)(3), as discussed below.

With respect to the Firm, the Court finds that the Firm took reasonable steps both before and after the issuance of the Show Cause Order to address the inherent risk associated with the use of generative artificial intelligence for legal research and writing, as summarized more fully above. Accordingly, the Court concludes that sanctions under Bankruptcy Rule 9011 are not appropriate with respect to the Firm.

4. Section 105(a)

Section 105(a) provides bankruptcy judges with broad power to implement the provisions of the Bankruptcy Code and to prevent abuse of the bankruptcy process. *See, e.g.*, *Insight Sec. Inc. v. Cordova (In re Cordova)*, Nos. 6:19-bk-04049-LVV, 6:19-ap-00323-LVV, 2021 WL 6550868, at *3 (Bankr. M.D. Fla. Sep. 24, 2021) (citing *Franken v. Mukamal*, 449 Fed. App'x 776, 778 (11th Cir. 2011)); *In re Volpert*, 110 F.3d 494, 500 (7th Cir.1997); *In re Coquico, Inc.*, 508 B.R. 929, 940-41 (Bankr. E.D. Pa. 2014).

Under Section 105(a), a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Title 11. Section 105(a) also permits a Bankruptcy Court, *sua sponte*, to "tak[e] any action or mak[e] any determination necessary or

28

appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). In addition, Section 105(a) may be used "to protect the integrity of the Bankruptcy Code as well as the judicial process." *See In re Arkansas Communities, Inc.*, 827 F.2d 1219, 1222 (8th Cir.1987) (quoting *In re Silver*, 46 B.R. 772, 774 (D. Colo. 1985)).

When sufficient evidence exists to find an abuse of the judicial system, a bankruptcy court may award sanctions against both attorneys and litigants under Section 105(a), without regard to the signed document requirement or safe harbor provisions of Rule 9011. *See e.g.*, *In re Schemelia*, 607 B.R. 455, 462 (Bankr. D.N.J. 2019); *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273-74 (11th Cir. 2009); *Ettinger & Assocs. LLC v. Miller (In re Miller)*, 529 B.R. 73, 85 (Bankr. E.D. Pa. 2015); *In re Antonelli*, No. 11-20255/JHW, 2012 WL 280722, at *13 (Bankr. D.N.J. Jan. 30, 2012); *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005); *In re Collins*, 250 B.R. 645, 657-59 (Bankr. N.D. Ill. 2000); *In re Mergenthaler*, 144 B.R. 632, 635 (Bankr. E.D.N.Y. 1992) (citing *United States v. Int'l Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)).

For the reasons stated in Sections B.2 and B.3 above, the Court finds that Ms. Preston's conduct with respect to the Motion to Reconsider, Supplemental Brief, and Progressive Response constituted an abuse of the bankruptcy process. The Court determines that a nonmonetary sanction against Ms. Preston is appropriate under, without limitation, Section 105(a), as forth in more detail below.

With respect to the Firm, consistent with the analysis in Sections B.2 and B.3 above, the Court finds that the Firm took reasonable steps both before and after the issuance of the Show Cause Order to address the inherent risk associated with the use of generative artificial intelligence for legal research and writing. Accordingly, the Court concludes that sanctions under Section 105(a), are not appropriate with respect to the Firm. Even so, the Court finds that further limited action by the Firm is necessary and appropriate to enforce or implement court orders and rules,

and to prevent future abuse of process in the context of the use of generative artificial intelligence. *See* 11 U.S.C. § 105(a).

As noted above, the Firm took numerous affirmative steps to mitigate the harm associated with Ms. Preston's actions in this case and to prevent future abuse of process. Among those steps were to adopt the Cite Checking Policy and to conduct training on the Updated AI Policy, the Cite Checking Policy, and the responsible use of artificial intelligence. The one gap in these measures relates to verifying that all attorneys and employees were aware of the Firm's policies. In response to a question from the Court, Mr. Giller stated that there was no specific record of Ms. Preston acknowledging the Original AI Policy or the Updated AI Policy. *See* Transcript of October 28, 2025, Hearing [Doc. 1152], at p. 29.[14] Mr. Giller further stated that over the past year the Firm developed a mechanism to track signed acknowledgments of updated policies, and he believed acknowledgments were tracked by the Firm's risk department. *Id*. at p. 30.

The Court finds it necessary and appropriate to procure a more definite certification from the Firm that the Updated AI Policy, the Cite Checking Policy, and the circumstances of this case have been reviewed and acknowledged by the Firm's personnel. Accordingly, under Section 105(a), the Court will impose a certification requirement on the Firm, as set forth below.

## CONCLUSION

Bankruptcy cases often involve, as here, a degree of scarcity not always present in other legal proceedings. There is a scarcity of financial resources and human resources, and almost inevitably a scarcity of time. It certainly is within a party's rights to litigate issues in a bankruptcy case, even if the litigation slows down the case and diverts resources. That said, doing so without a sound legal and factual basis is exceedingly and unnecessarily destructive, given the scarcity of

---

[14] *See* Exhibit E.

resources. The use of generative artificial intelligence to multiply the proceedings in this case was particularly egregious, given that not only the Debtors and the DIP Lender – but also the Court – repeatedly pointed out the very serious flaws in Progressive's arguments and authorities. Ms. Preston doubled down, tripled down, and quadrupled down on arguments unsupported by the authorities cited, diverting time, money, and attention from the Debtors' efforts at rehabilitation.

The Court applauds the accountability that the Firm has taken on account of Ms. Preston's actions and appreciates the accountability Ms. Preston has taken in the Preston Response and at the hearing on the Show Cause Order. The Court also recognizes that Progressive ultimately withdrew the Motion to Reconsider, Supplemental Brief, and Progressive Response. By that point, however, significant damage already had been done, such that nonmonetary sanctions and certain remedial actions are necessary and appropriate.

Accordingly, based on the foregoing:

1. The Court **PUBLICLY REPRIMANDS** attorney Cassie D. Preston for the misconduct described in this Memorandum Opinion and Order;

2. To effectuate her reprimand, to the extent Ms. Preston still is representing Firm clients in active litigation, she is **ORDERED** to provide a copy of this Memorandum Opinion and Order to her clients, opposing counsel, and the presiding judge in every pending state or federal case in which she is currently counsel of record. She must comply with this requirement within thirty days from the date of this Memorandum Opinion and Order and must certify to the court within twenty-four hours of that compliance that the requirement has been met;

3. To further effectuate the reprimand and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this Memorandum Opinion and Order for publication;

4.  Ms. Preston's *pro hac vice* admission to this Court is **REVOKED**;

5.  Ms. Preston is **DIRECTED** to provide the Clerk of Court with a listing of jurisdictions in which she is licensed to practice law within twenty-four hours of this Memorandum Opinion and Order;

6.  The Clerk of Court is **DIRECTED** to serve a copy of this Memorandum Opinion and Order on the General Counsel of the Alabama State Bar, the Georgia State Bar, and any other applicable licensing authorities for further proceedings as appropriate; and

7.  The Firm is not sanctioned or reprimanded, but the Firm is **DIRECTED** to provide a copy of this Memorandum Opinion and Order – as well as the Updated AI Policy and the Cite Checking Policy – to every attorney in the Firm, obtaining acknowledgment of receipt by each attorney. The Firm must comply with this requirement within thirty days from the date of this Memorandum Opinion and Order and must certify to the Court within twenty-four hours of that compliance that the requirement has been met.

Done this 20th day of November, 2025.

Christopher L. Hawkins
United States Bankruptcy Judge

c:      Cassie D. Preston
        Wallace D. Mills, Attorney for Ms. Preston
        Ronald A. Giller on behalf of the Firm
        Chad Shultz on behalf of the Firm
        Robert D. Segall, Attorney for the Firm
        J. David Martin, Attorney for the Firm
        Derek F. Meek, Attorney for Debtors
        Marc P. Solomon, Attorney for Debtors
        Catherine Via, Attorney for Debtors
        Paul M. Rosenblatt, Attorney for the DIP Lender
        Joel D. Connally, Attorney for Progressive Perfusion, Inc.

32

# Exhibit A

## Excerpts from Transcript of July 8, 2025, Hearing [Doc. 758]

```
 1    UNITED STATES BANKRUPTCY COURT

 2    MIDDLE DISTRICT OF ALABAMA

 3    Case No. 25-30256 (Jointly Administered)

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7         JACKSON HOSPITAL & CLINIC, INC., et al.,

 8

 9            Debtors.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    Middle District of Alabama

14                    One Church Street

15                    Montgomery, AL 36104

16

17                    July 8, 2025

18                    1:00 PM

19

20

21    B E F O R E:

22    HON. CHRISTOPHER L. HAWKINS

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: UNKNOWN
```

1    HEARING re Doc# 637 Supplemental Notice and Disclosure

2    Regarding Debtors' Motion for Interim and Final Orders (I)

3    Authorizing Debtors to (A) Obtain Postpetition Secured

4    Financing Pursuant to Section 364 of the Bankruptcy Code,

5    (B) Use Cash Collateral, (II) Granting Liens and

6    Superpriority Administrative Expense Status, (III) Granting

7    Adequate Protection, (IV) Modifying the Automatic Stay, (V)

8    Scheduling a Final Hearing, and (VI) Granting Related Relief

9

10   HEARING re Doc# 653 UMB Bank, N.A. Limited Response to

11   Debtors' Supplemental Disclosure Regarding DIP Financing

12   Motion

13

14   HEARING re Doc# 654 Objection to Use of Newly Discovered

15   Account Containing Reimbursements and Motion to Segregate

16   Trust or Earmarked Funds Not Property of the Estate

17   (Progressive Perfusion, Inc.)

18

19   HEARING re Doc# 660 Objection to Use of Funds filed by

20   Cassie Preston on behalf of Progressive Perfusion, Inc. (RE:

21   related document(s)649 Chapter 11 Monthly Operating Report

22   (Non-Small Business) filed by Debtor Jackson Hospital &

23   Clinic, Inc.)

24

25

1  HEARING re Doc# 675 Response to Progressive Perfusion's (I)

2  Objection to Use of Newly Discovered Account Containing

3  Reimbursements and Motion to Segregate Trust or Earmarked

4  Funds Not Property of the Estate; and (II) Limited Objection

5  of Progressive Perfusion, Inc. to Use of Funds from

6  Undisclosed Account and Reservation of Rights filed by Derek

7  F. Meek on behalf of Jackson Hospital & Clinic, Inc. (RE:

8  related document(s)654 Motion Directing Payment of Funds

9  filed by Creditor Progressive Perfusion, Inc., 660 Objection

10  filed by Creditor Progressive Perfusion, Inc.)

11

12  HEARING re Doc# 677 Response to Progressive Perfusion,

13  Inc.'s Objections to Use of Funds from Undisclosed

14  Account filed by Paul Rosenblatt on behalf of Jackson

15  Investment Group, LLC (RE: related document(s)654 Motion

16  Directing Payment of Funds filed by Creditor Progressive

17  Perfusion, Inc., 660 Objection filed by Creditor Progressive

18  Perfusion, Inc.)

19

20

21

22

23

24

25  Transcribed by:  J. Benjamin Graham, CET-3405

1    filed a response to the Progressive Perfusion papers.  I'd

2    like to proffer some testimony.  Mr. Wilen's here in support

3    of our response to that and speak briefly and then turn it

4    over to Progressive Perfusion for whatever they might say.

5              THE COURT:  Okay.  Thank you.

6              MR. MEEK:  Okay.  With that, Mr. Allen Wilen is

7    present and if he were called to testify today regarding the

8    debtors' response to Progressive Perfusion -- I'll just call

9    them Progressive -- Progressive's objection, Mr. Wilen's

10   testimony would be prior to the petition date the debtors

11   and Progressive were parties to a contract whereby

12   Progressive provided perfusion services to the debtors

13   primarily during open heart surgery and other major

14   cardiovascular procedures.

15             On or about May 2024, the debtors terminated their

16   contract with Progressive.  The debtors terminated their

17   contract because the debtors' cardiovascular surgeon no

18   longer worked at the hospital and thus the debtors did not

19   need Progressive's services anymore.

20             On October 21, 2024, Progressive filed a complaint

21   alleging breach of this contract against Jackson Hospital in

22   the Circuit Court of Montgomery County, Alabama.  That's

23   Case Number 03-cv-2024-901633.  Progressive has not provided

24   any services to the debtors since May of 2024.  To date, the

25   debtors do not have a cardiovascular surgeon that would

1    require the debtors to need Progressive's services.

2            Progressive is not a vendor of the debtors.  The

3    debtors did not designate Progressive as a critical vendor

4    because the debtors are not party to any agreement with

5    Progressive, nor are the debtors accepting services from

6    Progressive.  The debtors have no existing agreement with

7    Progressive.  Any funds in the U.S. Bank account do not

8    belong to Progressive.

9            Under the debtors' billing system, perfusion

10   services would be billed as part of an in-patient stay

11   through the hospital's electronic medical record system,

12   owned and operated by Altera, which is formerly Paragon, and

13   reimbursed on a diagnosis-related group, or DRG, basis.

14           The reimbursement from hospital in-patient billing

15   is deposited into an account held at Regions Bank, not the

16   U.S. Bank account.  The only items that are deposited in the

17   U.S. Bank account are those that are separately billable

18   under Section 410.42 or Section 412.50.  These claims would

19   be billed out of Athena and the reimbursements received into

20   the U.S. Bank account, and this does not include

21   perfusionist services.

22           That would conclude the testimony of Mr. Wilen and

23   I would proffer that into evidence at this time, Your Honor.

24           THE COURT:  Okay.  Are there any objections to the

25   proffer of that testimony?  All right.  Then I will admit

1    that proffer.

2            MR. MEEK:  Thank you, Your Honor.  So after that

3    presentation, for reasons set forth in our responsive

4    pleading, we believe Progressive is not entitled to a

5    constructive trust or any rights into the U.S. Bank funds

6    whatsoever under bankruptcy law, under health care law or

7    under any other area of law.  And even if they were, the

8    U.S. Bank account funds are not related to services

9    performed in any way by Progressive.  Perfusion services are

10   not billed through Athenahealth, which are the funds in the

11   account in question.  There are several other pleadings that

12   Progressive Perfusion has filed.  Those aren't set for

13   today.  The only thing I think is teed up before Your Honor

14   is the objection.  Happy to call Mr. Wilen to the stand if

15   needed.  Happy to answer any questions Your Honor may have.

16   Otherwise, we believe the objection should be overruled.

17           THE COURT:  Okay.  Thank you.

18           MR. MEEK:  Thank you.

19           THE COURT:  Ms. Preston, would you like to speak

20   to these issues?

21           MS. PRESTON:  Would you like me to come?

22           THE COURT:  Yes, please.  So if you'll speak into

23   the microphone so people that are participating on the Webex

24   will be able to hear you.

25           MS. PRESTON:  Good afternoon, everybody.  So first

1  I'd like to say that the contract, whether there is one or

2  not one, it's really not at issue today.  I think that is

3  going to be set for a different day.  But since it was

4  addressed, I'm going to address it as well.

