## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **Jackson Hospital & Clinic, Inc., *et al.*,**[1] | § | |
| | § | **Case No. 25-30256** |
| | § | |
| **Debtors.** | § | |
| | § | **Jointly Administered** |

| | | |
|---|---|---|
| **Jackson Hospital & Clinic, Inc.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adv. No. 25-_____** |
| | § | |
| **Blue Cross and Blue Shield of Alabama,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Jackson Hospital & Clinic, Inc. ("Plaintiff," "Debtor," or "Jackson Hospital"), the debtor in the above-styled chapter 11 bankruptcy case (the "Bankruptcy Case"), files this Original Complaint (the "Complaint") against Blue Cross and Blue Shield of Alabama ("Defendant" or "Blue Cross Alabama"). In support thereof, Plaintiff respectfully shows as follows:

---

[1] The Debtors in these Chapter 11 cases are Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC.

---

# I.
## SUMMARY

### The Sad Story of Jackson Hospital and Blue Cross Alabama
*How the greed of a behemoth insurance company – Blue Cross Blue Shield – is destroying healthcare in Alabama.*

*"Governor Ivey believes it is imperative this hospital keeps its doors open."*

*-Gina Maiola, spokesperson for Governor Kay Ivey*

*"Jackson Hospital is the single most important hospital in the state of Alabama because of the regional care it provides."*

*-Congressman Shomari C. Figures*

*"We have to have this hospital going forward. It's the only hospital in the area that is taking in indigent care, and that's a really important thing to have here in the city of Montgomery."*

*-Andrew Szymanski, Montgomery City Council Member*

1.      The importance of Jackson Hospital to the lives and health of Alabama residents is undeniable. Jackson Hospital provides critical healthcare services not only to residents of Montgomery but also to Alabamians in surrounding cities and counties. Approximately 40% of Jackson Hospital's patients reside outside the City of Montgomery. In 2023 alone, Jackson Hospital provided over $45 million worth of care to uninsured patients. The consequences of Jackson Hospital closing would be far-reaching and devastating: approximately 1,800 employees would be displaced; the Montgomery region already does not have enough hospital beds to serve those in need of acute medical care; and wait times at surrounding emergency rooms would increase exponentially. Put simply, if Jackson Hospital closes, there would not be nearly enough medical care to treat Alabamians in need.

2.      ***Doing what is necessary to keep Jackson Hospital open is literally a matter of life or death***. Blue Cross Alabama knows all this. ***But Blue Cross Alabama does not care***.

3.     Blue Cross Alabama calls itself a "nonprofit," but the insurance giant has become one of the most powerful and profitable corporations in Alabama – sitting on billions in reserves, paying executives multi-million-dollar salaries/bonuses, and posting hundreds of millions in annual surpluses while hospitals across Alabama (like Jackson Hospital) struggle to stay open and patients go without critical care. There is no doubt – Blue Cross Alabama places profits above patient care, as evidenced by Blue Cross Alabama recently boasting the highest Affordable Care Act ("ACA") claim denial rate in the country. Publicly, in an effort to improve its image and increase its bottom line, Blue Cross Alabama claims:

> "*Since 1936, we've been doing our part to provide quality, affordable healthcare coverage to each and every one of our members, at every stage of their lives. We are proud to be the **number one provider of healthcare benefits in Alabama**.*"

On its website, Blue Cross Alabama further represents:

> "*We believe in putting the customer first. **Our mission is to provide employers, families, and individuals access to quality, affordable healthcare** because we care about our members' health and their peace of mind. Our customers are at the center of everything we do, every decision we make, every claim we pay, and every call we are on. It's about treating them with compassion, urgency, and respect. Our customer-first philosophy is what makes our company elite and separates us from the competition.*"

> *[. . .]*

> "*One of our corporate values is to give back to the community. **We believe in being a good corporate citizen by investing in sustainable initiatives that support the health and well-being of Alabamians**. We want our members to live the healthiest life possible, so we offer resources that emphasize healthy living, prevention, and the care of chronic and complex medical conditions . . . . Doing the right things for the right reasons, for the more than 2.8 million members who put their trust in Blue Cross every day.*"

4.     Unfortunately, Blue Cross Alabama's alleged "mission" and marketing slogans constitute nothing more than empty, disingenuous, corporate lip service. Blue Cross Alabama had the opportunity to put its money where its mouth is and pay Jackson Hospital the fair

reimbursement rates needed to save "the single most important hospital in the state of Alabama." Instead, Blue Cross Alabama did what it always does: value profits over people.

5.  Blue Cross Alabama refuses to act in good faith and pay Jackson Hospital fair and reasonable reimbursement rates. The national commercial average reimbursement rates are approximately 240% of Medicare. In Alabama, however, these average rates, which Blue Cross Alabama imposes given its market dominance in the state, are closer to 140% of Medicare – ranking Alabama near the bottom of the entire country. That is bad for Alabama, but it gets even worse for Jackson Hospital. Blue Cross Alabama reimburses Jackson Hospital at approximately 120% of Medicare (*i.e.*, *significantly* below national commercial averages, and well below statewide averages). Blue Cross Alabama's reimbursement levels to Jackson Hospital are—and have been for years—discriminatory, unfair, and economically unsustainable.

6.  Blue Cross Alabama is now trying to nail the coffin shut for Jackson Hospital. Blue Cross Alabama denied Jackson Hospital's request for Blue Cross Alabama to simply match the same rates Blue Cross Alabama already pays the other hospital in Montgomery, Alabama – Baptist Medical Center ("Baptist"). Upon information and belief, Blue Cross Alabama pays Jackson Hospital ***30–40% less*** than Blue Cross Alabama pays Baptist for comparable services. Blue Cross Alabama *knows* Jackson Hospital is in imminent danger of closing its doors if Blue Cross Alabama does not pay Jackson Hospital the same rates Blue Cross Alabama already pays Baptist. However, with full knowledge of the dire consequences, Blue Cross Alabama continues its discriminatory attack on Jackson Hospital and refuses to pay Jackson Hospital the same rates Blue Cross Alabama already pays another hospital in same city, for the same services.

7.  Blue Cross Alabama's intentional and bad faith underpayments to Jackson Hospital have destabilized Alabama's healthcare system – proximately causing Jackson Hospital to lose

hundreds of millions of dollars, forcing the hospital into bankruptcy, and preventing Jackson Hospital from being able to successfully emerge from bankruptcy and continue providing critical healthcare services to Alabamians.

8. Blue Cross Alabama's discrimination against Jackson Hospital is unlawful. Blue Cross Alabama is a monopoly in every sense of the word; controlling roughly 90% of Alabama's commercial health-insurance market, which gives Blue Cross Alabama unchecked power to unilaterally dictate and control the amount providers such as Jackson Hospital are paid. This monopoly prohibits Jackson Hospital from securing fair reimbursement rates elsewhere; effectively giving Jackson Hospital no choice but to "take it" and get squeezed by the Blue Cross Alabama monopoly. But the squeeze – a scheme designed solely to inflate Blue Cross Alabama's already massive bottom line – has obvious, negative outcomes: specifically, Jackson Hospital cannot survive.

9. Blue Cross plans nationwide collude to divide territories and restrain competition, ensuring each Blue Cross entity dominates and controls its own state. In Alabama, Blue Cross Alabama's dominance is total, and – as evidenced by the bankruptcy of Jackson Hospital – this market dominance and control is devastating to health care providers and the millions of people who reside in Alabama and desperately need access to quality healthcare.

10. Blue Cross Alabama claims it values being "a good corporate citizen" and supports "the health and well-being of Alabamians." But Blue Cross Alabama's actions prove otherwise. Jackson Hospital's bankruptcy was not inevitable – it was the predictable result of a monopoly that allows one insurer (Blue Cross Alabama) to decide what care is worth and to value profits over people in the process of unilaterally and unfairly setting reimbursement rates. Blue Cross

Alabama's actions do not constitute community partnership; it is corporate abandonment and greed.