5          I disagree with him, with Derek entirely for the

6  reason that there is an implied in fact contract.

7  Regardless of the written contract that was in 2017, auto

8  transfusion services did go through June.  And so there is

9  an applied in fact contract which is recognized in Alabama

10  law and in federal law.  So I'll move on from there and we

11  can argue that another day.

12          You know, I'm not discounting completely what

13  Derek is saying.  I don't know.  And that's the whole point

14  of the motion.  We don't know where those funds are from.

15  And so we're taking Jackson's word, who -- I mean, there's a

16  lot of financial, you know, questions here that need to be

17  answered.  And I don't think that it would be proper for the

18  Court to just take Jackson's word for it without any kind of

19  documentation or discovery into the issue.  I think that the

20  creditors have a right to know, you know, what that money is

21  traced to.  And I think that they should not use it until

22  that is known.

23          I mean, it could be Progressive's.  It could be

24  someone else's, but regardless, it is not maybe Jackson's.

25  So we need to take that into account before we let them take

1    it instead of getting a loan.  And I understand their

2    reasoning, but the fact is it may not be their money.  So

3    even if it's not something that should be held in trust for

4    Progressive, it may be something that should be held in

5    trust for someone else.  So I think that we have a duty to

6    investigate.

7            The creditors' committee that agreed, I mean, that

8    wasn't put on record.  It wasn't presented to everybody, to

9    all the creditors.  Apparently it was just some conversation

10   between a couple of attorneys, and there are a lot of

11   attorneys on this case.  So I think it should have been

12   presented to everybody to make a decision about that.

13           THE COURT:  When you say the creditors' committee

14   -- and I'm sorry, I saw Mr. Williams, and I'll let you go

15   ahead and make an appearance if you would, just so --

16           MR. S. WILLIAMS:  Your Honor, I apologize.  I got

17   caught in the accidents on I-65.

18           THE COURT:  Okay.

19           MR. S. WILLIAMS:  Scott Williams, on behalf of the

20   unsecured creditors' committee.

21           THE COURT:  Okay.  Thank you.

22           MR. S. WILLIAMS:  Thank you, Your Honor.

23           THE COURT:  And so, Ms. Preston, are you saying

24   that --

25           MS. PRESTON:  I'm saying --

1          THE COURT:  Well, let me put it this way.  Of

2     record, Progressive Perfusion is the only party that has

3     objected to --

4          MS. PRESTON:  Sure.

5          THE COURT:  -- the use of this cash collateral

6     pursuant to -- I think there is a budget attached to the

7     notice.

8          MS. PRESTON:  There is.  Yes, sir.

9          THE COURT:  It gets hard to read unless you have

10    it on a big monitor, but it runs how much farther?  Do you

11    remember?

12         MR. MEEK:  It's, I think, a few weeks, Your Honor.

13    And I should have added, we intend to amend that in all the

14    DIP pleadings as we go forward.  Your Honor may have seen

15    the extension of the bid deadline goes through July 22nd

16    with the -- after consultation with the Consultation

17    Parties.  But as a result of that moving that date, it will

18    shift several dates and deadlines as well as an amendment to

19    the DIP and so forth, which all those pleadings are

20    forthcoming.  I was kind of saving that for housekeeping,

21    but --

22         THE COURT:  Okay.  Okay, and Ms. Preston, are you

23    saying that the committee did not object to this notice or

24    object to the use of the funds?

25         MS. PRESTON:  This is what Derek is saying.  I'm

1  sorry, Mr. Meek is saying.  He's saying that he spoke to

2  them, I guess, outside of court and asked if they had some

3  objection to the use of the funds.  And it was agreed that

4  they could use them by the creditors' committee.  That is

5  what Mr. Meek has testified to, or said in court.  I don't

6  know.  I don't know that.  I'm just taking him at his word.

7         But regardless, I think that it should not have

8  been presented just to the creditors' committee and one

9  other person.  I think it should have been presented for all

10 the creditors.  It should have been something that was made

11 aware of to all of us so that we could have objected.  I

12 mean, I know that he said it in open court, sure.  But you

13 know, it gave me a week to file something.  And I think that

14 a lot of creditors may not even have been present.

15        THE COURT:  Okay.  Well, what is the -- so you're

16 saying we don't know for sure, but there is now a proffer of

17 testimony that they did determine where these funds were

18 flowing from and for what purposes those payments were

19 coming in.  Does Progressive have any evidence that is

20 contrary to that proffer?

21        MS. PRESTON:  We do not.  Everything that I have

22 would be speculation because we don't have authority to go

23 in and investigate ourselves.  And I think that we should be

24 allowed to do that.  Obviously there were not good financial

25 practices in place and I can't say for certain that there

1    are now. So I think that because of that and because

2    they're owed a lot of money, that my client and some of the

3    other creditors have a right to go and conduct some

4    discovery. Whether they want to or not, I certainly do.

5    And I think that it's owed to us.

6         You know, we can say that maybe the Athena, you

7    know, didn't account for any of Progressive's DRG payments

8    that were bundled up in Dr. Kwan, which was the surgeon

9    before, all of those things. But that would just be taking

10   one person at their word instead of us going in and being

11   able to conduct a full-scale investigation like we should be

12   allowed to. And I think that that is the case in every

13   federal court case, whether it's bankruptcy or otherwise.

14   Discovery is a mainstay. I know it's not in bankruptcy.

15   But I think that when situations like this present

16   themselves, I think that it's practical.

17        THE COURT: We also, though, have concerns about

18   maintaining operations through a potential sale, refinancing

19   or other restructuring.

20        MS. PRESTON: Okay.

21        THE COURT: And this is cash collateral that --

22   and I do want to hear from Mr. Rosenblatt and Mr. Retherford

23   and Mr. Williams as well -- that would be used to maintain

24   operations through a sale. And is there not a problem with

25   bringing the operations to a halt in order to figure out

1    whether Mr. Wilen's investigation and proffer is accurate?

2              MS. PRESTON:  I'm going to be frank with you.  I

3    think that they have already themselves brought some of

4    their operations to a halt.  Derek -- Mr. Meek, sorry,

5    claims that there's no cardio surgeon there, and that is

6    true at the moment.  But I know that he's actively

7    recruiting, or the hospital is actively recruiting for Dr.

8    Kwan to come back.  And it's actively recruiting and has

9    advertisements out for a cardiothoracic surgeon.

10              So that tells me that it's kind of a gameplaying

11   thing they're doing where we don't need you right now, but

12   we needed you then and we may need you in the future.  And

13   the thing is, the CFO of Jackson Hospital actually told my

14   client that they wanted to continue working with him and

15   wanted his prices to be a little cheaper.  And they were in

16   active contract negotiations while he was still performing

17   services.

18              So I think there is a question as to whether he's

19   a critical vendor.  There's a question as to whether there

20   is an active contract.  There's a lot of things going on

21   here that I don't think are being fully investigated.  And I

22   think that these funds, and you say they're cash collateral,

23   Your Honor, and typically maybe that's the case, but these

24   in fact may be earmarked funds for one of the providers that

25   were bundled in those DRG paints.  And if that's the case,

1    they were never part of the estate to start with, and they

2    should not be used as cash collateral for certain.  And that

3    is where the trust comes in.  And Progressive may have one

4    in those funds.  Someone else may have one in those funds.

5    But regardless, Progressive has one somewhere.

6           THE COURT:  How does Progressive meet the

7    requirements for establishing a constructive trust?

8           MS. PRESTON:  Because under the Medicare

9    guidelines, when a DRG payment, or when, sorry, a claim is

10   submitted under the DRG, like it's supposed to be, because

11   Progressive, as a perfusionist, cannot bill itself.  It

12   can't bill Medicare itself.  It has to be bundled.  So the

13   hospital has to do it.  And so when they provide the

14   reimbursement, then whatever the perfusionist has contracted

15   with the hospital for is his specific amount that is

16   earmarked that is supposed to go to him.

17          And there is an abundance of law that shows that

18   in the event this happens and the hospital or whatever

19   entity it is, you know, has those funds, that portion is not

20   something that belongs to them.  And so effectively they

21   become, you know, a trustee of those funds until they're

22   given to the person they belong to.  It was never -- it's

23   never theirs to start with.

24          So I think that us just carte blanche saying there

25   is cash collateral is wrong.  I think it's wrong according

1    to the law and I think it's just -- it's wrong generally

2    because there are a lot of people owed a lot of money here

3    and that's not being accounted for.  And we have a $14.5

4    million fund that essentially they want to take and give to

5    themselves as attorneys or the other administrators, which

6    that's part of the process.  But when you have these folks

7    that are owed money, I think that's unfair.  It's

8    fundamentally unfair.

9              THE COURT:  But you're not arguing that

10   Progressive provided any postpetition services?

11             MS. PRESTON:  Absolutely, they -- no.

12   Postpetition?  No, sir.  No, they didn't.

13             THE COURT:  And it was actually nine months prior

14   to the bankruptcy that the services --

15             MS. PRESTON:  He didn't get paid --

16             THE COURT:  -- that the services stopped; is that

17   correct?

18             MS. PRESTON:  Perhaps.  But these funds were from

19   the time period where he was still performing services.  And

20   that's the issue.  These are not new funds.  These are funds

21   that -- you know, from a year ago when he was still actively

22   performing services.  So as we all know, it takes Medicare

23   or any carrier a while to reimburse.  And for that reason,

24   you know, it could have been services performed in 2023 for

25   all we know.  The whole fact is we need to investigate.

```
 1    There does need to be a third-party forensic investigation.

 2              THE COURT:  Do you have a regulation or --

 3              MS. PRESTON:  I do.

 4              THE COURT:  Can I finish my question, please?

 5              MS. PRESTON:  Yes, sir.  I'm so sorry.

 6              THE COURT:  Do you have a regulation or a statute

 7    that imposes a trust?

 8              MS. PRESTON:  Yes, sir.

 9              THE COURT:  Because the response to your limited

10    objection that the debtors filed say that the regulations

11    you cited do not impose a trust.

12              MS. PRESTON:  That's actually incorrect, and

13    according to --

14              THE COURT:  Okay.  Can you recite --

15              MS. PRESTON:  Yes.

16              THE COURT:  -- where it says that Progressive has

17    -- basically funds are held in trust for Progressive?

18              MS. PRESTON:  Yes, sir.  I have a case if you'd

19    like that.  A case cite.

20              THE COURT:  Okay.

21              MS. PRESTON:  It's In re Columbia Gas System,

22    Inc.,  997 F.2d 1039 (3d Cir. 1993).

23              THE COURT:  Well, that's a more general

24    proposition as to funds being held in trust.  I guess I'm

25    asking --
```

1          MS. PRESTON:  That's specific to Medicare, Your

2     Honor.

3          THE COURT:  Okay.  Well, can you explain that case

4     to me, where it fits with your facts?

5          MS. PRESTON:  It says that funds that are

6     traceable to services rendered under an arrangement, which

7     is this very type of situation where the hospital bills for

8     a perfusionist or radiologist, you know, or sorry,

9     radiologist technician, any person or company that cannot

10    bill Medicare themselves under their guidelines, perfusion

11    being one of those, that those payments made that are

12    traceable to that specific provider do not become the estate

13    property and instead they become a constructive trustee of

14    that property.  So that is what that case says.  Is there

15    something in Medicare, the Medicare guidelines that

16    specifically say that somebody becomes a constructive

17    trustee?  No, that's absolutely not the case.  I don't think

18    --

19          THE COURT:  Because that seems to be what was

20    represented in your pleading is that under the regulations,

21    a trust is imposed.  And I think that's where I was trying

22    to get clarification.

23          MS. PRESTON:  No, but the law imposes a trust.

24    Medicare is a guideline for billing and things like that.

25    That obviously would not be something where they would, you

1    know, make a decision about a legal theory.

2              THE COURT:  And isn't the key word though in what

3    you were stating or citing from that case traceable?

4              MS. PRESTON:  Yes, for certain.  But --

5              THE COURT:  Okay, and if they have proffered that

6    funds for perfusion services would not go into this account,

7    then how can we make that connection that they are somehow

8    traceable?

9              MS. PRESTON:  I don't know, Your Honor.  But they

10   proffered they were going to pay my client month after month

11   after month, and that never happened either.  So my point is

12   we're taking one man's word when we should be able to go in

13   and investigate ourselves.  I think that is standard.  I

14   think that is the right thing to do, and I think that is

15   legally accurate as well.  And I have many more cases that

16   show that an equitable lien or a conservative trust is

17   formed in instances where you have the bundled payments.

18             THE COURT:  Okay.  Do you have any other points

19   you'd like to make?

20             MS. PRESTON:  No, sir, not right now.  Thank you.

21             THE COURT:  All right.  Thank you.

22             Any response from debtors' counsel?  And I do want

23   to hear from the others as well.

24             MR. MEEK:  Your Honor, could I wait to hear from

25   them as well and summarize?

1 administrator?

2        MS. GRIGGS:  Your Honor, we would support the

3 debtors' position with regard to the transfer of the funds

4 to a Regions Bank account for the reasons that Mr. Meek has

5 already stated regarding the collateralization issue.  All

6 of the debtors' accounts currently are at Regions Bank.  So

7 the collateralization processes are set up.  I'm not saying

8 it can't be done for U.S. Bank, but the processes aren't in

9 place currently.  So for those reasons we would prefer that

10 they be transferred to Regions.

11        THE COURT:  Okay.  Subject to the existing order

12 on postpetition financing --

13        MS. GRIGGS:  Yes.  Yes, Your Honor.

14        THE COURT:  -- with the idea that there may be

15 other motions related to it.  Okay.

16        MS. GRIGGS:  With all the reservations that Mr.

17 Meek has previously stated.

18        THE COURT:  Okay.  Thank you.

19        Anyone else want to be heard on these issues?

20        MS. PRESTON:  (Indiscernible)

21        THE COURT:  Okay.  You're welcome.  You would just

22 need to come up to the podium and if you can keep it --

23        MS. PRESTON:  It's going to be very brief.

24        THE COURT:  Okay.  Thank you.

25        MS. PRESTON:  I just wanted to -- I just wanted to

1  say something about the final DIP order. Those funds were

2  not part of any kind of consideration when the DIP loan was

3  taken out. It hasn't been considered in anything going

4  forward, I mean, from that point forward because they just

5  filed it. So I don't think that the argument that the

6  gentleman, and I'm sorry I don't recall his name, made about

7  the DIP order has any relevance whatsoever. We didn't

8  object. We haven't waived anything because those funds were

9  not part of the consideration for the DIP to start with.

10 The argument makes no sense to me.

11         As far as the case law goes, I have a multitude of

12 the case law that support my position. It may not speak

13 directly about Medicare and Medicaid payments, but it speaks

14 to a lot of analogous situations, and we make analogies in

15 the law all the time. So I don't see why this would be any

16 different. And if Your Honor would like for me to brief the

17 Court after with these cases, I'll be glad to do that.

18         THE COURT: Okay.

19         MS. PRESTON: Thank you.

20         THE COURT: Thank you.

21         Any final say on the notice and the limited

22 objections?