11.    If an individual suffers a heart attack in Montgomery, Alabama and is rushed by ambulance to Jackson Hospital for life-saving care, that individual's life is not worth less than a similar heart attack patient who is transported to the other hospital in Montgomery (*i.e.*, Baptist). But this indefensible practice (*i.e.*, deciding whose life is worth more) is exactly what Blue Cross Alabama is doing through its discriminatory, unfair, and unlawful setting of reimbursement rates. Enough is enough. Blue Cross Alabama must be stopped.

12.    Through this lawsuit, Jackson Hospital seeks to stand up; fight back (for itself *and* the citizens of Alabama who Jackson Hospital has faithfully served for nearly 80 years); and hold Blue Cross Alabama responsible for its unlawful, discriminatory, and bad faith actions. Specifically, Jackson Hospital seeks (i) judgment against Blue Cross Alabama for the massive damages Blue Cross Alabama caused Jackson Hospital to suffer – specifically, at trial, Jackson Hospital anticipates requesting **_judgment against Blue Cross Alabama in excess of $250 million_**, and (ii) emergency injunctive relief requiring Blue Cross Alabama to immediately and permanently pay Jackson Hospital fair reimbursement rates – at minimum, the same rates Blue Cross Alabama already pays Baptist (*i.e.*, the other hospital in Montgomery, Alabama).

13.    The State of Alabama, Montgomery County, and the City of Montgomery have stepped up and committed to substantial grants needed for Jackson Hospital to successfully emerge from bankruptcy and continue providing the critical care Alabamians so desperately need. It is time for Blue Cross Alabama to do its part; the law requires it. Jackson Hospital is not asking for any handouts or special treatment from Blue Cross Alabama – only to be treated fairly.

Unfortunately, Blue Cross Alabama is unwilling to do so. That is why emergency injunctive relief is required.

## II.
## JURISDICTION AND VENUE

14.     On February 3, 2025, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

15.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

16.     Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent any matter in this adversary proceeding is not core, the Debtor consents to this Court's entry of final orders and judgment.

17.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
## THE PARTIES

18.     Debtor Jackson Hospital & Clinic, Inc. is a 344-bed acute care facility that includes a clinic, surgery center, and imaging center in Montgomery, Alabama. Jackson Hospital has provided healthcare services in Montgomery, Alabama since first opening its doors to patients on September 16, 1946.

19.     Defendant Blue Cross and Blue Shield of Alabama[2] is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.

---

[2]     Blue Cross Alabama's "affiliates," when used herein, includes, but is not limited to: Blue Cross and Blue Shield Association; Anthem, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company; Elevance Health, Inc. f/k/a Anthem, Inc.; Health Care Service Corporation; Highmark, Inc. f/k/a Highmark Health Services; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield of Michigan; and Blue Cross and Blue Shield of Texas.

Blue Cross is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than 3 million people. The principal headquarters for Blue Cross is located at 450 Riverchase Parkway East, Birmingham, Alabama.

## IV.
### THE FACTS

---

### *The History of Blue Cross Alabama's Dominance in the State of Alabama*

---

#### A.    *Rapid Increase in Membership*

20.    Blue Cross Alabama's dominance in the State of Alabama stems all the way back to the 1940s and 1950s when there was a significant increase in membership growth from steelworkers and other unionized workers. From 1946 to 1956, Blue Cross Alabama saw a 416% increase in enrollment.[3] As the popularity of employer-sponsored benefit plans increased, Blue Cross Alabama and its affiliates—from the get-go—utilized those plans and developed an anticompetitive system to expand their market shares and market power.

21.    This rapid increase in membership growth was not merely coincidental. Around that time, the steel industry agreed to include health benefits in a new collective bargaining agreement and selected Blue Cross of Western Pennsylvania, now known as Highmark ("Highmark"), to coordinate those benefits. However, Blue Cross Alabama—along with the entire Blue Cross Blue Shield network—adopted territorial limitations, which prevented Highmark from providing benefits to the tens of thousands of steel workers located in Alabama. As a result, other insurers (including Highmark) could not enter the healthcare market in Alabama and compete with Blue Cross Alabama.

---

[3]    *See* CLARENCE JOSEPH VANCE, THE HISTORY OF BLUE CROSS AND BLUE SHIELD OF ALABAMA 194-95 (1978).

---

22.     Shortly before the steel workers, Blue Cross Alabama's membership surged with enrollments from other unionized sectors as well. This too was no coincidence. Specifically, auto workers at a Ford plant in Alabama enrolled in plans with Blue Cross Alabama that would have been administered by Blue Cross Blue Shield of Michigan ("BCBS-MI") had the agreed territorial restrictions not been in place. As a result, BCBS-MI likewise could not enter the healthcare market in Alabama and compete with Blue Cross Alabama.

23.     This significant increase in enrollment almost immediately caused reimbursement issues. Blue Cross Alabama addressed these problems by imposing a cost-based reimbursement system in Alabama hospitals. Ultimately, this system resulted in Alabama hospitals receiving *among the lowest reimbursement levels in the country*.[4] This system, which requires Alabama hospitals (like Jackson Hospital) to be part of a cost-based reimbursement system, is still in place today.

**B.     *Stifling Competition Promoted by the Alabama Health Care Council***

24.     In or about 1985, several major Alabama corporations created the "Alabama Health Care Council," a nonprofit organization intended to help Alabama businesses improve healthcare quality and reduce healthcare costs.

25.     In or about 1995, in response to escalating healthcare expenses in the State, the council sought competitive bids for healthcare coverage. More than twenty companies submitted proposals. The council narrowed the field to United Healthcare of Alabama and Health Partners of Alabama (which was then the insurance arm of Baptist Health System). Blue Cross Alabama did not submit a bid in response to this initial solicitation.

---

[4]     *See, e.g.,* Milliman June 19, 2024 White Paper, *Commercial Reimbursement Benchmarking*, available at https://www.milliman.com/en /insight/commercial-reimbursement-benchmarking-medicare-ffs-rates

26. Catching wind of this, Blue Cross Alabama realized it risked losing coverage for roughly 60,000 employees if the Alabama Health Care Council (hereinafter, "Council") members switched their plans to another insurance carrier. So what did Blue Cross Alabama do? To preserve its market share and delay/obstruct pro-competitive healthcare reforms in Alabama, Blue Cross Alabama offered the Council a 20% discount for a three-year guarantee period. The Council accepted. Under this agreement, Blue Cross Alabama also committed to further reducing healthcare costs for Council members after the three-year guarantee period expired, specifically promising to improve its management of healthcare delivery and administration of health benefit plans in Alabama.

27. This agreement *should* have resulted in Blue Cross Alabama substantially altering how it managed healthcare delivery and plan administration in the State. However, rather than undertake the promised changes, Blue Cross Alabama funded the discounts using its hundreds of millions of dollars in surplus and increased charges to other consumers.

28. When the three-year guarantee was set to expire, Council members learned if they remained in contract with Blue Cross Alabama the following year, their healthcare costs would rise by approximately 35–45%. In response, one of the Council members terminated its contract with Blue Cross Alabama and secured coverage for its employees elsewhere. However, due to Blue Cross Alabama's use of "most-favored nations" clauses ("MFNs," *i.e.*, clauses in which Blue Cross Alabama would receive prices at least as favorable as those the provider gives to other insurers), this Council member had exceptional difficulty negotiating competitive rates with hospitals and physicians.

29. It is without question Blue Cross Alabama used temporary discounts and MFNs to maintain its market power in Alabama and shield itself from competition.

## C.    Extracting Money from Hospitals Through "Tiering"

30.    In furtherance of its efforts to exploit its market dominance and ensure the absence of competition in the State of Alabama, Blue Cross Alabama has used its hospital "tiering" program to pressure hospitals into making financial concessions by steering patients toward higher-tier hospitals and withholding the cost calculations behind Blue Cross Alabama's tier assignments.