23         MR. MEEK: Thank you, Your Honor. I just would

24 like to reiterate -- Derek Meek, again for the debtors --

25 that it's not just one person's statement. It's sworn

# Exhibit B

## Excerpts from Transcript of July 15, 2025, Hearing
## [Doc. 760]

1   UNITED STATES BANKRUPTCY COURT

2   MIDDLE DISTRICT OF ALABAMA

3   Case No. 25-30256 (Jointly Administered)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7       JACKSON HOSPITAL & CLINIC, INC., et al.,

8

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  Middle District of Alabama

14                  One Church Street

15                  Montgomery, AL 36104

16

17                  July 15, 2025

18                  1:00 PM

19

20

21  B E F O R E :

22  HON. CHRISTOPHER L. HAWKINS

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: UNKNOWN

```
 1    HEARING re Doc# 316 Motion for Relief from Stay (Johnny

 2    Alexander as Personal Representative of The Estate of Althea

 3    Alexander)

 4

 5    HEARING re Doc# 443 Motion for Rule 2004 Discovery (Johnny

 6    Alexander as Personal Representative of The Estate of Althea

 7    Alexander)

 8

 9    HEARING re Doc# 545 Motion for Relief from Stay (Humana,

10    Inc./Humana Insurance Co./Health Value Management, Inc.)

11

12    HEARING re Doc# 554 Order (I) Scheduling A Hearing To

13    Consider Approval Of The Sale Or Sales Of Substantially All

14    Assets Of Jackson Hospital & Clinic, Inc. And JHC Pharmacy,

15    LLC And The Assumption And Assignment Of Certain Executory

16    Contracts And Unexpired Leases, (II) Approving Certain

17    Bidding Procedures, Assumption And Assignment Procedures,

18    And The Form And Manner Of Notice Thereof, (III)

19    Establishing Procedures In Connection With The Selection Of

20    And Protections Afforded To Any Stalking Horse Purchasers,

21    And (IV) Granting Related Relief Entered On 6/2/2025(RE:

22    related document(s)394 Motion to Sell Free and Clear of

23    Liens

24

25
```

```
1   HEARING re Doc# 563 Notice of Filing of Declaration of

2   Disinterestedness of Robert E. Poundstone IV (Bradley Arant

3   Boult Cummings, LLP) in Support of Retention as an Ordinary

4   Course Professional

5

6   HEARING re Doc# 564 Notice of Filing of Declaration of

7   Disinterestedness of Capell & Howard, P.C. in Support of

8   Retention as an Ordinary Course Professional

9

10  HEARING re Doc# 583 Bankruptcy Administrator's Response to

11  Declaration of Disinterestedness of Robert E. Poundstone IV

12  (Bradley Arant Boult Cummings, LLP) in Support of Retention

13  as an Ordinary Course Professional

14

15  HEARING re Doc# 584 Bankruptcy Administrator's Response to

16  Declaration of Disinterestedness of Raley L. Wiggins of

17  Capell & Howard, P.C. in Support of Retention as an Ordinary

18  Course Professional

19

20  HEARING re Doc# 614 Motion to Determine that Medicare

21  Reimbursements Misappropriated by Debtor and Earmarked for

22  Progressive Perfusion, Inc. are Not Property of the Estate

23

24

25
```

1    HEARING re Doc# 617 Motion to Compel the Designation of

2    Progressive Perfusion, Inc. as a Critical Vendor and for

3    Payment of the Outstanding Pre-Petition Debt

4

5    HEARING re Doc# 692 Debtors' Emergency Motion for Entry of

6    an Order (I) Authorizing the Debtors to Amend the DIP Credit

7    Agreement and (II) Granting Related Relief

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  J. Benjamin Graham, CET-3405

1    Preston.  Let her speak, and then we'll --

2              MR. MEEK:  That makes sense.

3              THE COURT:  And we'll hear your response shortly

4    after that.

5              MR. MEEK:  Thank you, Your Honor.

6              THE COURT:  Okay.  So, Ms. Preston, are you still

7    with us?

8              MS. PRESTON:  I'm sorry (indiscernible).  I am

9    here.  Can you hear me?

10             THE COURT:  Yes.

11             MS. PRESTON:  Okay.

12             THE COURT:  So we are just covering the two

13   motions that Progressive filed.  One of them was the motion

14   to compel the designation of Progressive Perfusion, Inc. as

15   a critical vendor and for payment of the outstanding

16   prepetition debt.  And the other was the motion to determine

17   that Medicare reimbursements misappropriated by debtor and

18   earmarked for Progressive Perfusion are not property of the

19   estate.

20             So I've read both of the motions.  I've read the

21   debtors' response.  I've read your reply.  Are there any

22   points you'd like to make that are different from or in

23   addition to what you had filed in your papers?

24             MS. PRESTON:  No, Your Honor.  I just want to

25   reiterate that everything in the reply is supported by law,

1   whereas the debtors' motion or response was not necessarily

2   so.

3           THE COURT:  If I could ask -- I'm going to ask you

4   a couple questions, I guess.

5           MS. PRESTON:  Sure.

6           THE COURT:  You had cited 42 -- I think kind of

7   where I'm struggling with the motions filed by Progressive

8   Perfusion is there are references to some regulations that

9   have been presented to the Court as if they directly support

10  this idea that the funds are earmarked or obligated or

11  placed into a trust for the benefit of vendors that do work

12  or provide other goods and services to the hospital.

13          But I've looked at each of these, starting with 42

14  CFR 412.2(c)(5), and you have represented it as saying that

15  it's saying that the hospital is financially responsible for

16  paying your client.  But that's not what it says.  And so it

17  doesn't articulate any position with respect to the payment

18  of vendors.  And so how are we getting to the point you're

19  trying to make when the regulation doesn't state that?

20          MS. PRESTON:  I think that it's just a natural

21  conclusion, Your Honor.  I mean, if you're speaking -- I'm

22  sorry, I think you said that 412 --

23          THE COURT:  I mean 412.2(c)(5) does not say when

24  you have a provider of goods and services -- well, I

25  shouldn't say provider because I think that is technically

1     the hospital under the regulation.  If there's a third party

2     that provides --

3          MS. PRESTON:  Yes.

4          THE COURT:  -- you know, goods or services,

5     there's nothing in there that says the providers, meaning

6     the hospital, is to hold funds in trust or anything to that

7     effect.  And I mean each of those regulations, I'm not

8     seeing that.  409.3 doesn't obligate payments to vendors.

9     That's the definition of arrangement.  And it's really there

10     to discharge the liability of its -- in there it's termed

11     the beneficiary, but basically the patient.  So it's saying

12     the patient is not responsible for the amounts that Medicare

13     pays to the hospital.  But it doesn't say anything about

14     vendors having, you know, funds held in trust for their

15     benefit.

16          And then, you know, the same thing with 412 -- I'm

17     sorry, 42 CFR 412.50.  It says what, you know, what only --

18     it basically just says that only the hospital can bill, but

19     it doesn't say what the hospital's obligations are.  All it

20     says is that the hospital is the party that can bill

21     Medicare for the services.

22          And so I guess I'm struggling with these citations

23     that aren't standing for the proposition -- they're not

24     standing for the proposition that funds are held in trust.

25     There's definitions and there's some other provisions in

1    there, but they're not saying that Progressive Perfusion has

2    -- that any services or goods provided by Progressive

3    Perfusion are entitled to constructive trust.

4         MS. PRESTON:  Okay.  So, Your Honor, I mean,

5    you're correct in that it's not explicitly stated in any of

6    those code sections that a constructive trust is created.  I

7    think that the constructive trust is something that was

8    defined by case law, and it's actually state law, and I

9    believe it's actually federal law as well.  But

10   (indiscernible) is case law for the state, which is

11   applicable here as well.

12        And a constructive trust is created by definition

13   from the very situation that we have here.  So I don't think

14   that the federal regulations need to necessarily explicitly

15   state that there's been a constructive trust created that,

16   you know, because of that, that Medicare has to pay -- I'm

17   sorry, the hospital has to pay its vendors that were

18   included in that bundled payment.  I think that stands to

19   reason that that would be the case.  I mean, it would be

20   extremely unjust for the hospital to be able to bill for,

21   you know, its vendors as well.  And in fact, with

22   Progressive Perfusion, it had to bill for the services

23   because Progressive cannot deal Medicare on its own.

24        So that is the whole nature of the DRG payment

25   services.  So, I mean, they literally billed the hospital,

1    Jackson, billed for Progressive Perfusion services that were

2    included in that one big bundle.  And it received the funds,

3    the reimbursement, but yet it didn't take that money and

4    then give it to Progressive Perfusion.  I mean, on so many

5    levels, that is very wrong.

6            But I mean, if we're talking about just the law

7    here, I think that the federal payment arrangement itself, I

8    mean, it leads one to believe that part of that money

9    belongs to another party.  I mean, it just -- I don't see

10   how it doesn't make sense or I don't see how it can be

11   construed any other way.  The money is clearly

12   Progressive's.  And the law says that if, you know, in

13   situations such as these where one party gets money that was

14   in fact intended for another, it then becomes the trustee

15   because it only has a physical possession.  It does not have

16   equitable interest.  Progressive Perfusion is the only party

17   that has equitable interest in the amount of that bundled

18   payment service that was reimbursed.  I mean, it is not the

19   estate's.  It never was.  It is Progressive's.

20           THE COURT:  But I think what I need is something

21   that distinguishes Progressive Perfusion from all other

22   creditors that have contributed goods or services towards

23   patient care, that they are not in the same boat because you

24   cited no cases that say this is how it works under Medicare,

25   Progressive Perfusion is entitled to the invoiced amount.

1 So we have, if I recall, roughly $100 million in unsecured

2 claims that don't represent claims (indiscernible), a little

3 bit less than $100 million of claims associated with

4 creditors that are in a very similar situation. And I just

5 -- I'm not seeing the case law or specific reference in the

6 regulations that establish Progressive Perfusion as being in

7 a separate category from other providers of goods and

8 services to the hospital.

9 MS. PRESTON: And I'll be glad to explain that,

10 Your Honor. I mean, we're talking about vendors, creditors

11 that were not under a bundled payment. You have vendors

12 that provided chocolate milk to the cafeteria or telecom

13 services. There are lots of creditors. I do agree with

14 that. They are not anywhere close to my client and the

15 situation it finds itself in. And that is because of the

16 Medicare (indiscernible).

17 If in fact my client had just billed the hospital

18 directly or billed Medicare directly, we wouldn't be in the

19 situation top start with. But if they billed the hospital

20 directly for services that were not included in the service

21 procedures that were actually paid out by Medicare, then

22 you're right. I think that your premise will be correct.

23 But because that's not the case, I think that's an

24 incorrect (indiscernible). I think that -- I know that.

25 It's a very different situation than any other creditor.

1   And in fact, I did put in the reply that there are no

2   anesthesiologist groups listed in the schedules as them

3   having to owe money.  Any of the other roles that are

4   generally involved in an open heart surgery or something of

5   that nature, none of those people are creditors.  And that

6   is because every one of them got paid.  Every single one of

7   them got paid because a lot of them were actually bundled in

8   as well.  So they got paid.  My client did not get paid.  So

9   I don't see that the similarities, as you say, Your Honor.

10  I just don't.

11          THE COURT:  Okay.  Let's talk about the critical

12  vendor, the motion to compel the designation of Progressive

13  Perfusion as a critical vendor.  Anything more you want to

14  add beyond what was in the pleadings?

15          MS. PRESTON:  I'd just like to add from a personal

16  standpoint that the fact that he is -- the company has been

17  with this hospital for 27 years and has been part of a

18  program, but they still tout on their website as being, you

19  know, this renowned heart program and just widely

20  established.  And, you know, the reason that it is, is

21  because my client actually got it off the ground with Dr.

22  Kwan.  So the fact that they are just rebuffing every

23  attempt to get paid for work actually (indiscernible) is

24  incredible to me.  Other than that, the legalities, they are

25  all mentioned.

1          THE COURT:  Okay.  But there's no dispute that we

2     were -- that the services from Progressive Perfusion stopped

3     about May of 2024?

4          MS. PRESTON:  No, that's incorrect, Your Honor.

5     Actually, it went through June after they -- after the CFO

6     actually improperly rescinded the contract, my client

7     continued to provide auto transfusion services in June, and

8     that is because he and the CFO had discussed it and had

9     intended to enter into another contract and were actually in

10    the process of doing that, and all of a sudden, the

11    negotiations stopped.  And I think that maybe would have

12    been around the time that he was removed or something of

13    that nature.  I'm not exactly sure on that.

14         THE COURT:  All right.  Well --

15         MS. PRESTON:  But the communications

16    (indiscernible) because of the bankruptcy --

17         THE COURT:  Well, let's take it --

18         MS. PRESTON:  -- so I don't agree with that.

19         THE COURT:  Well, let's take it as true that they

20    provided services through June.  The case was filed in

21    February of 2025, and I don't think there's a dispute, but I

22    want to confirm, no services have been provided by

23    Progressive Perfusion since the filing.  Is that correct?

24         MS. PRESTON:  That's correct, yes.

25         THE COURT:  Okay.  Now, you cited the Kmart case.

1    Do you see any procedural difference between Kmart and this

2    case?

3              MS. PRESTON:  I do not, no.

4              THE COURT:  Okay.  Where I'm going with that is

5    I'm struggling because the majority of the motion seems to

6    be attacking the critical vendor order.  And there are

7    allegations that there's not enough evidence that, you know,

8    pursuant to kind of how the Court analyzed it in Kmart, not

9    enough evidence, or maybe not even the proper statutory

10   predicates stated for providing critical vendor relief.

11             But that was appealed.  So in that case, there was

12   an unsecured creditor that said, I have a problem with this

13   order, and they timely appealed it, and it ran its course

14   through the district court and the court of appeals, and at

15   that point, it was reversed.  And that's when the court said

16   there wasn't sufficient evidence.

17             In this case, we have a critical vendor order that

18   was entered in February, and the attack is coming now in

19   July or maybe June from the first filing.  There wasn't a

20   motion to reconsider the order.  There wasn't an appeal of

21   the order.  And now there are arguments being made that the

22   order was incorrect.  Isn't the time -- hasn't the time

23   coming on for a challenge to the order itself?

24             MS. PRESTON:  Well, I think that's Your Honor's

25   decision, and obviously it's not within (indiscernible)

1    authority.  So that is your decision completely, Your Honor.

2    I think that just based on their nature, that the services

3    they provided -- and I agree, I think that -- well, for one,

4    I don't think my client is necessarily to be lumped in like

5    Your Honor is doing and the rest of the attorneys are doing.

6    You're lumping my client in like it's just another creditor,

7    and that's just not the case.

8              Now, I will say that I did try to conference with

9    Mr. Meek and his partner several times, actually, about the

10   (indiscernible) thing, and we were kept hanging.  We didn't

11   know whether we were going to be designated.  And in fact, I

12   believe that there was an amended or a supplemental critical

13   vendor order that came down.  And I could be wrong about

14   that, but I believe that there was.  But nevertheless, we

15   didn't know for sure until we got that second order, so.