31.    Under Blue Cross Alabama's "Hospital Tiered Network Program," which it launched in or about 2006, Blue Cross Alabama assigns hospitals to different "tiers" based on various criteria (such as fiscal, quality, patient safety, and patient experience).[5] In the program's current form, Blue Cross Alabama's determination of a hospital's tier is supposedly driven by "costs." Blue Cross Alabama claims to compare a hospital's "costs" to specific Medicare percentage thresholds and use those comparisons in its scoring. However, because Blue Cross Alabama refuses to provide its internal "cost" calculations, hospitals have repeatedly requested information to learn how Blue Cross Alabama actually determines the "costs" used and calculates the associated percentage of Medicare payment rates. Receiving no clarity, hospitals have even endeavored to match Blue Cross Alabama's purported cost calculations but have been unable to make sense of them. As such, these percentages of Medicare appear to be arbitrary thresholds designed to lower reimbursements paid by Blue Cross Alabama and, as set forth below, to extract payments from hospitals.

---

[5]    _See, e.g._, Total Blue BlueCard PPO, Hospital Tiered Network, available at https://www.bcbsal.org/plans/blue/pdfs/detailsTotal.pdf. Notably, at least through 2010, the "fiscal" category—which is clearly the most important, if not the only important, criterion in Blue Cross Alabama's view—was always based on a hospital's acceptance of contractual terms that reduce the amounts or rates that Blue Cross Alabama pays to that hospital. Thus, to score high in the "fiscal" category, a hospital must have entered into a financial agreement with Blue Cross Alabama to provide the most favorable discounts for their services.

32.     Notably, a hospital cannot reach "Tier 1" status without satisfying these lower, arbitrary "cost" thresholds. However, being placed below "Tier 1" is designed to inflict *severe* harm to a hospital. Specifically, Blue Cross Alabama affirmatively steers its members away from non-Tier 1 hospitals by imposing higher costs on subscribers and actively pushing subscribers to Tier 1 hospitals. Indeed, Blue Cross Alabama subscribers face higher out-of-pocket responsibility for receiving treatment at hospitals that are ranked in lower tiers.

33.     Even worse, under the Blue Cross Alabama "tiering" regime, Blue Cross Alabama's "cost" determinations and tier assignments are used to hold non-Tier 1 hospitals hostage unless they essentially pay off Blue Cross Alabama. Though Blue Cross Alabama touts this exercise as a "negotiation," that is far from the truth. Instead, to regain Tier 1 status, Blue Cross Alabama requires hospitals to make concessions either with respect to the costs a hospital reported in previous years or by reductions in forward-looking reimbursement rates.

34.     Confronted with the prospect of either losing large portions of their patient base or paying what can only be described as a ransom, hospitals have no choice but to accept lower reimbursement rates and pay Blue Cross Alabama so they can continue to treat the high percentage of Blue Cross Alabama subscribers in Alabama.

**D.    *Lowering Reimbursements Using "Cost Reporting" Requirements***

35.     Along the same lines, Blue Cross Alabama has required all hospitals to submit to "cost reporting" for almost seventy years. This cost reporting allows Blue Cross Alabama to arbitrarily adjust or reclaim payments based on a hospital's cost data. Aside from being incredibly time consuming and administratively inefficient, it allows Blue Cross Alabama to arbitrarily alter contracted reimbursement rates and even change the per diem rates Blue Cross Alabama pays a hospital throughout the year.

36.     Even worse, Blue Cross Alabama's cost reporting requirements deter hospitals from negotiating with other insurers (*i.e.*, competitors of Blue Cross Alabama) since the related costs and revenues would have to be revealed to Blue Cross Alabama.

37.     Blue Cross Alabama's cost reporting requirements are simply another way for Blue Cross Alabama to weaponize its market power, guarantee Blue Cross Alabama will get the best rates from hospitals in Alabama, and drive provider reimbursements lower.

**E.     Interfering with Competitive Bidding**

38.     Blue Cross Alabama has fought so hard to maintain its dominance in the State of Alabama that, back in 2013, it helped the City of Birmingham violate Alabama's Competitive Bid Law.

39.     Specifically, following a bid process for a contract managing the City of Birmingham's employee health coverage, United Healthcare emerged as the lowest bidder. However, to avoid losing subscribers and risk United Healthcare increasing its market share in Alabama, Blue Cross Alabama swooped in and conveniently offered to provide the City with additional services. Unsurprisingly, the contract was then awarded to Blue Cross Alabama.

40.     Ultimately, United Healthcare obtained a ruling from a Jefferson County, Alabama court (1) providing that the City of Birmingham's actions violated Alabama's Competitive Bid Law, and (2) requiring the City to restart the bid process and award the contract to the lowest bidder.[6]

**F.     Blue Cross Alabama's Dominance in Alabama Today**

41.     As discussed further herein, Blue Cross Alabama is *the* health insurer in the State of Alabama. Blue Cross Alabama insures or administers a supermajority of commercially insured

---

[6]     *See United Healthcare Services, Inc. v. City of Birmingham, Alabama*, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.).

lives (*i.e.*, upwards of 90%) in Alabama, wielding dominant buyer power over commercial hospital services in Alabama.

42.     Meanwhile, Blue Cross Alabama and its affiliates pay hospitals—like Jackson Hospital—among the lowest reimbursement rates in the country.

---

### *Blue Cross Alabama's Corporate Greed: Far From a "Nonprofit"*

---

43.     Blue Cross Alabama operates under a specialized Alabama statute that classifies it as a nonprofit special health-benefit service plan. This structure exempts Blue Cross Alabama from the state premium tax and many regulations applied to traditional insurers.

### *A.     Financial Secrecy in Executive Compensation*

44.     Blue Cross Alabama spends *heavily* on executive compensation and lobbying relating to same. Specifically, Blue Cross Alabama's executives have profited handsomely from the lack of competition in Alabama. In 2013 (*i.e.*, the last year in which Blue Cross Alabama's compensation was publicly available), top executives at Blue Cross were paid as follows:

- CEO and President Terry Kellogg, $4.84 million;

- Executive Vice President Timothy Kirkpatrick, $2.69 million;

- Chief Administrative Officer (and current CEO) Timothy Vines, $1.9 million;

- Senior Vice President and Chief Marketing Officer Timothy Sexton, $1.7 million;

- Senior Vice President and CFO Cynthia Vice, $1.47 million;

- Senior Vice President and CIO Brian S. McGlaun, $1.45 million;

- Senior Vice President of Business Operations Dick Briggs III, $1.44 million;

- Senior Vice President of Health Care Networks Jeffrey Ingrum, $1.42 million;

- Senior Vice President of Enterprise Resources Vickie Saxon, $1.26 million; and

- Senior Vice President and Chief Legal Officer Michael Patterson, $1.03 million.

45.     Moreover, upon information and belief, these extremely high salaries are at odds with salaries paid to executives of Blue Cross Alabama's affiliates in 2013, despite some of these affiliates having more customers and reporting annual revenue of $2 billion *more* than Blue Cross Alabama.

46.     Recognizing these inconsistencies, Blue Cross Alabama lobbied in support of legislation to remove executive compensation from the public record. In 2015, the Alabama legislature amended Ala. Code 1975 § 27-2-24 and made compensation data for officers and employees of insurance companies confidential and privileged. Notably, this amendment was sponsored by Former Alabama Senator Slade Blackwell who, in 2013 and 2014, coincidentally received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from Blue Cross Alabama.

47.     Though Blue Cross Alabama has successfully shielded its top executives' salaries from public view for the past decade, upon information and belief, these salaries have continued to increase.