16   And I do believe that that was (indiscernible).

17             THE COURT:  Okay.  Any other points you want to

18   make on that?

19             MS. PRESTON:  No.  It's all in my reply brief.

20             THE COURT:  All right.  Thank you.

21             Mr. Meek, I will let you respond.

22             MR. MEEK:  Thank you, Your Honor.  Yeah.  Once

23   again, it's the debtors' position that Progressive's motions

24   are not grounded in either the spirit or the letter of the

25   law.  Your Honor has hit on some of these things.  But on

1    the critical vendor motion, you know, the debtors, of

2    course, recognize we need Court authority to deem someone a

3    critical vendor, but it doesn't require us to deem someone

4    to be a critical vendor.  And using the factors on just Page

5    5 of Progressive's reply, it says that Progressive, you

6    know, it has the prerequisites to be deemed a critical

7    vendor.  They don't meet any of those, Your Honor.  But even

8    if Progressive did, it doesn't require us to deem them to be

9    a critical vendor.  And so we think that motion should be

10   denied, Your Honor.

11           As it relates to the misappropriation motion,

12   there is not a trust under any area of law.  To just address

13   Ms. Preston's argument, if a physician used a tongue

14   depressor or a reflex hammer, which is the little hammer

15   that makes your knee jump, in a procedure and billed for

16   that, that doesn't mean that the supplier of the wooden

17   tongue depressors receives a constructive trust for the

18   amount that they're left owed, if they were indeed owed

19   money for supplying those depressors by virtue of the

20   reimbursement.  So again, we object to that motion, ask that

21   it be denied.

22           And I just want to reserve our rights on the

23   record, Your Honor, as it relates to Progressive Perfusion.

24   There's an AP out there as well.  I don't think we've been

25   served with that yet, but if we are, we'll deal with that.

1   But all of these are not efficient uses of this estate's

2   limited funds here in bankruptcy.  So we will reserve all

3   our rights as to those pleadings, Your Honor.  Thank you.

4           THE COURT:  Okay.  Anybody else in the courtroom

5   wish to be heard on those motions?

6           MR. S. WILLIAMS:  Your Honor --

7           MS. PRESTON:  I'd like to reply to that, Your

8   Honor.

9           THE COURT:  Okay.  Hang on just a second.  We have

10  Mr. Williams, counsel for the unsecured creditors'

11  committee.

12          MR. S. WILLIAMS:  Your Honor, I will be brief on

13  that.  Scott Williams, on behalf of the unsecured creditors'

14  committee.  This argument makes my head hurt.  They're not a

15  critical vendor.  They shouldn't be a critical vendor.  This

16  Court entered a timely order that was not addressed.  It was

17  not appealed.  That gave the debtor sole discretion.  They

18  can't bootstrap some argument in at this point.

19          As it relates to their somehow constructive trust,

20  you are absolutely correct.  There is no law.  What she

21  cites is incorrect.  She draws conclusions from statutory or

22  federal regulatory authorities that simply do not say what

23  she says they say.  More importantly, since I represent the

24  broad swath of all unsecured creditors, she is right.  There

25  are some who are not in her situation, that they may have

1   provided milk, they may have provided gasoline, they may

2   have done something else that was not a Medicare

3   reimbursement.  There is a whole host of constituents that I

4   and my committee represent that that are in her same

5   situation, and I am not up here making the same, I think,

6   frivolous argument.  That's all I have, Your Honor.

7               THE COURT:  All right.  Thank you.

8               Before you respond, Ms. Preston, any other parties

9   on the Webex that would like to address the motions?

10              MR. ROSENBLATT:  Thank you, Your Honor.  Paul

11  Rosenblatt, for the DIP lender.  We would support the

12  debtors' and the committee's arguments and ask that both of

13  the motions be denied.

14              THE COURT:  Okay.  Thank you.

15              Anybody else wishing to respond to the motions?

16  And I'll give Ms. Preston one more opportunity to clarify

17  any point she'd like to make.  Okay.  Go ahead, Ms. Preston.

18              MS. PRESTON:  First, I'd like to say that, Mr.

19  Williams, don't you represent my client as well?  You're

20  arguing against his interests, but I believe that he is part

21  of the unsecured creditors that you're supposed to be

22  representing.  And I would also like to point out to the

23  Court that every argument that's made is self-serving here,

24  mine included.  But here's the thing.  Here's the

25  difference.  They're getting fees based on their arguments.

1    I'm not getting fees based on my arguments.  My arguments

2    are directly for my client.  I don't believe that theirs

3    are.  I don't believe that they're genuine.  And I think

4    that that's just been very clear throughout the entire

5    process.  Thank you, Your Honor.

6              THE COURT:  Okay.  Thank you.  All right.  On the

7    motion to determine that Medicare reimbursements

8    misappropriated by the debtor and earmarked for Progressive

9    Fusion, Inc. are not property of the estate, which was filed

10   at Docket 614, I have considered the pleadings of record and

11   the arguments and representations of counsel.  And based on

12   those pleadings and representations, I'm going to deny that

13   motion.

14             On the motion to compel the designation of

15   Progressive Perfusion, Inc. as a critical vendor and for

16   payment of the outstanding prepetition debt, which was found

17   at Docket Number 617, I've considered all the pleadings of

18   record and the representations and arguments of counsel.

19   And based on those pleadings and representations, I'm going

20   to deny that motion as well.  So thank you all.

21             MR. MEEK:  Thank you, Your Honor.

22             THE COURT:  And I think, Mr. Meek, that leaves us

23   with the motion -- the emergency motion to amend the DIP

24   agreement.

25             MR. MEEK:  To amend.  Thank you, Your Honor.  And

# Exhibit C

Excerpts from Transcript of
August 26, 2025, Hearing
[Doc. 891]

1    UNITED STATES BANKRUPTCY COURT

2    MIDDLE DISTRICT OF ALABAMA

3    Case No. 25-30256

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7       JACKSON HOSPITAL & CLINIC, INC.,

8

9       Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12          United States Bankruptcy Court

13          One Church Street

14          Montgomery, AL 36104

15

16          Tuesday, August 26, 2025

17          12:12 PM

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER L. HAWKINS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: UNKNOWN

Case 25-30256    Doc 1182    Filed 11/20/25    Entered 11/20/25 15:26:23    Desc Main
Case 25-30256    Doc 891    Filed 09/04/25    Entered 09/04/25 16:05:50    Desc Main
Document    Page 1 of 43

212-267-6868                    Veritext Legal Solutions                    516-608-2400

1   HEARING re #776 Motion for Reconsideration of Orders Denying

2   Motion to Compel Turnover or to Recognize Constructive Trust

3   in Medicare Funds filed by Progressive Perfusion, Inc.

4

5   HEARING re #841 Debtors' Second Emergency Motion for Entry

6   of an Order (I) Authorizing the Debtors to Further Amend the

7   DIP Credit Agreement and (II) Granting Related Relief

8

9   HEARING re #842 DIP Lender's Objection to Progressive

10  Perfusion, Inc.'s Motion for Reconsideration and Request for

11  Sanctions

12

13  HEARING re #843 Debtors' Response and Motion to Strike

14  Progressive Perfusion's Motion for Reconsideration of Orders

15  Denying Motion to Compel Turnover or to Recognize

16  Constructive Trust in Medicare Funds

17

18  HEARING re #848 Debtors' Emergency Motion for Entry of an

19  Order Pursuant to Bankruptcy Code Section 365(d)(4) Further

20  Extending the Time to Assume or Reject Unexpired Leases of

21  Nonresidential Real Property and Executory Contracts

22

23

24

25  Transcribed by: Benjamin Graham, AAERT CET-3405

1    end of the month.  So that is why those numbers are what

2    they are.

3                 THE COURT:  Okay.

4                 MR. SHERMAN:  Thank you, Your Honor.

5                 THE COURT:  Anyone else wish to be heard on the

6    motion to amend the DIP agreement?

7                 Okay.  I'll grant that motion.  If you would

8    circulate and submit the order?

9                 MR. MEEK:  Thank you, Your Honor.  We will.

10                THE COURT:  I think that leaves us with the motion

11   for reconsideration of orders denying motion to compel

12   turnover or to recognize constructive trust and Medicare

13   funds.  That's found at Docket Number 776.  It's filed by

14   Progressive Perfusion, Inc.  Previously, Ms. Preston was

15   representing Progressive Perfusion.

16                Ms. Preston, have you joined the Webex?  Oh, is

17   that Ms. Preston?

18                MR. MEEK:  I think it is.

19                MS. PRESTON:  Yes, Your Honor.

20                THE COURT:  Okay.  We had already taken care of

21   the two other matters that were set for this afternoon, Ms.

22   Preston.  We had just called the motion for reconsideration

23   of orders denying motion to compel turnover to recognize

24   constructive trust and Medicare funds that Progressive

25   Perfusion, Inc. filed at Docket Number 776.

1          So I think what I would like to do first is

2     discuss a few things with Ms. Preston, and then you guys

3     will definitely have an opportunity to be heard.

4          MR. MEEK:  Thank you, Your Honor.

5          THE COURT:  So if you could approach, Ms. Preston.

6     I'm going to refer to Docket Number 776 as the motion to

7     reconsider.

8          MS. PRESTON:  Yes, sir.

9          THE COURT:  I'll let you know that shortly after

10    adjourning the hearing in this case on August 13th, I went

11    back to chambers.  I began to review the motion to

12    reconsider in preparation for today's hearing.  I did become

13    concerned as I began comparing the arguments in the motion

14    to reconsider to the authorities cited in support of the

15    motion.  I was concerned enough that I continued my review

16    late into the evening of August 13th.  I resumed that review

17    early the next morning.

18          You know, my agitation with what I found when

19    reviewing the motion to reconsider, it's lingered since

20    August 13th.  It's increased throughout the past two weeks.

21    And really, my concerns are consistent with some of the

22    points raised by the Debtors and the DIP lender and their

23    respective responses to a motion to reconsider.

24          With that backdrop, I'll note, Ms. Preston, that

25    you filed an application to appear pro hoc vice on March 7th

1    of this year, Docket Number 183, pursuant to Local Rule

2    2090-1 and Rule 83.1 of the Local Rules of the United States

3    District Court for the Middle District of Alabama.

4            The Local District Court Rule 83.1(g) provides

5    without limitation that attorneys admitted to practice

6    before this Court shall adhere to the Court's local rules,

7    the Alabama Rules of Professional Conduct, the Alabama

8    Standards for Imposing Lawyer Discipline, and, to the extent

9    not inconsistent with the proceeding, the American Bar

10   Association Model Rules of Professional Conduct.  Alabama

11   Rule of Professional Conduct 3.3(a) provides, among other

12   things, that a lawyer shall not knowingly make false

13   statement of material fact or law to a tribunal.

14           So bearing those applicable rules in mind, which,

15   without limitation, prohibit making a false statement to the

16   Court, I first want to ask you this question.  Was

17   generative artificial intelligence used at any point in the

18   preparation of the motion to reconsider?

19           MS. PRESTON:  No, sir.  I had a younger attorney

20   start the motion.  I finished it.  I did not check the

21   citations, to be frank with you, not to the degree that I

22   should have.  I did go back and realize the mistakes myself.

23   And I have since created a table for myself with the actual

24   premise behind each of the cited cases.  The Monongahela

25   Valley Hospital case --

Page 18

1          THE COURT:  Before we get to all that --

2          MS. PRESTON:  Sure.

3          THE COURT:  -- because before we start arguing the

4    actual motion, I first will ask you, would you like to

5    withdraw the motion to reconsider?

6          MS. PRESTON:  Can I have a moment to talk to my

7    client?

8          THE COURT:  Yes.

9          MS. PRESTON:  Okay, and can we then substitute the

10   supplemental brief in support?

11         THE COURT:  And that is the document that you

12   filed --

13         MS. PRESTON:  This morning.  Yes, sir.

14         THE COURT:  -- less than an hour and a half ago?

15         MS. PRESTON:  Yes, because -- well, I did, and I

16   also filed responses to the DIP lender and Jackson on their

17   measures that were filed, I think, yesterday or the day

18   before.

19         THE COURT:  I'm not inclined to consider that to

20   be a substitute for the motion to reconsider because it

21   wasn't filed as such.  You didn't withdraw the motion to

22   reconsider.  You, in my eyes, decided to kind of double down

23   on what you said in the motion to reconsider by filing more

24   documents just within the last hour and a half.  I'm happy

25   to take a short recess --

1      MS. PRESTON:  Sure.

2      THE COURT:  -- if you would like to confer --

3      MS. PRESTON:  I would.

4      THE COURT:  -- with your client.  But I also would

5 encourage you to confer with the leadership of your firm

6 before we come back.

7      MS. PRESTON:  Okay.  Yes, sir.

8      THE COURT:  So I will take a recess.

9      Mr. Livingston, if you would, can you stay in the

10 Court and let me know when everybody's ready?

11      Okay.  So we're going to recess.  Thank you.

12      CLERK:  All rise.

13      (Recess)

14      CLERK:  Back in session

15      THE COURT:  Please be seated.  Okay.  We recessed

16 to allow Ms. Preston to discuss the motion to reconsider

17 with her client and potentially colleagues at her firm.

18      Ms. Preston, do you have any steps that you'd like

19 to take with respect to the motion to reconsider?

20      MS. PRESTON:  We'll withdraw, Your Honor.

21      THE COURT:  Okay.  I'm going to note for the

22 record Ms. Preston was behind the bar.  Progressive

23 Profusion has elected to withdraw the motion to reconsider.

24      Just for the sake of cleaning things up, there

25 were two documents filed, like I said, just a little earlier

1    this afternoon.  One of them was a supplemental brief in

2    support of the motion for reconsideration.

3              MS. PRESTON:  That is -- (indiscernible) --

4              THE COURT:  Okay.  That is going to be withdrawn

5    as well.  There is a response to the DIP lender's objection

6    and request for sanctions and Debtors' motion to strike.

7    That's docket -- I'm sorry, let me, just for the record, the

8    other document that was being withdrawn was Docket Number

9    859, a supplemental brief in support of a motion for

10   reconsideration.  And then there's Docket 860, which is

11   Progressive Perfusion's joint response to the DIP lender's

12   objection and request for sanctions and Debtors' motion to

13   strike.

14             I know that's addressing maybe some other issues,

15   but do you -- would you like to withdraw that or do you want

16   to --

17             MS. PRESTON:  If their motion's going to stand,

18   then I (indiscernible) --

19             CLERK:  Ms. Preston, you're going to need to come

20   forward.

21             MS. PRESTON:  If the DIP lender's objection and

22   the Debtors' motion is going to stand, I think that I have

23   to respond, Your Honor.  So I don't --

24             THE COURT:  Okay, and that brings us to -- with

25   the motion to reconsider and the supplemental brief being

1   withdrawn, that takes certain issues off the table.  But the

2   DIP lender's response did include a motion for sanctions.

3   And based on what I've seen, even though the motion to

4   reconsider has now been withdrawn, I still have concerns

5   about what I read.  And so I will consider the motion to

6   reconsider and the supplemental brief withdrawn.