**B.     Blue Cross Alabama's Documented Pattern of Service Denials**

48.     Blue Cross Alabama has also demonstrated a pattern of baselessly denying claims for routine and/or medically necessary services. For example, it was alleged in a prior lawsuit that – in 2014 – Blue Cross Alabama denied over $320,000 in claims for a deceased patient due to a lack of precertification during an emergency admission; it was alleged that the patient was admitted unconscious and died of a ruptured brain aneurysm two weeks later.[7] Moreover, it was reported

---

[7]     *See Andrews v. Blue Cross Blue Shield of Alabama*, Circuit Court of Jones County, Mississippi, (May 8, 2014).

that – in 2021 – Blue Cross Alabama denied coverage for a four-year-old's gene therapy for a fatal brain disease until widespread public pressure forced a reversal.[8] Unfortunately, Blue Cross Alabama's true motto appears to be "denied." Why? Because that increases Blue Cross Alabama's bottom-line, of course.

49.     In 2023, Blue Cross Alabama had the highest ACA claim denial rate in the country. In fact, one report found Blue Cross Alabama denied 35% of in-network claims for a specific ACA plan.[9] Further, Blue Cross Alabama has a documented history of continually denying coverage for critical treatments. Blue Cross Alabama's extraordinarily high denial rate further evidences that Blue Cross Alabama cares first and foremost about the money it makes or saves—not the Alabamians it is supposed to serve.

## C.     *Excessive Financial Reserves*

50.     Despite branding itself a "nonprofit," Blue Cross Alabama (and many of its affiliates) has amassed excessive financial reserves by leveraging the gap between the high premiums it charges consumers and the below-market reimbursement rates it pays healthcare providers.

---

[8]     *See* Chasity Maxie, *Family Gets Insurance Cooperation for 4-Year-Old's Historical Lifesaving Treatment*, WBRC News (Sept. 29, 2021), https://www.wbrc.com/2021/09/29/family-gets-insurance-cooperation-4-year-olds-historical-treatment/

[9]     *See* Justin Lo, Michelle Long, Rayna Wallace, Meghan Salaga, Kaye Pestaina, *Claims Denial and Appeals in ACA Marketplace Plans in 2023*, KFF Foundation (Jan. 27, 2025), available at https://www.kff.org/private-insurance/claims-denials-and-appeals-in-aca-marketplace-plans-in-2023/; *see also* Jonathan Hardison, *Blue Cross and Blue Shield of Alabama Denial Rate of In-Network Claims Highest in Country for Specific Affordable Care Act Plan*, WBRC News (May 15, 2025), https://www.wbrc.com/2025/05/16/study-blue-cross-blue-shield-alabama-denial-rate-in-network-claims-highest-country-specific-affordable-care-act-plan/

---

51.     In fact, in a study conducted in 2010 of the "nonprofit" Blue Cross Blue Shield entities, it was found that seven out of ten held more than three times the amount of surplus that regulators considered to be the minimum for solvency protection.[10]

52.     It appears that many Blue Cross Blue Shield entities significantly downplay their actual financial reserves by reporting only the surplus from their primary entity while omitting the broader general reserves detailed in their combined financial statements, which account for all business lines. These supra-competitive profits are a direct result of anticompetitive agreements between Blue Cross Blue Shield entities and their market dominance—especially their ability to compel providers like Jackson Hospital into their networks at below-market rates.

## D.     *Premium Increases*

53.     Blue Cross Alabama's corporate greed continues to grow. Even just recently, per Blue Cross Alabama's request, Alabama regulators approved a 19.3 percent average rate increase for Blue Cross Alabama's 2026 ACA plans, beginning January 2026.[11] But Blue Cross Alabama still refuses to pay Jackson Hospital the fair rates needed to keep the hospital open (all while Blue Cross Alabama boasts one of the highest claim denial rates).

---

[10]     ConsumersUnion, *How Much is Too Much: Have Nonprofit Blue Cross Blue Sheld Plans Amassed Excessive Amounts of Surplus?*, July 2010, available at https://advocacy.consumerreports.org/wp-content/uploads/2014/04/surplus_report.pdf

[11]     Josh LeBerte, *Alabama Approves 2026 ACA Premium Rates with Significant Increases*, WBMA (Sept. 2, 2025), https://abc3340.com/news/alabama-news/alabama-approves-2026-aca-premium-rates-with-significant-increases

54.     Blue Cross Alabama has achieved and maintained both monopoly and monopsony power in the State of Alabama. This power has been closely protected by Blue Cross Alabama for decades.

55.     Blue Cross Alabama has market power throughout the State of Alabama in the healthcare financing market and the health services market in *every* geographic area within the state. In Alabama, Blue Cross Alabama's market share is approximately 84%.[12] In Montgomery— *i.e.*, where Jackson Hospital is located—Blue Cross Alabama's market share is approximately 89%.[13] As such, Blue Cross Alabama is a monopolist in the sale of commercial health insurance and in the sale of administrative services for healthcare plans in every geographic area that one could possibly define in the State of Alabama. Blue Cross Alabama is further a monopsonist in the purchase of healthcare services by commercial insurers, again within every geographic market one could define in Alabama.

56.     Blue Cross Alabama and its affiliates have agreed that Blue Cross Alabama's affiliates will not compete with Blue Cross Alabama in the sale of commercial health insurance and the sale of administrative services for healthcare plans in Alabama. As such, rather than having any real negotiating power in contracting with commercial insurers for the sale of goods, services, and facilities, healthcare providers, like Jackson Hospital, are at the mercy of Blue Cross Alabama (and, as it turns out, Blue Cross Alabama is merciless).

---

[12]     Jose R. Guardado and Carol K. Kane, *Competition in Health Insurance: A Comprehensive Study of U.S. Markets*, American Medical Association (2025 Update), available at https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf

[13]     *Id.*

57. For healthcare providers like Jackson Hospital, contracting with commercial insurers to be in-network is critical. In fact, for Jackson Hospital, there is no reasonable alternative to contracting with Blue Cross Alabama because Jackson Hospital cannot adequately replace the patient volume or revenue from commercial insurance plans from other sources like out-of-pocket payors (a group that essentially does not exist) or government programs like Medicare or Medicaid (which pay prices that are significantly lower than the prices paid for commercial health plans of private employers or groups and are largely non-negotiable).

58. Jackson Hospital cannot sustain its operations without sufficient revenue from commercial insurers like Blue Cross Alabama. Jackson Hospital depends on payments from patients insured by Blue Cross Alabama to offset financial losses from treating uninsured patients, out-of-pocket patients, and patients covered by government programs. Replacing even a small portion of commercially insured patients with non-commercially insured patients is not a viable option, as Jackson Hospital often receives little to no compensation—and frequently incurs losses—when providing critical and needed medical care to these groups.

59. As such, Jackson Hospital cannot forego sales to a commercial buyer like Blue Cross Alabama. Yet, Blue Cross Alabama—like the true monopsonist it is—has lowered reimbursement rates and prices paid to Jackson Hospital well below competitive levels (and well below levels Blue Cross Alabama pays other hospitals in the same region), knowing Jackson Hospital has no choice but to deal with them. As a result, without sufficient reimbursement for healthcare services provided to patients insured by Blue Cross Alabama, Jackson Hospital has become financially unsustainable and will not be able to successfully emerge from bankruptcy if Blue Cross Alabama continues its refusal to contract in good faith.

60.    Jackson Hospital cannot simply move to another geographic area (whether in Alabama or outside the state). Jackson Hospital, like most other healthcare facilities, primarily provides services to patients living or working in relatively close proximity to its facilities. Jackson Hospital has built its patient base, invested significantly in both physical and human capital, and built substantial goodwill in Montgomery, Alabama. Blue Cross Alabama has taken advantage of this to Jackson Hospital's detriment.

61.    By suppressing prices for provider goods, services, and facilities, Blue Cross Alabama has lessened competition, thereby depriving providers—like Jackson Hospital—of choices in the marketplace for healthcare insurers with which to contract. Further, Blue Cross Alabama has likewise deprived patients in Alabama of choices in the marketplace for both healthcare insurers and healthcare providers and, ultimately, has significantly increased healthcare costs.