7           But I do intend to enter a separate order to

8   appear and show cause as to why sanctions are not

9   appropriate --

10          MS. PRESTON:  Sure.

11          THE COURT:  -- with respect to Ms. Preston

12  personally and her firm in connection with the documents

13  that were filed.

14          MS. PRESTON:  Can you tell me specifically what

15  your -- besides the citation errors, specifically what the

16  concern is?

17          THE COURT:  I would consider it to be more than

18  citation errors.

19          MS. PRESTON:  Okay.

20          THE COURT:  I would consider it to be potentially

21  something more serious than just a missed cite.  But I do

22  not want -- I'm not going to rule on that today.

23          MS. PRESTON:  Okay.

24          THE COURT:  And just, Mr. Rosenblatt, I know that

25  there was a motion for sanctions under Bankruptcy Rule 9011

1    that was kind of included in the response to the motion to

2    reconsider.  I do believe that technically under Bankruptcy

3    Rule 9011, that should have been presented in a separate

4    motion.  I don't know whether any other parties, including

5    the Debtors, that have taken the time to respond to the

6    motion to reconsider, whether they will have any other

7    pleadings they want to file.  But my intention is to enter

8    this order to appear and show cause, set it for a hearing

9    probably 30 to 45 days from now.

10          MS. PRESTON:  If the motion was withdrawn, then

11   how are other parties going to enter responses?

12          THE COURT:  I'm sorry?  I didn't hear you.

13          MS. PRESTON:  If the motion has been withdrawn,

14   how are other parties going to enter responses?

15          THE COURT:  I'm not saying they necessarily would

16   respond to the motion.  I'm saying that one party has asked

17   for sanctions, and I'm saying that may require a separate

18   motion, something separate from the response to the motion

19   to reconsider if they want the Court to take it up.  And so

20   I'm going to -- this order to show cause, I intend to get

21   out within the next day.

22          MS. PRESTON:  Okay.

23          THE COURT:  I'll set that hearing far enough out

24   so that you and your firm will have an opportunity to

25   prepare for it.  My intention is to put enough detail into

1    that that you will know exactly what I'm concerned about and

2    what I think is potentially, you know, a violation that is

3    sanctionable.

4              MS. PRESTON:  Okay.

5              THE COURT:  And I would just say that if anybody

6    else is seeking relief similar to that, you know, I would

7    like to see those things filed in a manner and in a timeline

8    that there's sufficient notice given to Ms. Preston and her

9    firm of what you're asking for and why.

10             But I did not confer with my clerk about a date

11   yet.  But I would just say we'll put it 30 to 45 days out to

12   give people plenty of time.

13             Any other issues we need to take up today?

14             MR. R. WILLIAMS:  Your Honor, my only concern as

15   it relates to the committee is that the committee doesn't

16   believe, not the initial motions that the Court denied that

17   I didn't think were meritorious and the Court made a ruling,

18   but this motion to reconsider and the subsequent pleadings

19   have cost the estate thousands of dollars.

20             MS. PRESTON:  Absolutely not.

21             MR. R. WILLIAMS:  And as part of your show cause

22   order, I would suggest, or I can file it myself, that the

23   Court direct any party that wishes to be set forth the time

24   and expenses they took because the committee didn't file a

25   response because I was told the Debtors were filing

1   something.  I did not know that DIP lender would be filing

2   something.

3         But I took a fair amount of time reviewing that

4   motion to reconsider myself on behalf of the committee, that

5   the Court enter its order directing something as it relates

6   to fees and to address that motion.  And I know that

7   bondholders may have had time and expenses as well related

8   to that.  If the Court doesn't put it in its motion, then I

9   anticipate I will be filing something to ask for it.  But

10  I'm raising it because I think it's probably appropriate to

11  be put in your motion.

12        MS. PRESTON:  Can I respond to that, Your Honor?

13        THE COURT:  Yes.

14        MS. PRESTON:  Okay.  First of all, you're supposed

15  to be co-counsel with me as to my client because he's one of

16  the top creditors.  So I think it's inappropriate for you to

17  go against us, but -- without speaking to me first,

18  certainly.

19        Two, I mean, the fact that you say that it costs

20  (indiscernible) thousands is absurd.  I mean, the fact is

21  the Debtor themselves has continuously extended deadlines.

22  There was already a hearing today, so this was just added to

23  the docket, then the motion was withdrawn.  So I don't -- I

24  mean, for the life of me cannot see how it cost the estate

25  thousands of dollars.  I just think that that is

1    disingenuous, so --

2          THE COURT:  Okay.  Well, and I think we are no --

3    we're now starting to approach the actual hearing --

4          MR. R. WILLIAMS:  I don't (indiscernible) --

5          THE COURT:  -- on the order to show cause that has

6    not even been entered yet.

7          MS. PRESTON:  Yes, sir.

8          THE COURT:  And I hear what you're saying, Mr.

9    Williams.  It's --

10         MR. R. WILLIAMS:  I'd simply ask the Court to

11   consider it.

12         THE COURT:  Yeah.  I'll take it under

13   consideration.  I need to think about the mechanics of that

14   and whether -- my concern is I don't want to deny Ms.

15   Preston or her firm due process.

16         MR. R. WILLIAMS:  Understood.

17         THE COURT:  And I'm trying to figure out whether

18   that makes it more difficult, and it may require more than

19   one hearing is what I'm getting at.  But I appreciate you

20   raising it, and I'm happy to consider it.

21         MR. R. WILLIAMS:  I'll coordinate with other

22   parties as it relates to, after the Court enters its order,

23   try and get something so the Court can track things at the

24   same time and get an appropriate motion, if necessary,

25   filed.

1          THE COURT:  Okay.  Thank you.

2          MS. PRESTON:  And Your Honor, is this going to be

3     simply on the motion to reconsider that was withdrawn?

4          THE COURT:  Well, there were other documents filed

5     today that facially appeared to double down on what was in

6     the motion to reconsider.

7          MS. PRESTON:  Well, we are doubling down because

8     we do believe that there is a constructive trust.  We

9     absolutely believe that.

10          THE COURT:  Okay.  But you have withdrawn the

11     motion?

12          MS. PRESTON:  We have.

13          THE COURT:  Okay.  I will make clear in order what

14     behavior or conduct I believe to be problematic.

15          MS. PRESTON:  Yes, sir.

16          THE COURT:  And like I said, we're going to do

17     that quickly.  But we're not going to set a hearing next

18     week on it.  We're going to give people time to process it

19     and figure out what they want to do with it.

20          MS. PRESTON:  Okay.

21          MR. MEEK:  Your Honor, mechanically, if I'm --

22     Derek Meek, for the Debtor.  If I'm understanding, if we

23     want to seek those sanctions, we should file our own motion

24     is what the Court is expecting, or should we wait on the

25     order?  I want to make sure I understand your wishes.

1          THE COURT:  The way the rule reads, there may be

2     certain relief to which parties are entitled to that the

3     Court entering an order sua sponte would not --

4          MR. MEEK:  Right.

5          THE COURT:  -- have an opportunity to in the form

6     of sanctions.  And so to the extent parties in interest

7     believe that there has been, you know, conduct that they

8     would like to be addressed, my approach is I would like that

9     to all be heard on the same day to give sufficient time and

10    we'll go from there.

11         MR. MEEK:  Thank you, Your Honor.

12         MS. PRESTON:  I feel like the Court is inviting

13    people to file motions for sanctions against us, and I think

14    that's inappropriate, Your Honor.  I mean, if they wanted

15    to, they could've, without the urging of them to do so.  I

16    think that's inappropriate.

17         THE COURT:  I have not urged anybody to file

18    anything.  One is already on file.  What I did was I pointed

19    out that it probably needs to be in a separate pleading.

20         MS. PRESTON:  Okay.

21         THE COURT:  What I'm trying to do is give you

22    enough time to consider what has happened and consider what

23    the defense might be, if any.

24         MS. PRESTON:  Sure.

25         THE COURT:  I did not encourage folks to file

1   motions for sanctions.  What I'm saying is, if they believe

2   that they're entitled to some sort of relief, I want to hear

3   it all on the same day --

4            MS. PRESTON:  Sure.

5            THE COURT:  -- because it's going to have common

6   facts and common law.  That's all I'm saying.  I'm not

7   encouraging anybody to file anything.

8            MS. PRESTON:  Yes, sir.

9            MR. ROSENBLATT:  Your Honor?

10           THE COURT:  Yes?

11           MR. ROSENBLATT:  Paul Rosenblatt, for the DIP

12  lender.  The order to show cause could set a preliminary

13  date by which people could file whatever motion they intend

14  to file, if they choose to do so, and then a later date for

15  Progressive to respond, and that would create an organized

16  schedule to then roll up to one hearing to address the

17  issues.

18           THE COURT:  Okay, and I will take that under

19  consideration as well.  It's an unusual situation.  So I'm

20  trying to navigate it and put people in the best position to

21  represent themselves.

22           Okay.  Any other matters today?

23           MR. MEEK:  Not from the Debtor, Your Honor.  Thank

24  you.

25           THE COURT:  Okay.  Anybody else have anything

# Exhibit D

Chart from the Debtors'
Motion for Sanctions
[Doc. 902]

## Cases with Incorrect Citations in Motion for Reconsideration

| Case Name Cited in Motion for Reconsideration | Record Cite to Motion for Reconsideration | Proposition/Quote in Motion for Reconsideration | Debtors' Notes |
|---|---|---|---|
| *In re Monongahela Valley Hosp., Inc.*, 446 B.R. 490, 498 (Bankr. W.D. Pa. 2010) | *See* Doc. 776, p. 6. | "*In re Monongahela Valley Hosp., Inc.*, 446 B.R. 490, 498 (Bankr. W.D. Pa. 2010) ("[T]he hospital's receipt of funds from Medicare or Medicaid that are clearly intended to reimburse services performed by a third party gives rise to a trust or equitable lien.")" | A diligent search by the Debtors did not reveal a case matching this citation. The only case associated with 446 BR 490 is *In re QuVis, Inc.*, 446 B.R. 490 (Bankr. D. Kan. 2011), *aff'd sub nom. In re QuVIS, Inc.*, 469 B.R. 353 (D. Kan. 2012), *aff'd*, 504 F. App'x 747 (10th Cir. 2012). This case does not appear to be related to the facts or relevant law subject of the Motions and Orders. |
| *Matter of Vacuum Corp*, 55 B.R. 595 (Bankr. E.D. Tenn. 1985) | *See* Doc. 776, p. 7. | "*See Matter of Vacuum Corp*, 55 B.R. 595 (Bankr. E.D. Tenn. 1985) (constructive trust imposed where debtor retained misappropriated and traceable funds earned by another party)." | A diligent search by the Debtors did not reveal a case matching this citation. The correct citation for this case is *Matter of Vacuum Corp.*, 215 B.R. 277 (Bankr. N.D. Ga. 1997). This case did not hold that the Motion for Reconsideration asserts. |

62117140 v1

**Fabricated Quotations Cited in the Motion for Reconsideration**

| Case Name Cited in Motion for Reconsideration | Record Cite to Motion for Reconsideration | Proposition/Quote in Motion for Reconsideration | Debtors' Notes |
|---|---|---|---|
| *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994) | *See* Doc. 776, p. 4. | "*See United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994) ('[t]he fact that the services were provided through arrangements with contractors does not affect the hospital's responsibility for payment where reimbursement has been made under the hospital's provider number) . . .'" | A diligent search by the Debtors did not reveal the quoted language appearing in the case cited by Progressive. |
| *U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 386 (1st Cir. 2011) | *See* Doc. 776, p. 5. | "Furthermore, as explained in *U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 386 (1st Cir. 2011), billing Medicare for a DRG claim "'implies that the billing provider has met the requirements of coverage, including that the services were necessary and delivered as claimed.'" | A diligent search by the Debtors did not reveal the quoted language appearing in the case cited by Progressive. |

62171140 v1

| In re Mid-Delta Health Systems, Inc., 251 B.R. 811, 816 (Bankr. N.D. Miss. 2000) | See Doc. 776, p. 6. | "Additionally, *In re Mid-Delta Health Systems, Inc.*, 251 B.R. 811, 816 (Bankr. N.D. Miss. 2000) holds that to 'the extent that the debtor received Medicare reimbursement for services actually performed by the creditor under arrangement, those funds are not property of the estate and must be turned over.'" | A diligent search by the Debtors did not reveal the quoted language appearing in the case cited by Progressive. |
| *In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) | See Doc. 776, p. 6. | "*In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) (payments owed to third-party providers 'never became part of the debtor's estate')." | A diligent search by the Debtors did not reveal the quoted language appearing in the case cited by Progressive. |

62117140 v1

Misrepresented/Misconstrued Cases Cited in the Motion for Reconsideration

| Case Name Cited in Motion for Reconsideration | Record Cite to Motion for Reconsideration | Proposition/Quote in Motion for Reconsideration | Debtors' Notes |
|---|---|---|---|
| *In re Club Assoc.*, 951 F.2d 1223, 1230 (11th Cir. 1992) | *See Doc. 776, p. 2.* | "Under Fed. R. Civ. P. 59(e), incorporated via Bankruptcy Rule 9023, reconsideration is warranted where the court has committed clear error of law, misapprehended facts, or to prevent manifest injustice." | A diligent search by the Debtors did not reveal any reference to FRCP 59(e), Bankruptcy Rule 9023, or any reference to the reconsideration standard. |
| *In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987) | *See Doc. 776, p. 2.* | "*In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987), held that property held in constructive trust is excluded from the estate under § 541(d)." | This case does not reach this holding. |
| *In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987) | *See Doc. 776, p. 2.* | "A constructive trust arises at the moment of inequitable conduct, not merely upon judicial declaration. *Id.* at 707." | This case does not reach this holding. |
| *In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987) | *See Doc. 776, p. 8.* | "Each of these confirms the principle that property held in constructive trust, or intended for another party, is not estate property — even if in debtor's possession. The holdings are clear in each and every case cited, as well as a myriad of | This case does not reach this holding. |

| | | other cases that were not cited simply to prevent duplication." |
|---|---|---|
| *In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987) | *See* Doc. 776, p. 9. | "Instead, they are granted with a constructive trust in favor of the actual service provider. Courts routinely exclude such funds from the estate…*In re General Coffee Corp*, 828 F.2d 699, 707 (11th Cir. 1987)." | This case does not reach this holding. |
| *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) | *See* Doc. 776, p. 8. | "As stated in *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993), funds held in trust, even if intermingled, remain the property of the beneficiary and not the estate." | This case does not discuss intermingled finds, but does generally hold that funds held in constructive trust are excluded from the bankruptcy estate. |
| *In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) | *See* Doc. 776, p. 2 | "The traceability of these reimbursements to specific DRGs linked to Progressive's work mirrors the facts in *In re Visiting Nurse Ass'n of W. Pa.*, 143 B.R. 633 (Bankr. W.D. Pa. 1992), where such reimbursements were deemed held in trust and excluded from the estate." | This case does not reach this holding and these facts were not present. |
| *In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) | *See* Doc. 776, p. 8. | "Each of these confirms the principle that property held in constructive trust, or intended for another party, is not estate property — even if in debtor's | This case does not reach this holding. This case does not mention "constructive trusts." |

| | | |
|---|---|---|
| | possession. The holdings are clear in each and every case cited, as well as a myriad of other cases that were not cited simply to prevent duplication." | This case does not discuss funds held in trust or whether they are property of the estate. It discusses Medicare reimbursements in the context of whether the United States Department of Health and Human Services has a right to recoupment or set off to collect past Medicare overpayments. |
| *In re St. Mary Hosp.*, 89 B.R. 503, 513–14 (Bankr. E.D. Pa. 1988) | *See* Doc. 776, p. 4.<br><br>"*In re St. Mary Hosp.*, 89 B.R. 503, 513–14 (Bankr. E.D. Pa. 1988) (funds received by a hospital from Medicare for services provided by outside providers are held in trust for those providers and are not property of the estate)." | |
| *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1296 (11th Cir. 2003) | *See* Doc. 776, p. 2.<br><br>"Under Fed. R. Civ. P. 59(e), incorporated via Bankruptcy Rule 9023, reconsideration is warranted where the court has committed clear error of law, misapprehended facts, or to prevent manifest injustice. *See In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1296 (11th Cir. 2003)...." | The only reference to reconsideration in this case is in Footnote 8. There is no reference to Federal Rule of Civil Procedure 59(e) or Bankruptcy Rule 9023. Rather, Footnote 8 cites Bankruptcy Rule 9024 and references Federal Rule of Civil Procedure 60. |
| *Matter of CoServ, L.L.C.*, 273 B.R. 487, 500 (Bankr. N.D. Tex. 2002) | *See* Doc. 776, p. 3.<br><br>"These reimbursements were earmarked, are undoubtedly traceable, and never meant to be retained by Jackson for its own use. Courts routinely exclude such funds from the | This case does not discuss property held in trust or whether it is part of the estate. This case deals with payment of |