## *Jackson Hospital Has Suffered Substantial Injury at the Hands of Blue Cross Alabama*

62.    Blue Cross Alabama's monopoly and monopsony power gained by virtue of its unlawful agreements with its affiliates has resulted in substantial injury to Jackson Hospital, which, in turn, has harmed patients across the State of Alabama.

63.    Blue Cross Alabama's unlawful activities have resulted in concrete antitrust injury to Jackson Hospital, including (1) lost revenues resulting from anti-competitively low prices for goods, services, and facilities that Jackson Hospital provides to patients, (2) lost revenue resulting from decreased use of Jackson Hospital's services and facilities, and (3) threatened future harm to Jackson Hospital's business and property. As a direct and proximate result of Blue Cross Alabama's unlawful conduct (including, but not limited to, its agreements with its affiliates),

Jackson Hospital has suffered antitrust injury in the form of lower reimbursement rates, the imposition of unfair contracting terms, and a reduction in the output of healthcare services, equipment, supplies, and facilities. Even worse, Jackson Hospital is in imminent danger of having to close its doors due to Blue Cross Alabama's wrongful conduct.

64.     Blue Cross Alabama's restraints on competition have enabled Blue Cross Alabama to impose unfair, inefficient, and burdensome contract provisions on Jackson Hospital, which Blue Cross Alabama has then used to delay and reduce reimbursements to Jackson Hospital. Blue Cross Alabama has even leveraged its market power in Alabama to unilaterally change its reimbursement policies and procedures and refuse to negotiate in good faith with Jackson Hospital. These actions are further used and intended to reduce reimbursements, delay the payment to, and drain the administrative resources of Jackson Hospital. And that is exactly what has occurred.

65.     In light of Blue Cross Alabama's ill-gotten market power resulting from anti-competitive agreements with its affiliates, Jackson Hospital has been faced with (and continues to face) non-negotiable, sub-competitive reimbursement rates during contract renewal periods with Blue Cross Alabama. In these instances, Blue Cross Alabama provides no legitimate/fair alternatives to the rates it dictates, other than to terminate its agreement with Jackson Hospital. As a result, Jackson Hospital is forced to either accept these rates or risk being put out of business, ultimately receiving lower reimbursements than it would absent Blue Cross Alabama's unlawful agreements with its affiliates.

66.     Further, despite that there are now hundreds of thousands of subscribers of non-Blue Cross Alabama plans living or working in Alabama, Blue Cross Alabama's and its affiliates' "rules" prevent Alabama providers that treat these patients from negotiating directly with those

affiliates. Instead, providers—like Jackson Hospital—are forced to accept the low, unfair, and discriminatory reimbursement rates dictated by Blue Cross Alabama.

67. Jackson Hospital also employs many healthcare professionals. Jackson Hospital has to pay market rates to retain high quality healthcare professionals. Blue Cross Alabama's below-market reimbursement rates have caused Jackson Hospital to *lose* money simply by continuing to employ these healthcare professionals because the alternative would be to close Jackson Hospital.

68. Further, Blue Cross Alabama's anticompetitive conduct has significantly limited Jackson Hospital's ability to improve patient care through investments in better quality services, equipment, supplies, and facilities. Blue Cross Alabama's failure to pay proper, fair reimbursement rates to Jackson Hospital has directly discouraged collaboration and innovation in the provision of healthcare services and, instead, has forced Jackson Hospital to reduce its services.

69. In the end, Blue Cross Alabama's and its affiliates' anticompetitive conduct was a proximate cause in Jackson Hospital facing no other option but to file for bankruptcy, and Blue Cross Alabama's continued refusal to pay Jackson Hospital fair reimbursement rates (*i.e.*, at minimum, the same rates Blue Cross already pays a competitor hospital in Montgomery, Alabama) will likely be – if the injunctive relief requested by Jackson Hospital is not granted – a proximate cause of Jackson Hospital's demise, closure, and inability to successfully emerge from bankruptcy (all of which Jackson Hospital faces immediate danger of occurring).

***Blue Cross Alabama Has Benefitted Handsomely From Its Wrongful Conduct***

70. The only beneficiary of Blue Cross Alabama's antitrust violations is Blue Cross Alabama itself, whose revenues and profits have skyrocketed for decades off the backs of struggling hospitals like Jackson Hospital.

71.     Blue Cross Alabama's and its affiliates' anticompetitive conduct has enabled Blue Cross Alabama to generate *excessive* revenues and/or profits at the expense of Jackson Hospital and the patients Jackson Hospital serves (*e.g.*, Blue Cross Alabama's own customers). Blue Cross Alabama's market power in Alabama (including in Montgomery, where Jackson Hospital operates) has enabled Blue Cross Alabama to reimburse Jackson Hospital at rates far below competitive levels, resulting in massive surplus revenues and/or profits. Without competition, Blue Cross Alabama has been able to significantly underpay Jackson Hospital for services provided to patients covered under Blue Cross Alabama's insurance plans or administered policies. It is without question this cost reduction has led to notably higher revenues, profit margins, and/or financial surpluses than Blue Cross Alabama would have been able to achieve in a competitive market.

## *Blue Cross Alabama's Discriminatory Treatment and Lack of Good Faith and Fair Dealing Resulted in Jackson Hospital's Bankruptcy*

72.     Blue Cross Alabama maintains monopoly and monopsony power throughout the entire State of Alabama. Blue Cross Alabama has used this power to cause substantial, specific antitrust injury to Jackson Hospital. However, as if that was not enough, Blue Cross Alabama has taken it even a step farther: upon information and belief, Blue Cross Alabama is paying Jackson Hospital *30–40% less* than Blue Cross Alabama pays Jackson Hospital's main competitor in the region (specifically, in Montgomery) – Baptist – for comparable services.

73.     Medicare sets allowable rates for hospital services. Commercial in-network allowed amounts for those same services are, on average, much higher. To that end, hospitals—like Jackson Hospital—*depend* on commercial insurance payments to offset chronic government underpayment. Hospitals with low commercial reimbursement rates cannot sustain operations. If

all commercial insurers were to pay hospitals at, below, or near Medicare rates (which is what Blue Cross Alabama does to Jackson Hospital), *no* full-service hospital could maintain 24/7 emergency operations, inpatient and outpatient services, or vital community services.

74.     The national commercial average reimbursement rates are approximately 240% of Medicare.[14] In Alabama, however, these average rates are closer to 140% of Medicare.[15] Blue Cross Alabama is reimbursing Jackson Hospital at approximately 120% of Medicare (*i.e.*, *significantly* below national commercial averages, and well below statewide averages). As such, Blue Cross Alabama's reimbursement levels to Jackson Hospital are—and have been for years—economically unsustainable.

75.     Even worse, upon information and belief, Blue Cross Alabama is reimbursing Baptist approximately 30–40% *more* than Jackson Hospital for comparable services. Jackson Hospital and Baptist both operate in Montgomery and provide acute-care inpatient and outpatient hospital services in the commercial sector. Blue Cross *knows* Jackson Hospital and Baptist are competitors. Blue Cross Alabama *knows* Jackson Hospital has no choice but to accept the below-market, unfair, and discriminatory reimbursement rates dictated by Blue Cross Alabama. And Blue Cross Alabama has chosen to weaponize its market dominance by paying one hospital in Montgomery (*i.e.*, Baptist) more than statewide commercial reimbursement averages and another hospital (*i.e.*, Jackson Hospital) much less.