62117140 v1

| | | unsecured claims for critical vendors. |
|---|---|---|
| *Matter of CoServ, L.L.C.*, 273 B.R. 487, 500 (Bankr. N.D. Tex. 2002) | *See* Doc. 776, p. 8. | This case does not discuss property held in trust or whether it is part of the estate. This case deals with payment of unsecured claims for critical vendors. |
| | | "Each of these confirms the principle that property held in constructive trust, or intended for another party, is not estate property — even if in debtor's possession. The holdings are clear in each and every case cited, as well as a myriad of other cases that were not cited simply to prevent duplication." |
| *Matter of Nash Concrete Form Co*, 159 B.R. 611 (Bankr. D. Mass. 1993). | *See* Doc. 776, p. 3. | This case does not deal with Medicare reimbursement funds. This case deals with whether income tax withholdings are held in trust in favor of Department of Revenue under a specific Massachusetts state statute and federal counterpart. |
| | | "These reimbursements were earmarked, are undoubtedly traceable, and never meant to be retained by Jackson for its own use. Courts routinely exclude such funds from the estate...*Matter of Nash Concrete Form Co*, 159 B.R. 611 (Bankr. D. Mass. 1993)." |

62117140 v1

## Cases with Incorrect Citations or Misrepresented/Misconstrued Holdings Cited in Supplemental Brief and/or Joint Response

| Case Name Cited in Pleading | Record Cite to Pleading | Proposition/Quote in Pleading | Debtors' Notes |
|---|---|---|---|
| *Davies Cnty. Hosp. v. Bowen*, 811 F.2d 338, 346-47 (8th Cir. 1987) | *See* Doc. 859, p. 3. | "In other words, hospitals are reimbursed only for expenses *they have paid or remain obligated to pay to those who furnished said direct patient care [emphasis added]*. *Davies Cnty. Hosp. v. Bowen*, 811 F.2d 338, 346-47 (8th Cir. 1987)." | The citation is incorrect. The correct citation is: *Daviess Cnty. Hosp. v. Bowen*, 811 F.2d 338, 343-344 (7th Cir. 1987). |
| *In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) | *See* Doc. 859, p. 12. | "*In re Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 118 (Bankr. M.D. Fla. 1990) (holding that Medicare or Medicaid funds clearly intended to reimburse a third-party provider give rise to a trust or equitable lien)." | This case was also cited in the Motion for Reconsideration. This case does not reach the holding that Respondents state it does. |
| *Barba v. Seung Heun Lee* (D. Ariz. 2010) | *See* Doc. 860, p. 2. | "In *Barba v. Seung Heun Lee* (D. Ariz. 2010), the court held that sanctions are improper absent a finding that the party acted deliberately to mislead the court." | Respondents do not include a reference to the volume and reporter of this decision. A diligent search by the Debtors revealed the following case: *Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2010 WL 1515528 (D. Ariz. June 15, 2010). This case does not reach the holding that Respondents state it does. |

62414989 v1

| | | | |
|---|---|---|---|
| *Metricolor, LLC v. L'Oreal S.A.* (C.D. Cal. 2018) | *See* Doc. 860, p. 2. | "In *Metricolor, LLC v. L'Oreal S.A.* (C.D. Cal. 2018), the court refused sanctions where no improper purpose was shown, even though counsel's work product contained citation errors." | Respondents do not include a reference to the volume and reporter of this decision. A diligent search by the Debtors revealed a case with the same name and year: *Metricolor LLC v. L'Oreal S.A.*, No. CV 18-364-R, 2018 WL 509496 (C.D. Cal. Aug. 15, 2018), *aff'd in part, vacated in part, remanded, 791 F. App'x 183 (Fed. Cir. 2019). This case does not reach the holding that Respondents state it does.<br><br>Debtors also found a case with the following citation: *Metricolor, LLC v. L'Oreal USA, Inc.*, No. 2:18-CV-00364-CAS-EX, 2024 WL 1376476 (C.D. Cal. Mar. 29, 2024). This case does not reach the holding that Respondents state it does. |
| *In re Bonilla*, 573 B.R. 368 (D.P.R. 2017) | *See* Doc. 860, p. 2-3. | "Similarly, *In re Bonilla*, 573 B.R. 368 (D.P.R. 2017), excused citation mistakes, allowing for their correction. Here, neither the DIP lender nor Jackson provide evidence that Progressive acted in bad faith. The speculation of "AI use" is unsupported. Citation errors do not justify punishment. | This case does not reach this holding. There are no references to citation mistakes in this decision. |