---

[14]     *See, e.g.,* RAND December 10, 2024 Report, *Prices Paid to Hospitals by Private Health Plans*, available at https://www.rand.org/pubs/research _reports /RRA1144-2-v2.html; Milliman June 19, 2024 White Paper, *Commercial Reimbursement Benchmarking*, available at https://www.milliman.com/en/ insight/commercial-reimbursement-benchmarking-medicare-ffs-rates

[15]     *See, e.g.,* Milliman June 19, 2024 White Paper, *Commercial Reimbursement Benchmarking*, available at https://www.milliman.com/en /insight/commercial-reimbursement-benchmarking-medicare-ffs-rates

---

76.     Toward the end of each calendar year, pursuant to existing agreements between Jackson Hospital and Blue Cross Alabama, the parties "negotiate" increases in Blue Cross Alabama's reimbursement rates to Jackson Hospital. Most recently, Blue Cross Alabama proposed a reimbursement rate increase that it claims to be a "significant increase" when, in reality, it is effectively no increase at all. In response, Jackson Hospital specifically informed Blue Cross Alabama that Jackson Hospital will not be able to emerge from bankruptcy and continue in operations with the 2026 rates Blue Cross Alabama intends to impose upon Jackson Hospital. Jackson Hospital specifically requested that – at a minimum – Blue Cross Alabama pay Jackson Hospital the same rates that Blue Cross Alabama pays Baptist. Blue Cross Alabama refused.

77.     Rather than operating in good faith and addressing Jackson Hospital's concerns, Blue Cross Alabama responded that its unfair, below market, and discriminatory rates for 2026 are its "best and final" rates for Jackson Hospital. Blue Cross Alabama further implied that its "customers" are to blame for its refusal to further increase reimbursement rates, stating that customers "continue to voice concerns over medical costs at current rates/premium levels." Notably, Blue Cross Alabama did *not* deny it is paying higher reimbursement rates to Baptist and instead made a weak attempt at justifying the massive disparity – blaming same on Blue Cross Alabama's claim that Jackson Hospital is supposedly "not comparable to Baptist . . . in terms of patient acuity, medical service lines or patient volume." Blue Cross Alabama then disingenuously "encouraged" Jackson Hospital to "contact other payers," with which Blue Cross Alabama claims it "directly compete[s]," "to assist in Jackson [Hospital's] efforts to maintain viability."

78.     First, for all of the reasons set forth herein, Blue Cross Alabama's monopsony and monopoly power prevent Jackson Hospital from "negotiating" with "other payers" that compete with Blue Cross Alabama (because Blue Cross Alabama intentionally eliminates any such

competition). In fact, in Blue Cross Alabama's own contracts with Jackson Hospital, Blue Cross Alabama attempts to prohibit Jackson Hospital from entering into a contract with any other payor based upon reimbursement rates provided by Blue Cross Alabama. If Jackson Hospital were to enter into a contract with another payor, it would clearly be because of Blue Cross Alabama's sub-par reimbursement rates, which Blue Cross Alabama would then use *against* Jackson Hospital as a purported violation of the parties' own agreements. Thus, Blue Cross Alabama knows Jackson Hospital cannot simply look to alleged competitors (because no competition exists) and Blue Cross Alabama's suggestion otherwise is just more unfair and blatant gamesmanship.

79.     In response to Blue Cross Alabama's refusal to at least match the rates it is paying to Baptist, Jackson Hospital explained to Blue Cross Alabama that patient acuity differences in no way justify such a persistent and substantial rate disparity to the detriment of Jackson Hospital across comparable services. To the extent Blue Cross Alabama disagrees, Jackson Hospital requested that Blue Cross Alabama provide objective support for that conclusion. To date, Blue Cross Alabama has failed to do so.

80.     Importantly, in the context of these recent discussions, Jackson Hospital made it explicitly clear to Blue Cross Alabama that if Blue Cross Alabama refuses to – at a minimum – pay Jackson Hospital the same reimbursement rates as Baptist, it will put Jackson Hospital in imminent danger of being forced to close its doors and no longer provide critical care to the community Jackson Hospital has been faithfully serving for almost 80 years. Jackson Hospital urged Blue Cross Alabama to reconsider its position. To date, Blue Cross Alabama has refused to do so.

81. Blue Cross's refusal to perform its agreements with Jackson Hospital in good faith are designed to force—and continue to force—Jackson Hospital's acceptance of sub-competitive rates. And that is exactly what has occurred.

82. By being forced to accept Blue Cross's egregiously low, unfair, and discriminatory reimbursement rates, Jackson Hospital has lost hundreds of millions of dollars. Though Jackson Hospital has repeatedly tried to get Blue Cross to do the right thing, stop engaging in anticompetitive conduct, and perform its contracts in good faith, Blue Cross has refused. Ultimately, Jackson Hospital had no choice but to seek bankruptcy protection, and – unless Blue Cross Alabama is enjoined from continuing to engage in unlawful conduct and violate its duty of good faith and fair dealing – Jackson Hospital is in imminent danger of suffering the irreparable harm of not being able to successfully emerge from bankruptcy and being forced to cease operations.

### *Jackson Hospital Faces Immediate, Irreparable Harm Absent Injunctive Relief*

83. Absent immediate injunctive relief, Blue Cross Alabama's antitrust violations and other wrongful conduct (*i.e.*, Blue Cross Alabama's continued breach of the duty of good faith and fair dealing) will continue unabated to the detriment and harm of Jackson Hospital.

84. Jackson Hospital is already in the midst of bankruptcy proceedings, and it continues to hang on by a thread. Put simply, Jackson Hospital is at imminent risk of having to close its doors and cease operations if Blue Cross Alabama is permitted to continue its unlawful conduct.

85. The importance of Jackson Hospital to the lives and health of Alabama residents— including those in Montgomery, Alabama and surrounding cities and counties—is undeniable. If Jackson Hospital is forced to close, the consequences would be immediate and devastating:

approximately 1,800 employees would be displaced; the Montgomery region already does not have enough hospital beds to serve those in need of acute medical care; and wait times at surrounding emergency rooms would increase exponentially. As a result, there would not be nearly enough medical care to treat Alabamians in need.

86.     Blue Cross Alabama has shown it simply does not care if the unfair, discriminatory, and well-below market rates Blue Cross Alabama is imposing on Jackson Hospital causes Jackson Hospital to cease operations and prevents Jackson Hospital from successfully emerging from bankruptcy. But, as set forth above, if Jackson Hospital is forced to close its doors, it is not only Jackson Hospital that will suffer. Instead, Blue Cross Alabama will be responsible for a multitude of Alabamians—including many who are indigent—losing access to essential acute care and hospital services.

87.     Thus, as this litigation is pending, Blue Cross Alabama should be ordered, at minimum, to pay Jackson Hospital the same reimbursement rates Blue Cross already pays other hospitals in the Montgomery region (specifically, the same reimbursement rates Blue Cross already pays Baptist). Otherwise, Jackson Hospital is in immediate danger of not being able to survive.

## V.
### CAUSES OF ACTION

### COUNT 1: Claim for Injunctive Relief (15 U.S.C. § 26)

88.     Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

89.     Jackson Hospital asserts a claim for Injunctive Relief under Section 16 of the Clayton Act. *See* 15 U.S.C. § 26.

90. As set forth herein, Blue Cross Alabama's conduct constitutes violations of Section 2 of the Sherman Act, *i.e.*, 15 U.S.C. § 2. Specifically, Blue Cross Alabama has unlawfully discriminated against Jackson Hospital and refused to pay Jackson Hospital the same reimbursement rates as other hospitals in Montgomery, Alabama, including Baptist. Instead, Blue Cross Alabama has used its monopsony power to pay Jackson Hospital approximately 30-40% less than the market reimbursement rates Blue Cross Alabama pays other hospitals in the Montgomery region.

91. As set forth herein, Blue Cross Alabama's conduct constitutes violations under Section 1 of the Sherman Act, *i.e.*, 15 U.S.C. § 1, under a *per se*, quick look, or rule of reason analysis. Blue Cross Alabama has engaged in—and continues to engage in—unreasonable restraints on trade by colluding with its affiliates to, among other things, divide territories, restrain competition, and impose anticompetitive reimbursement rates for healthcare services. As a result, Jackson Hospital has no choice but to "accept" below-competitive reimbursement rates, including even rates that are significantly lower than competitor hospitals in the Montgomery region.