62414989 v1

# Exhibit E

## Excerpts from Transcript of October 28, 2025, Hearing [Doc. 1152]

```
 1            UNITED STATES BANKRUPTCY COURT
                MIDDLE DISTRICT OF ALABAMA
 2

    Jackson Hospital& Clinic, Inc.) CASE NO:  25-30256
 3                               ) Montgomery, Alabama
            Plaintiff,           )
 4          v.                   )
                                 ) Tuesday,
 5   Official Committee of       ) October 28,2025
     Unsecured Creditors         )
 6          Defendant.           )
     -----------------------------)
 7
 8         HEARING ON A MOTION FOR ORDER TO SHOW CAUSE
 9         BEFORE THE HONORABLE CHRISTOPHER L. HAWKINS
10               UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For Progressive Perfusion, Inc.
13                         JOEL CONNALLY
                           Strength & Connally, LLC
14                         7020 Fain Park Drive, Suite 3
                           Montgomery, AL 36117
15
     For Jackson Investment Group, LLC
16                         CHASE POTTER
                           Iacuone McAllister Potter PLLC
17                         4925 Greenville Avenue
                           Energy Square One, Suite 1112
18                         Dallas, TX 75206
19                         STEVEN D. ALTMANN
                           The Nomberg Law Firm
20                         3940 Montclair Road, Suite 401
                           Birmingham, AL 35213
21
                           PAUL M. ROSENBLATT
22                         Kilpatrick Townsend & Stockton LLP
                           1100 Peachtree Street NE,
23                         Suite 2800
                           Atlanta, GA 30309
24
     For Gordon Rees Scully Mansukhani, LLP
25                         BOBBY SEGALL
```

```
 1                              DAVID MARTIN
                                Copeland, Franco, Screws & Gill,
 2                              P.A.
                                444 South Perry Street
 3                              Montgomery, AL 36104
 4     For Cassie D. Preston
                                WALLACE MILLS
 5                              Wallace D. Mills, P.C.
                                621 South Hull Street
 6                              Montgomery, AL 36104
 7     For Patient Care Ombudsman
                                ELISE HELTON
 8                              Baker Donelson
                                1901 6th Avenue North, Suite 2600
 9                              Birmingham, AL 35203
10     For ServisFirst Bank
                                JEREMY L. RETHERFORD
11                              Balch & Bingham, LLP
                                PO Box 306
12                              1901 6th Avenue North, Suite 1500
                                Birmingham, AL 35201
13
       For the Committee
14                              R. SCOTT WILLIAMS
                                Rumberger, Kirk & Caldwell
15                              2001 Park Place North, Suite 1300
                                Birmingham, AL 35203
16
       For Jackson Hospital & Clinic, Inc.
17                              MARC P. SOLOMON
                                DEREK MEEK
18                              Burr & Forman, LLP
                                420 North 20th Street, Suite 3400
19                              Birmingham, AL 35203
20                              STUART MEMORY
                                Memory Memory & Causby, LLP
21                              469 S. McDonough Street
                                Montgomery, AL 36103
22
       ALSO APPEARING:
23                              BRAD KIRKLAND
                                RONALD A. GILLER
24                              CHAD A. SHULTZ
                                CASSIE D. PRESTON
25
```

```
 1    WITNESSES:

 2

 3    Court Reporter:

 4    Courtroom Deputy:

 5    Transcribed by:           Veritext Legal Solutions

                                330 Old Country Road, Suite 300

 6                              Mineola, NY 11501

                                Tel: 800-727-6396

 7

 8

 9    Proceedings recorded by electronic sound recording;

      Transcript produced by transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    it.  What I can't guarantee is what the Judge in the

2    Northern District of Alabama is going to do with that order.

3    So I don't want really want anything in the -- I would ask

4    that you circulate and submit the order, but I don't want

5    there to be anything in the order that is a directive from

6    me to another Court to deal with this being set aside, if

7    that makes sense.

8           MR. POTTER:  Completely understood and agree with

9    it, Your Honor.  And I'm happy to circulate both the

10   debtor's Counsel and the Committee's Counsel for comment,

11   obviously, before submitting as to form following the

12   hearing.

13          THE COURT:  Okay.  Then I will grant the motion if

14   you would circulate and submit that order.

15          MR. POTTER:  Thank you, Judge.

16          THE COURT:  Thank you.

17          Okay.  I think we are now to the matters involving

18   Progressive Perfusion.  Is that correct?

19          MR. MEEK:  Derek Meek, for the debtors, Your

20   Honor.  I believe it is -- that is correct, Your Honor.

21          THE COURT:  Okay.  What I thought I might do is

22   start with the DIP Lender's motion for sanctions regarding

23   Progressive Perfusion, Inc.'s filings.  That's docket number

24   898.  And the reason that I wanted to start with that one is

25   the Gordon Rees Law Firm filed a status report at docket

1    number 10 -- excuse me.  The Gordon Rees Firm filed a status

2    report at docket number 1073 that indicated it had remitted

3    to the DIP Lender the fees requested in their motion for

4    sanctions in settlement of that motion.  But I just wanted

5    to confirm that, I guess, with Mr. Rosenblatt, and

6    potentially, with Mr. Segall.

7              MR. ROSENBLATT:  Thank you, Your Honor.  Paul

8    Rosenblatt, for the DIP Lender.  That is correct.  We did

9    receive payment in full for the amount of legal fees that we

10   saw in our sanctions motion.  And on that basis, we were

11   able to resolve our sanctions motion on the terms that were

12   set forth in the statement that Progressive filed at docket

13   number 1073, which is the sum that payment of those fees

14   would resolve our sanctions motion so long as the withdrawn

15   pleadings were renewed or similar pleadings were not filed.

16   And so far, that has not occurred.

17             THE COURT:  Okay.  Is that your understanding as

18   well, Mr. Segall, of the agreement?

19             MR. SEGALL:  It is, Your Honor.

20             THE COURT:  Okay.  So I'm going to consider that

21   one settled by virtue of the payment of the fees and the

22   conditions set forth in that status report.

23             So that takes us to the debtor's motion for

24   sanctions, which was docket number 902.  The status report

25   at 1073 indicated that the Gordon Rees Firm had tendered

1   payment of the fees sought in the motion for sanctions, but

2   it didn't have the same language about the settlement.

3          So I'll let you speak to that, Mr. Meek.

4          MR. MEEK:  Thank you, Your Honor.  Derek Meek, for

5   the debtors, again.  There were three areas of relief the

6   debtors were interested in in connection with this issue,

7   and they have all been addressed to the debtor's

8   satisfaction as I stand before you today.  Number one was a

9   check was tendered to us in the amount we sought in our

10  motion.  I am holding that check in my office.  I didn't

11  want to negotiate or cash it or do anything pending this

12  hearing, but we did receive it.  I confirmed that with

13  Counsel that we have that.  So that's area number one.

14         Number two was Ms. Preston's future involvement in

15  this case.  And the Gordon Rees Firm has withdrawn and has

16  been replaced by a new Counsel.  I will say, setting Ms.

17  Preston aside, my every interaction with the Gordon Rees

18  Firm has been professional and courteous and urbane and

19  pleasant, bankruptcy lawyers with the firm and non-

20  bankruptcy lawyers with the firm, Your Honor.  And so now

21  that there's separate Counsel for Progressive Perfusion, and

22  we're satisfied on the Ms. Preston issue.

23         And then the third issue was what happens with the

24  adversary proceeding that was set before Your Honor today.

25  That's been resolved.  So with those three things behind us,

1    Your Honor, we're satisfied with where things stand with

2    Progressive Perfusion.

3             THE COURT:  Okay.  Thank you.

4             And I don't know if Mr. Connally, if you want to

5    speak to that at all.  I'll note for the record that the

6    motion to withdraw filed by the Gordon Rees Firm, including

7    Mr. Pope and Ms. Preston, was filed at docket number 1050.

8    And that I know, Mr. Connally, you had filed a limited

9    response.  And I think that really related to any liability

10   of Progressive Perfusion as opposed to the law firms or any

11   lawyers at the law firms.  And it sounds like that is not an

12   issue.

13            Is that correct, Mr. Meek and Mr. Connally?

14            MR. MEEK:  For the debtors, yes, Your Honor.

15            THE COURT:  Okay.

16            MR. CONNALLY:  Yes, Your Honor.  If I come closer,

17   I need to get to this microphone to make that official.

18            THE COURT:  Okay.  So with Counsel having been

19   replaced, and with the debtors' representations, I'm going

20   to consider the payment of those fees that were sought in

21   the debtors' motion for sanctions to be sufficient such that

22   no further sanctions are necessary against Gordon Rees under

23   the debtors' motion.

24            So I think that then we still have the Court's

25   order to Cassie D. Preston and Gordon Rees Scully

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

1   Mansukhani, LLC to appear and show cause as to why sanctions

2   should not be imposed.  That was docket number 871.  Both

3   Gordon Rees and Ms. Preston filed responses timely under

4   that order last Thursday.  But I would welcome, first,

5   Gordon Rees' Counsel, representatives of Gordon Rees, to

6   speak to their response.

7        MR. SEGALL:  Your Honor, again, for the record,

8   I'm Bobby Segall.  And my law partner, David Martin and I

9   represent the law firm in this Show Cause Hearing.  The

10  first thing, Your Honor, that I would like you to know is

11  that Gordon Rees and its lawyers, David and me, come into

12  court today hat in hand.  All of us take what occurred in

13  your courtroom, and we all approach this, Show Cause

14  Hearing, with extraordinary seriousness.  Representatives of

15  the law firm are present in court today.  Ron Giller, who is

16  the chief legal officer for the firm and who practices out

17  of its New Jersey office, is here.

18       Mr. Giller, Judge, has headed up the effort to

19  determine what happened, to decide what steps the firm

20  should take to address what happened, and to determine what

21  the firm should do to try to assure that nothing like this

22  happens in the future.

23       Also, here is Chad Shultz, who is the managing

24  attorney of the Atlanta office of Gordon Rees, where Ms.

25  Preston works.  Mr. Shultz has also, Judge, been involved in

Case 25-30256   Doc 1152   Filed 11/10/25   Entered 11/20/25 16:08:49   Desc Main
Case 25-30256   Doc 1182   Filed 11/20/25   Entered 11/20/25 15:26:23   Desc Main
Document    Page 107 of 150
Document    Page 107 of 150

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

1    the firm's investigation and in trying to determine how to

2    respond.  Subject to your approval, my plan is to summarize,

3    briefly, the steps taken by the law firm in response to the

4    Show Cause Order.  And then, Your Honor, to respond to any

5    questions that you may have.  Try best to do that.

6              So first, in response to the Court Show Cause

7    Order, in addition to retaining Counsel, the firm undertook

8    to determine whether artificial intelligence had been used

9    without checking the citations.  What the firm can say, in

10   that regard, is that it appears that is what, in fact,

11   occurred.  And that is what the firm concluded from its

12   investigation.

13             In the same regard, on September 11, 2025, last

14   month, after the entry of Your Honor's Show Cause Order, the

15   firm learned of a problem in a Georgia State Court case

16   that's similar to the problem involved here, and it was

17   close to the same time as the problem that arose here.  Firm

18   management, and by that, I really mean Chad, without any

19   court order or other court direction requiring that it do so

20   got promptly involved in that Georgia matter.  I can report

21   to the Court it has been resolved to the satisfaction of the

22   Georgia State Court and the opposing attorney.

23             Then, Judge, as set forth in the declaration of

24   Ron Giller, the firm also undertook to determine whether

25   there were any other incidents where something similar had

1   occurred.  And to do that, the firm first identified 2,700

2   documents that had been prepared by Ms. Preston from the

3   time her employment began, which was in February of 2024.  A

4   law partner, a partner in the firm, reviewed those documents

5   to determine which ones had both been filed in court and

6   included citations to legal authority.  And those were then

7   checked, Your Honor.  Those citations were checked through

8   Westlaw to make sure they were accurate.  Aside from this

9   case and the Georgia State Court case, the firm's

10  investigation disclosed no other similar problems.

11          Also, in response to Your Honor's Show Cause

12  Order, the firm undertook to determine whether it needed to

13  update its policies with respect to artificial intelligence.

14  As background, and we've provided this to you, the firm

15  developed and circulated, distributed to all lawyers in the

16  firm, an artificial intelligence policy in June of 2023.

17  And we've submitted that to the Court.

18          The one provision I'd quickly point out to the

19  Judge, says that "although artificial intelligence," this is

20  what the policy says, it's a quote, "may be used as a tool

21  of enhancement or to aid in the development of initial

22  drafts, no finalized versions of any such materials shall be

23  utilized or released outside the firm absent the prior

24  verification of the accuracy of saying by the user or by

25  another individual acting on his or her behalf."  Now,

Case 25-30256   Doc 1152   Filed 11/10/25   Entered 11/20/25 16:08:49   Desc Main
Case 25-30256   Doc 1182   Filed 11/20/25   Entered 11/20/25 15:26:23   Desc Main
Document      Page 109 of 130

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400

1 Judge, at the time that policy was developed and distributed

2 in June of 2023, Ms. Preston was not yet a member of the

3 firm.  She became a member in February of 2024.

4 But as is the case with all new hires to the firm,

5 she was provided a handbook of all of the firm's policies at

6 that time.  Then, Judge, without any knowledge of what was

7 going here, the firm modified that policy somewhat.  I think

8 we've provided that to you as well.  Circulated that, July

9 30 of 2025.  Now, that was shortly after the motion for

10 reconsideration had been filed.  But it was three weeks

11 before the supplemental brief was filed and the joint

12 response to the pleadings by the debtor and the DIP Lender

13 was filed.  So that policy had been circulated in advance of

14 that.

15 As in the other policy, it says that "all

16 applicable laws and regulations pertinent to the use of

17 artificial intelligence, including any rules of professional

18 conduct, any local court rules, any rules of professional

19 responsibility are to be adhered to in connection with the

20 use of such technology."  That has been the rule and was

21 circulated before some of this happened.

22 After the firm became aware of the incident in

23 this Court, Your Honor, the firm on September 19, 2025,

24 distributed a new policy, making even more clear that

25 artificial intelligence citations must be checked.  Just

1    briefly, the pertinent part, "Consistent with the firm's

2    policies regarding artificial intelligence, it is mandatory

3    that before any attorney files or brief, the document needs

4    to be checked in its entirety for whether the cases are

5    still good law, and whether the citations are accurate, in

6    the correct form, and reflect what the cases actually say.

7    This is not just the responsibility of the associate/Counsel

8    who may have done the work, but also, of the partner who may

9    be approving documents for filing to ensure that someone has

10   performed these checks." All of these policies, Your Honor,

11   to which I have referred, have a clear provision that a

12   failure to comply with the policy will result in discipline

13   up to and including termination of employment.

14           In addition, with respect to artificial

15   intelligence, Your Honor, since the time the Court entered

16   its Show Cause Order in response to the Court's Show Cause

17   Order, the firm has implemented education and training on

18   the use and the risk of using artificial intelligence and on

19   the firm's existing policies and its new policies. And that

20   education and training, it happened. I can't say we called

21   a meeting of the partners nationwide, but we had a meeting

22   of the partners nationwide. And significant training is

23   further set out in Mr. Giller's declaration, I think

24   paragraph 17. That training has already been provided to

25   the partners, and it will be provided on an office-level to

1    all the other lawyers in the law firm using, by the way,

2    this case as a real world example of problems that can arise

3    if AI is not used correctly and carefully.

4            Another step we took, I won't go into it, is we

5    did withdraw from representing Progressive Perfusion.  David

6    and I determined that the firm had an irreparable conflict

7    in continuing that representation, and especially in

8    advising the client with respect to what it should do in the

9    adversary proceeding.  We assisted the client in finding new

10   Counsel.  And as you know, the client has found very good,

11   competent Counsel, and is now represented by Mr. Connally.

12           Another thing the firm did, Your Honor, I'm not

13   going into it, but we were doing it anyway, but Your Honor,

14   reinforced that we should carry out and conclude a

15   resolution of the pending motions for sanctions filled by

16   the debtor and the DIP Lender.  And we did that.  Your Honor

17   has received a report of that.  Finally, as a precautionary

18   measure, we want the Court to know that another lawyer in

19   the Gordon Rees Law Firm has been assigned to work with Ms.

20   Preston on every case that she is involved in.

21           So in closing, Your Honor, Gordon Rees requests

22   that in your consideration of whether to order sanctions

23   against the law firm that you take into account --

24           THE COURT:  Can I interrupt for just a minute?

25   I'm sorry.  I think we may have lost our connection.  I

1  don't want anybody to miss what you're saying.

2          MR. SEGALL:  I know they're hanging on every word.

3          MR. MEEK:  Apologies for this.

4          THE COURT:  We're now back on?  Okay.  I think

5  we're back.  Okay.  If you can try to back up about, what?

6  A minute or two?  And Sorry.

7          MR. SEGALL:  Well, I think, Your Honor, the one

8  thing that I may have said that people didn't hear was that,

9  as a precautionary measure, the law firm has assigned a

10  lawyer to work with Ms. Preston on each case with which she

11  is involved.  And then in closing, Your Honor, we would ask

12  in your consideration of whether to order sanctions against

13  the law firm, that you take into account the declarations we

14  have submitted to you and what the law firm has done in

15  response to the Show Cause Order.  And Judge, I can't

16  emphasize this part enough, if there is anything that the

17  law firm has not done that the Court feels should be done or

18  should have been done, the firm would certainly welcome the

19  Court's instruction in that regard.  Finally, Judge, if

20  you've got any questions, we will do our best to answer

21  those questions.

22          THE COURT:  Okay.  I do have a couple of

23  questions, and maybe you can answer them, or maybe Mr.

24  Giller and Mr. Shultz can answer them.  First of all, I do

25  appreciate the fact that the firm, once it was made aware of

1    the issue, was proactive in dealing not only with the

2    motions for sanctions, but the underlying issue.  And I do

3    take into account -- the reason I wanted to hear the motions

4    for sanctions first was because I did, in connection with

5    the order to show cause, want to take into account that the

6    firm did proactively go ahead and take care of the fees

7    requested, which I do think is an appropriate monetary

8    sanction with respect to what has happened, both for the

9    motions for sanctions and the order to show cause.

10            A couple of questions.  And again, folks are

11   welcome to step up and answer if you don't know the answer.

12   But the first question is in the past three years, has any

13   attorney for the firm been sanctioned or reprimanded by any

14   other state or federal court for misciting legal

15   authorities, including, but not limited to, hallucinated

16   cases that may have been generated through artificial

17   intelligence?

18            MR. SEGALL:  Any sanctions related to AI, Your

19   Honor?

20            THE COURT:  Reprimands or sanctions for use of AI?

21            MR. SEGALL:  The answer is in the negative, Your

22   Honor.

23            THE COURT:  Okay.  As noted in the response and in

24   the declarations, it did look like Gordon Rees had the

25   policy in place as of late June 2023.  It was difficult for

1    me to tell from the exhibits for the declarations.  So I'm