92. Blue Cross Alabama's unlawful conduct threatens to continue to injure Jackson Hospital. Indeed, Jackson Hospital is already in the midst of bankruptcy proceedings, and it is imminently at risk of closing its doors for good – unless Blue Cross Alabama is enjoined from continuing its unlawful conduct. For the reasons set forth herein, the consequences of Jackson Hospital closing would be far-reaching and devastating.

93. Jackson Hospital therefore seeks emergency injunctive relief requiring Blue Cross Alabama, at minimum, to immediately and permanently pay Jackson Hospital the same reimbursement rates Blue Cross already pays the other hospital in Montgomery, Alabama (specifically, the same reimbursement rates Blue Cross already pays Baptist). The specific

injunctive relief being sought by Jackson Hospital is outlined in the separate Emergency Motion for Temporary Restraining Order and Preliminary Injunction being filed by Jackson Hospital, which is incorporated herein by reference.

**C**OUNT **2: Claim for Threefold Damages and Interest: Monopsonization (15 U.S.C. § 15)**

94.     Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

95.     Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 2 of the Sherman Act.

96.     Blue Cross Alabama has engaged in conduct by which it has created or maintained monopsony power in Alabama, including, but not limited to, in Montgomery where Jackson Hospital is located. Indeed, as set forth herein, Blue Cross Alabama's market share in Alabama is approximately 84%, and Blue Cross Alabama's market share in Montgomery is approximately 89%.[16] This monopsony power has lasted for decades.

97.     Blue Cross Alabama's creation of monopsony power (along with Blue Cross's affiliates) was willful. An express purpose of Blue Cross Alabama's and its affiliates' conduct was to prevent Blue Cross Alabama's affiliates from competing with Blue Cross Alabama and thus interfering with Blue Cross Alabama's monopsony power in Alabama.

98.     In connection with its monopsony power, Blue Cross Alabama has unlawfully discriminated against Jackson Hospital and refused to pay Jackson Hospital the same reimbursement rates as other hospitals in Montgomery, Alabama, including Baptist. Instead, Blue

---

[16]     Jose R. Guardado and Carol K. Kane, *Competition in Health Insurance: A Comprehensive Study of U.S. Markets*, American Medical Association (2025 Update), available at https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf

Cross Alabama has used its monopsony power to pay Jackson Hospital approximately 30-40% less than the market reimbursement rates Blue Cross Alabama pays the other hospital in Montgomery, Alabama (specifically, Baptist). Blue Cross Alabama's use of its market power has also stifled innovation at Jackson Hospital, interfered with Jackson Hospital's ability to provide acute medical care the residents of Alabama desperately need, and imminently threatened Jackson Hospital's very existence.

99. By willfully creating monopsony power, Blue Cross Alabama has violated Section 2 of the Sherman Act, *i.e.*, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 prohibits monopsonization as well.

100. As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 2 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced to "accept" far less favorable terms and reimbursement rates than other hospitals (including those operating in the same area as Jackson Hospital), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

101. Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross Alabama for Blue Cross Alabama's violations of Section 2 of the Sherman Act.

**COUNT 3:** **Claim for Threefold Damages and Interest: Attempted Monopsonization (15 U.S.C. § 15)**

102.    Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

103.    In the alternative, Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 2 of the Sherman Act.

104.    Blue Cross Alabama has engaged in conduct by which it has attempted to create or maintain monopsony power in Alabama, including, but not limited to, in Montgomery, Alabama, where Jackson Hospital is located.

105.    Blue Cross Alabama—along with its affiliates—specifically intended to create monopsony power. An express purpose of Blue Cross Alabama's and its affiliates' conduct was to prevent Blue Cross Alabama's affiliates from competing with Blue Cross Alabama and thus interfering with Blue Cross Alabama's monopsony power in Alabama.

106.    In connection with its attempted monopsony power, Blue Cross Alabama has sought to unlawfully discriminate against Jackson Hospital and refused to pay Jackson Hospital the same reimbursement rates as the other hospital in Montgomery, Alabama (specifically, Baptist).

107.    By attempting to create or maintain monopsony power, Blue Cross Alabama has violated Section 2 of the Sherman Act, *i.e.*, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 prohibits monopsonization as well. Even if Blue Cross Alabama had not yet created or maintained monopsony power, its conduct has created a dangerous risk of success.

108. As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 2 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced to "accept" far less favorable terms and reimbursement rates than other hospitals (including those operating in the same area as Jackson Hospital), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

109. Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross for Blue Cross's violations of Section 2 of the Sherman Act.

COUNT 4: **Claim for Threefold Damages and Interest: Conspiracy to Monopsonize (15 U.S.C. § 15)**

110. Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

111. In the alternative, Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 2 of the Sherman Act.

112. Blue Cross Alabama and its affiliates have agreed to restrict competition in Alabama, including, but not limited to, Montgomery, Alabama, where Jackson Hospital is located. In so doing, Jackson Hospital and its affiliates specifically intended to create monopsony power. An express purpose of Blue Cross Alabama's and its affiliates' conduct was to prevent Blue Cross Alabama's affiliates from competing with Blue Cross Alabama and thus interfering with Blue

Cross Alabama's monopsony power in Alabama. Blue Cross Alabama and its affiliates have taken overt acts in furtherance of this conspiracy by signing various agreements that restrict competition among them (which include, but are not limited to, restricting competition in Montgomery, Alabama). This conspiracy has affected a substantial amount of interstate commerce.

113.     By conspiring to create or maintain monopsony power, Blue Cross Alabama and its affiliates have conspired to violate Section 2 of the Sherman Act, *i.e.*, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 prohibits monopsonization as well.

114.     As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 2 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced to "accept" far less favorable terms and reimbursement rates than other hospitals (including Baptist), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

115.     Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross for Blue Cross's violations of Section 2 of the Sherman Act.

**COUNT 5:   Claim for Threefold Damages and Interest: *Per Se* Market Allocation (15 U.S.C. § 15)**

116.     Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

117.    In the alternative, Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 1 of the Sherman Act.

118.    Blue Cross Alabama has engaged in market allocation agreements with its affiliates, which represent a contract, combination, and conspiracy within the meaning of Section 1 and constitutes a *per se* violation of the Sherman Act (*i.e.*, 15 U.S.C. § 1).

119.    Blue Cross Alabama and its affiliates have agreed to divide and allocate geographic markets for the financing of healthcare into a series of exclusive areas, including an exclusive area for Blue Cross Alabama in the State of Alabama. They further have agreed to divide and allocate geographic markets where hospital reimbursement rates are determined. In so doing, Blue Cross Alabama and its affiliates have agreed to suppress competition and increase Blue Cross Alabama's profits by decreasing payments to hospitals like Jackson Hospital, in clear violation of Section 1 of the Sherman Act. Due to the lack of competition which results from Blue Cross Alabama's and its affiliates' illegal conduct, healthcare providers like Jackson Hospital have an extremely limited market for the healthcare services they provide.

120.    Put simply, Blue Cross Alabama's agreement with its affiliates that these affiliates will not compete with Blue Cross Alabama in Alabama constitutes, on its face, an unlawful restraint on trade and competition. This agreement is *per se* illegal under Section 1 of the Sherman Act.

121.    As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 1 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced

to "accept" far less favorable terms and reimbursement rates than other hospitals (including Baptist), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

122.    Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross for Blue Cross's violations of Section 1 of the Sherman Act.

COUNT 6: **Claim for Threefold Damages and Interest: Quick Look Claim for Market Allocation (15 U.S.C. § 15)**

123.    Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

124.    In the alternative, Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 1 of the Sherman Act.

125.    In addition to constituting a *per se* violation of Section 1 of the Sherman Act, Blue Cross's market allocation agreements with its affiliates violate the Sherman Act (*i.e.*, 15 U.S.C. § 1) under a quick look analysis.