2    just going to ask, was there a mechanism for the attorneys

3    to acknowledge receipt of an agreement to abide by that

4    policy?

5              MR. SEGALL:  I think there was, Your Honor, and we

6    could find no such receipt from Ms. Preston.  She wasn't

7    there in June of 2023, but the handbook of policies was

8    distributed to her.  But we find nothing that shows she

9    signed, acknowledging having read it.

10             THE COURT:  Okay.  And then there was the July

11   31st update to the AI policy.  It did look like, from the

12   attachments that I had available to me, that one did have

13   some sort of acknowledgement function to it.  Is that

14   correct?

15             MR. SEGALL:  I think it did, Your Honor, but I

16   don't think we received anything from Ms. Preston

17   acknowledging receipt, although it was sent to her.  But we

18   didn't have an acknowledgement of receipt from her.

19             THE COURT:  Okay.  So speaking a little bit more

20   broadly than just Ms. Preston, is some record kept of

21   attorney acknowledgements of the new policy on AI?

22             Oh, yes.  Please feel free to step up and --

23             MR. GILLER:  Your Honor, excuse me, Ron Giller.

24   Yes, there is.  And that has sort of evolved in the last

25   year or so.  But there is a mechanism for us to track who

1   has signed the acknowledgement.  And we have in place a

2   follow-up system, too, that's with 1,800 attorneys.  Doesn't

3   hit everybody right away.  But there is follow-up that goes

4   out to the attorneys who haven't acknowledged it by the

5   deadline that's set.

6            THE COURT:  Okay.  Thank you.  And so just closing

7   the loop on that, you had the September update -- or

8   actually, a new policy that ties in with the AI policy about

9   checking citations.  Does it have a similar tracking

10  function for acknowledging receipt of or agreeing to it?

11           MR. GILLER:  I believe so.  I believe that is the

12  same as with the new policy.  That there's a tracking where

13  you have to acknowledge it.  And then it gets sent to, I

14  think, someone in our Risk Department has track of who has

15  acknowledged it and who hasn't.

16           THE COURT:  Okay.  All right.  So again, Mr.

17  Segall touched on this.  And again, anybody can answer this.

18  Discussing that there was training on the use of AI at

19  partner's retreat, was it the 16th through 18th?  Am I

20  remembering correctly?  Was that training recorded such that

21  it could be shared with others that weren't in attendance at

22  the retreat?

23           MR. GILLER:  No, because the retreat that's

24  referenced in the affidavit is for partners, and not even

25  for all partners.  So part of what we were trying to

1    describe in the affidavit was that the message was

2    delivered, essentially trained to the managers, to the more

3    top level, with the message to bring it back to the offices.

4    And I think this is what Mr. Segall was referencing, to make

5    sure all the associates and all the other attorneys were

6    getting the same message from that.  It wasn't recorded,

7    though, no.

8                 THE COURT:  Okay.  So I guess, is there almost

9    like a script or a program that people in the offices will

10   follow with respect to the training?

11                MR. GILLER:  Well, there's the written policy that

12   lays out what's required.  And that was reiterated through

13   sort of multiple different ways at the firm.  And that's

14   what we were describing in the affidavit.  So I, in my role,

15   was delivering that message to the equity partnership.  We

16   also had meetings with all of the people that were involved

17   in oversight of all the offices and again, delivered the

18   same message of what the policy is and what was happening

19   with this case to bring it back to every office so that all

20   the attorneys would hear the same message of what the policy

21   is and what's expected of them.

22                MR. SEGALL:  Your Honor, I would add to that, Your

23   Honor, that Chad Shultz told me this morning that Ron spoke

24   about this so often at the meeting that another partner told

25   Chad that he was driving everybody crazy to the extent that

1 he was raising it.

2        THE COURT:  Okay.  All right.  So I can't remember

3 which of the two declarations it was said that a partner had

4 checked all of Ms. Preston's other pleadings since she had

5 started at the firm.  Is that correct?

6        MR. SEGALL:  Yes.

7        MR. GILLER:  Yes.  I have somebody, another

8 partner that works with me in our department, essentially

9 our risk or legal Counsel department, and she was assigned

10 to look through all of those filings to see if there was

11 anything else with citations.

12        THE COURT:  Okay.  And this is not something that

13 you all would be aware of, but part of the issue I had, too,

14 was in the pleadings leading up to the motion to reconsider,

15 including the two that were subject to the motion to

16 reconsider, but also in several other pleadings, there may

17 have been accurate cites from the standpoint of there being

18 an actual regulation or statute or case with that citation,

19 but they didn't necessarily stand for the proposition for

20 which they were cited.  I suspect that may have been

21 difficult for this other lawyer to track down when reviewing

22 her work.  Is that fair to say?

23        MR. GILLER:  Maybe.  You're right.  I mean, it's

24 possible.  I mean, she was able to distill down all of the

25 documents that Ms. Preston ever touched in our office to

1   about 24 documents that had any citations in it.

2           THE COURT:  I see.

3           MR. GILLER:  And then was able to use that to run

4   through a Westlaw program to see if there was any issues.

5           THE COURT:  Okay.  Okay.  This is a slightly

6   different issue, but I think it goes hand-in-hand with the

7   citations and the AI issue.  I know you all have 1,800

8   attorneys, 50 states.  This might not be something that you

9   can put a policy around or monitor.  But is there any policy

10  regarding the delegation of client referrals to attorneys

11  with specialized knowledge and expertise?

12          In this case, Ms. Preston's response indicated,

13  and I can kind of tell from the bench, that she was not a

14  bankruptcy expert.  Is there any policy in place to make

15  sure that if a lawyer is assigned to a case or receives a

16  referral for a case in an area where they're not an expert,

17  that they call on somebody else in the firm to assist them

18  or guide them through it?

19          MR. GILLER:  There's not a policy per se as a

20  written policy or whatnot.  It would be more anecdotal of

21  what I sort of know for the offices that I oversee, and I'm

22  sure Chad can speak to it also.  It's discouraged.  We don't

23  want our attorneys practicing in areas they don't know

24  about.  To me, bankruptcy is an area that I don't know

25  enough about, so I wouldn't want to be practicing in it.

1  And frankly, I think the way this came about with initially

2  being filed in state court, and then the bankruptcy of

3  evolving out of that, is kind of how this happened.  It

4  shouldn't have.  She shouldn't have, frankly, taken a case

5  in bankruptcy court without supervision.  We have a

6  bankruptcy group, so that's who should have been involved in

7  this.

8       MR. SEGALL:  And Your Honor, I think Ms. Preston

9  noted in her response to the Court that these people, the

10  clients, the principals in the client, and especially the

11  wife of the main principal was like her best friend.  And I

12  don't know if she said that as clearly in the document filed

13  in court, but that -- like family to her.  And I think

14  that's why she did it.  She regrets that she did it, and she

15  expressed that, I think, to the Court.  But she did it.  She

16  didn't ask for assistance, and so this is what happened.

17       THE COURT:  Okay.  Well, as I mentioned, I do feel

18  like the firm's voluntary payment of the attorney's fees of

19  DIP Lender's Counsel and debtor's Counsel in advance of the

20  hearing evidences the firm's recognition that these are

21  serious issues.  And between that and what was in the

22  declarations and what you all spoke about today it does

23  indicate a commitment to mitigate the damages and prevent

24  this from happening in the future.  Does the firm have a

25  position on appropriate sanctions, if any, above and beyond

1    what you all have already undertaken to do?

2              MR. SEGALL:  Do we have a position, Your Honor?

3              THE COURT:  Yes.

4              MR. SEGALL:  We have a hope and a prayer.  Does

5    that count?

6              THE COURT:  Yes, I guess.

7              MR. SEGALL:  We would hope, Your Honor, would find

8    that the firm responded appropriately.  At the same time,

9    the firm recognizes that it's responsible for what its

10   lawyers do.  So our hope is that the Court would find that

11   adequate with any additional steps that Court might

12   instruct.  We would hope not to be sanctioned further.

13             THE COURT:  Okay.  Is there anything else that's

14   in addition to or different from what was presented either

15   in the filings or in court today that you want me to

16   consider?

17             MR. SEGALL:  I don't think so.  Your Honor.

18             THE COURT:  Okay.  And I'm not suggesting that you

19   all need to do this.  Do you want an opportunity to submit

20   anything post-hearing?

21             MR. SEGALL:  Only if Your Honor thinks it would be

22   helpful to the Court.  We think we've presented to the Court

23   how we have responded, what we have done.  And if the Court

24   wants something further, we definitely want to do anything

25   the Court wants.  But I don't think -- we're satisfied that

1    Your Honor, we believe, has the information necessary to

2    make a decision.  If Your Honor feels otherwise, then we

3    would definitely want to assist the Court in that regard.

4             THE COURT:  Okay.  No, I feel like I have what I

5    need.  I just wanted to give you that opportunity if you

6    wanted to take it.

7             MR. SEGALL:  I think we're satisfied, Your Honor.

8             THE COURT:  Okay.  Thank you.

9             I want to move to Ms. Preston individually, and

10   we'll address a few of those things as well.

11            MR. MILLS:  Your Honor, Wallace Mills, for Cassie

12   Preston.  Your Honor, Ms. Preston is here today, and I am

13   here today, not to make any excuse whatsoever for the

14   filings that were made or the representations made by Ms.

15   Preston in court in the August 26th hearing.  We are

16   prepared, however, to supply whatever information the Court

17   thinks is appropriate by way of context, but not excuse.  We

18   would request that Your Honor would hold an ex parte

19   hearing, which is allowed for under the Alabama Rules of

20   Professional Conduct, Rule 3.3, so that Ms. Preston can be

21   completely candid with the Court in terms of this context.

22            And I say that both as her Counsel and because I

23   know she wants to.  First, there are issues.  She has a

24   continuing ethical duty to her clients and former clients.

25   In this case, there are potential liability issues at stake,

1    and there are some intensely personal issues that, I think,

2    Ms. Preston would appropriately share with the Court, but

3    they might not be appropriate for a public forum.  And in

4    order to allow Ms. Preston to be completely candid with the

5    Court, well, she would have difficulty doing that in an open

6    hearing.

7              THE COURT:  Okay.  Okay.

8              MR. CONNALLY:  Your Honor, I can only assume that

9    that's due to some privilege issues unbeknownst to us, so we

10   object to that.  I can only presume that's designed or

11   offered or requested, rather, in order to discuss something

12   communicated under attorney-client privilege, which can only

13   be requested by my clients.  So I've got to be cautious with

14   that.

15             MR. MILLS:  Judge, there's Federal Case Law on

16   this that allows for a federal Judge to require an attorney

17   in this situation to share, even privileged information,

18   obviously, in a sealed or closed hearing.  But that is --

19   the Court does have that authority.  I've had this issue in

20   the middle district with Judge Huffaker, with another lawyer

21   that I represented, and have researched it pretty

22   thoroughly.  Because I took the same position that they're

23   taking now.  And if we want to look at that, we can, but

24   there is some Case Law that allows for it that can help.

25             THE COURT:  Do you have a motion for this?

1              MR. CONNALLY:  And Your Honor, I would just, of

2       course, request the opportunity to address the issue that

3       Wallace may be well ahead of me, hereon, I may disagree with

4       him on.

5              THE COURT:  Okay.  Would it be helpful for the two

6       of you to confer?  Is there a way that you can resolve this

7       dispute?  Or do you think it's just a matter of other

8       federal law applicable to the situation?

9              MR. MILLS:  I'm certainly willing to discuss it

10      with him.

11             MR. CONNALLY:  I'll discuss it with him, Your

12      Honor.  I haven't looked at any law on it.  I mean, I come

13      in today, seven or eight days into the representation with

14      the basic understanding that the privilege, of course, is

15      the clients to waive.  I haven't looked at anything.  But I

16      want to talk to Wallace, that would be ideal.

17             THE COURT:  Okay.

18             MR. MILLS:  And I'm not representing, Judge, that

19      it is a privilege issue.  Honesty, there are a whole suite

20      of ethical duties that Ms. Preston owes to her former

21      client.

22             MR. CONNALLY:  And I'm only concerned about the

23      privilege.

24             THE COURT:  Okay.  Okay.  Well, before we get into

25      that, I may want to just ask a few questions either for

1    Counsel or Ms. Preston directly, if Counsel doesn't know.  I

2    guess the first question is if Ms. Preston had worked on any

3    other bankruptcy matters before appearing in this case?

4             MR. MILLS:  I am at liberty to say she did not

5    have very much experience in bankruptcy.

6             THE COURT:  Okay.  And related to that, were there

7    other matters Ms. Preston has handled that involved

8    bankruptcy issues where she enlisted the help of others in

9    the firm that specialize in bankruptcy?

10            MR. MILLS:  I don't know the answer to that,

11   Judge.  I can ask my client.

12            THE COURT:  If you don't mind, just so we'll have

13   it on the microphone.

14            MS. PRESTON:  (indiscernible)or --

15            THE COURT:  Just so we'll have it recorded, yes.

16            MS. PRESTON:  And what was your question exactly?

17   I'm sorry.

18            THE COURT:  Okay.  So I think the answer to

19   whether you had handled any other bankruptcy-specific

20   matters was, no.

21            MS. PRESTON:  Yes.

22            THE COURT:  Were there ever instances where

23   bankruptcy issues were involved in matters you were

24   handling, and if so did you enlist the help of others in the

25   firm that were bankruptcy specialists?

1      MS. PRESTON:  So this would have been years ago

2  when I first started practicing, maybe 15 years ago when I

3  was with Cozen O'Connor.  I was in the Segregation

4  Department.  So we sometimes had large corporations file

5  bankruptcy.  I would attend a creditor's meeting for the

6  purpose of just asserting a claim, and that was it.  Other

7  than that, it was, no.

8      THE COURT:  Okay.  Okay.  So what would be your

9  general practice regarding verifying legal authorities that

10  were going to be in a document that you'd file with the

11  Court?

12      MS. PRESTON:  I would do cite check with Westlaw,

13  generally.

14      THE COURT:  Okay.  And was that practice followed

15  in this case with respect to the motion to reconsider?

16      MS. PRESTON:  With this, no.  Not with that

17  motion, no, Your Honor.

18      THE COURT:  Okay.  And I don't know if we're

19  getting into questions that you believe need to be answered

20  somewhere else, but why weren't they followed in this case?

21      MS. PRESTON:  We are getting into that, yes.  I

22  can tell you that regardless, it was not an excuse, but

23  there are some personal things that we can discuss.

24      And I can actually answer the question, so

25  Wallace, maybe you don't have to.

1        There's nothing privileged.  It's a personal issue

2   that I would rather not --

3        THE COURT:  Okay.  Okay.

4        MR. SEGALL:  Suffice it to say, Judge, I think

5   we're in agreement.  This was a time-constraint issue in her

6   life.  Some of these filings were literally filed while she

7   was on the road.  And I think she took a shortcut.

8        THE COURT:  Okay.  So the firm had this policy in

9   place as of June of 2023.  You came in, in 2024.  Do you

10  recall reviewing the handbook, and specifically, the AI

11  policy in the handbook?

12       MS. PRESTON:  I did review the handbook, for sure.

13  Do I recall everything that was in it?  No, sir, I don't.

14       THE COURT:  Okay.  Okay.  And I think there may

15  have been one other case that was disclosed in the firm's

16  declarations, but a state court case?

17       MS. PRESTON:  Same time as this filing, yes, Your

18  Honor.

19       THE COURT:  Okay.  Okay.  Do you all feel like it

20  would be helpful to discuss the other issues ex parte?  Do

21  you feel like it's relevant to --

22       MS. PRESTON:  I think that it would give a better

23  understanding for Your Honor.

24       MR. SEGALL:  Your Honor, I think she could give

25  you context for -- not an excuse.  She understands that she

Case 25-30256   Doc 1152   Filed 11/10/25   Entered 11/10/25 16:08:49   Desc Main
Case 25-30256   Doc 1182   Filed 11/20/25   Entered 11/20/25 15:26:23   Desc Main
Document    Page 127 of 130

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400

1   shouldn't have done this.  But what she can tell you is

2   essentially why she resorted to it, what brought her to

3   that, and give you context for why it happened.

4          THE COURT:  Okay.  With the caveat that I'm not

5   going to address the privilege issue, if we are just talking

6   about personal circumstances at this point, I'm going to

7   allow that.  And so what I'm going to do, if you all want to

8   stay put in the courtroom, I'm just going to move over to

9   courtroom 4D.  If you all want to move over to courtroom 4D,

10  we can discuss that for as long as you need to, and we'll be

11  back.  Okay.

12         MS. PRESTON:  Thank you, Your Honor.

13         MR. SEGALL:  Your Honor?

14         THE COURT:  Yes.

15         MR. SEGALL:  Would the firm be permitted to being

16  the audience for this hearing?

17         THE COURT:  Do you all have any opposition?

18         MS. PRESTON:  I don't.  My managing partner

19  already knows.

20         THE COURT:  Okay.  It seems appropriate.

21         MR. CONNALLY:  Your Honor, then I think I have to

22  ask for Progressive Perfusion.  I would like to know her

23  answers relating to that.

24         MS. PRESTON:  I'm sorry.  If you're representing

25  Progressive, and I'm sorry I'm late to the party, you're

1  welcome to join.

2          THE COURT:  Okay.  All right.  So members of

3  Gordon Rees and Ms. Preston and Counsel for Progressive, if

4  you want to go over to 4D, and we'll let her speak.  And

5  we'll be back.

6          You all can be seated as you come back in.

7          Have everybody back.  He's going to be back in?

8          COURT DEPUTY:  I just think Mr. Segall just needs

9  a second.

10         THE COURT:  Okay.

11  (Pause)

12         Okay.  Again, kind of as I mentioned to the firm,

13  I'm not suggesting that you need to do so but would you guys

14  like an opportunity to submit anything post-hearing?

15         MR. SEGALL:  No, Your Honor, unless you'd like us

16  to file something under sealed that reflects what we just

17  discussed?

18         THE COURT:  No, I don't think that would be

19  necessary.  Okay.  Is there anything else that you -- any

20  points above and beyond what had been filed that you'd like

21  to make?

22         MR. SEGALL:  No, Your Honor.  What I would say is

23  that, like I said in the beginning, Ms. Preston is not here

24  to defend her actions or in any way try to explain them.

25  She understands fully the gravity of what she did.  She

1  understands the wrongfulness of what she did.  She is

2  sorrowful for it.  She has, at least, to me, been apologetic

3  for it.  This will be very detrimental to her career and her

4  ability to produce income going forward.

5       Gordon Rees did audit her documents.  And like

6  they said, they audited 2,700 documents.  But for these two

7  pleadings that were prepared about the same time, there was

8  no other anomaly.  I would not want the Court nor the

9  parties to believe that this was a standard for her in the

10  15 years she's practiced law.  I think, as humans, we are

11  all subject to doing bad things under the wrong or right

12  circumstances.  And certainly, I wouldn't want to cast too

13  many stones myself, lest I find myself in such a

14  predicament.  But she knows it was wrong.  She understands

15  the gravity of it.  And there are already going to be

16  serious repercussions for her from it.

17       THE COURT:  Okay.  Thank you.  All right.  I'm

18  going to take this under advisement.  I'm not going to sit

19  on it for a long time.  I just want to make sure I've

20  thought through everything that you all submitted.  I

21  appreciate the seriousness with which you've taken this.  I

22  appreciate members of the firm being present to answer

23  questions, Ms. Preston being present to answer questions.

24  And like I said, I will rule on it very quickly.  I just

25  don't want to rule on it from the bench, just to make sure I