126.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The arrangements between Blue Cross Alabama and its affiliates also have an anticompetitive effect on and reduce output by hospitals like Jackson Hospital.

127.    The market allocation agreements between Blue Cross Alabama and its affiliates prevent other insurers from competing with Blue Cross Alabama in Alabama and, specifically, in

Montgomery. Yet, these agreements have no pro-competitive effect. Further, neither Blue Cross Alabama nor its affiliates have offered any new product. In fact, they would increase competition if they provided healthcare financing without the anticompetitive conspiracies in which they are engaging.

128.    Thus, because a "quick look" shows that Blue Cross Alabama's and its affiliates' arrangements are anticompetitive, no inquiry into market power is required.

129.    As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 1 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced to "accept" far less favorable terms and reimbursement rates than other hospitals (including Baptist), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

130.    Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross for Blue Cross's violations of Section 1 of the Sherman Act.

COUNT 7:  **Claim for Threefold Damages and Interest: Rule of Reason Claim for Market Allocation (15 U.S.C. § 15)**

131.    Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

132.    In the alternative, Jackson Hospital asserts a claim under Section 4 of the Clayton Act (*i.e.*, 15 U.S.C. § 26) for threefold or trebled damages and interest in connection with Blue Cross Alabama's violations of Section 1 of the Sherman Act.

133.    For the reasons set forth herein, the market allocation agreements between Blue Cross Alabama and its affiliates violate Section 1 of the Sherman Act (*i.e.*, 15 U.S.C. § 1) under a "rule of reason" analysis and give rise to damages to hospitals in markets throughout the country, including Jackson Hospital.

134.    As a direct and proximate result of Blue Cross Alabama's continuing violations of Section 1 of the Sherman Act, Jackson Hospital has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such damages include, but are not limited to, receiving lower reimbursement rates from Blue Cross Alabama, being forced to "accept" far less favorable terms and reimbursement rates than other hospitals (including Baptist), having access to fewer patients than Jackson Hospital would have had with increased competition (and but for Blue Cross Alabama's anticompetitive agreements with its affiliates), and, ultimately, having no choice but to file for bankruptcy and being put in imminent danger of not being able to successfully emerge from bankruptcy.

135.    Jackson Hospital seeks both injunctive relief and monetary damages from Blue Cross for Blue Cross's violations of Section 1 of the Sherman Act.

<u>**C**OUNT 8:</u>    **Breach of Contract (via Implied Covenant of Good Faith and Fair Dealing)**

136.    Jackson Hospital hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

137.    Alabama law includes a covenant of good faith and fair dealing in the performance of contracts. A breach of such implied promise of good faith and fair dealing may be construed as a breach of contract, thereby giving the other party a cause of action on the contract at issue.

138.    Jackson Hospital and Blue Cross Alabama are parties to certain agreements, including: (1) a Participating Hospital Contract for Prospective Payment with respect to inpatient

services, effective July 1, 2003 (hereinafter, the "Inpatient Contract"), and (2) a Preferred Outpatient Facility Contract, effective January 1, 2006 (hereinafter, the "Outpatient Contract") (the Inpatient Contract and Outpatient Contract, collectively, the "Contracts").

139.    Each year since the Contracts were initially executed, the parties executed letter agreements and/or amendments whereby they amended the prospective inpatient and outpatient reimbursement rates for that contract year. In connection with same, the Inpatient Contract provides that the final reimbursement rate for the prospective year "shall be agreed upon through *negotiation*." *See* Inpatient Contract, Art. III, § 2(a)(ii)(Step 3) (emphasis added) Likewise, the Outpatient Contract contemplates that the parties amend reimbursement amounts "by mutual agreement." *See* Outpatient Contract, Art. VII, §§ 7.1, 7.2.

140.    However, as evidenced by Blue Cross Alabama's recent negotiation tactics (set forth above), Blue Cross Alabama has refused to negotiate in good faith with Jackson Hospital as to fair and reasonable reimbursement rates per contract year. Instead, knowing that Jackson Hospital has no choice but to "accept" the unfair, discriminatory, and well below market reimbursement rates that Blue Cross Alabama unilaterally imposes, Blue Cross Alabama has effectively removed any "negotiation" from the process. As such, Blue Cross Alabama has breached the Contracts by refusing to negotiate with Jackson Hospital in good faith and even attempt to reach a "mutual agreement" as to fair and reasonable reimbursement rates per contract year (including, but not limited to, the upcoming 2026 calendar year). Blue Cross Alabama's breaches of the Contracts further establish Blue Cross Alabama's failure to abide by the duty of good faith and fair dealing in Blue Cross Alabama's performance under same.

141.    Further, despite admitting that it is paying much higher reimbursement rates to a similarly situated hospital in Montgomery, Alabama (*i.e.*, Baptist), Blue Cross Alabama has

nonetheless refused to provide any reasonable justification for this persistent and substantial rate disparity. Blue Cross Alabama informed Jackson Hospital that the low and discriminatory proposed reimbursement rates for 2026 are Blue Cross Alabama's "best and final" rates for Jackson Hospital.

142.    In addition to Blue Cross Alabama's complete control over the "negotiated" changes to the yearly reimbursement rates, the Contracts reflect Blue Cross Alabama's desired power to trap Jackson Hospital in a never-ending cycle of being subject to Blue Cross Alabama's unilateral imposition of unfair reimbursement rates. Indeed, both of the Contracts purport to prohibit Jackson Hospital from entering into an agreement with any other payor if the "basis" for such agreement is the payment rates (*i.e.*, unfair, discriminatory reimbursement rates) "developed by" Blue Cross Alabama.

143.    Blue Cross Alabama's breaches of the implied duty of good faith and fair dealing in performing under the Contracts (including, but not limited to, Blue Cross Alabama's failure to negotiate yearly reimbursement rates paid to Jackson Hospital) have caused significant harm to Jackson Hospital. As a result of Blue Cross Alabama's refusal to perform under the Contracts in good faith, Jackson Hospital has suffered—and continues to suffer—millions of dollars in damages. Jackson Hospital seeks such damages from Blue Cross Alabama.

144.    Moreover, if Blue Cross Alabama is not *immediately* required to abide by the implied duty of good faith and fair dealing in the performance of the Contracts, Jackson Hospital is in immediate and serious danger of being forced to close its doors and no longer provide essential care to the residents of Montgomery, Alabama. Jackson Hospital therefore seeks mandatory injunctive relief requiring Blue Cross Alabama to comply with basic contractual obligations under Alabama law. The specific injunctive relief being sought by Jackson Hospital is outlined in the

separate Emergency Motion for Temporary Restraining Order and Preliminary Injunction being filed by Jackson Hospital, which is incorporated herein by reference.

## VI.
### CONDITIONS PRECEDENT

145.    All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VII.
### CONCLUSION

Based on the foregoing, Plaintiff Jackson Hospital & Clinic, Inc. respectfully requests the following relief from the Court:

a)  The immediate injunctive relief requested herein;

b)  Judgment against Defendant Blue Cross and Blue Shield of Alabama for all actual damages;

c)  Judgment against Defendant Blue Cross and Blue Shield of Alabama for exemplary, statutory, special, and/or additional damages;

d)  Judgment against Defendant Blue Cross and Blue Shield of Alabama for pre- and post-judgment interest at the maximum rate permitted by law;

e)  Judgment against Defendant Blue Cross and Blue Shield of Alabama for costs of suit and reasonable and necessary attorney's fees; and

f)  Such other and further relief to which Plaintiff is entitled.

Respectfully submitted,

/s/ Chase J. Potter

**CHASE J. POTTER\***
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**JOSHUA L. SHEPHERD\***
Texas State Bar No. 24058104
E-Mail: shepherd@imcplaw.com

**ANNA OLIN RICHARDSON\***
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536

*Admitted Pro Hac Vice*

**COUNSEL FOR JACKSON HOSPITAL & CLINIC, INC.**