**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| In re: | Chapter 11 |
| JACKSON HOSPITAL & CLINIC, INC., *et al.*,[1] | Case No. 25-30256 |
| Debtors. | Jointly Administered |

## PATIENT CARE OMBUDSMAN'S EIGHTH REPORT

In accordance with Section 333(b)(2) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Suzanne Koenig (the "Ombudsman"), in her capacity as the patient care ombudsman appointed by this Court in the above-captioned Chapter 11 cases of Jackson Hospital & Clinic, Inc., *et al.* (collectively, the "Debtors"), submits this eighth report for the time period from April 17, 2026 through June 16, 2026 (the "Report Period").

## I.  GENERAL BACKGROUND

1.  On February 3, 2025, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Alabama (the "Court").

2.  On February 13, 2025, this Court entered an order directing the appointment of a patient care ombudsman under Section 333 of the Bankruptcy Code [Docket No. 115]. On February 21, 2025, Danielle K. Grego, the U.S. Bankruptcy Administrator for this district, appointed Suzanne Koenig of SAK Management Services, LLC to serve as patient care ombudsman in these cases [Docket No. 130]. The Ombudsman filed applications to retain the law firm of Baker, Donelson, Bearman, Caldwell, & Berkowitz, P.C. ("Baker Donelson") as her

---

[1] The Debtors in these cases are: Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC.  *See* [Doc. No. 49].

1

counsel and SAK Management Services, LLC ("SAK") as her medical operations advisor. SAK's employment application and Baker Donelson's employment application were approved by the Bankruptcy Court [Docket Nos. 376 and 433, respectively].

3. On April 21, 2025, the Ombudsman filed the *Patient Care Ombudsman's Initial Report* [Docket No. 406] (the "First Ombudsman Report"). The First Ombudsman Report summarized the quality of patient care for the period from the appointment of the Ombudsman on February 21, 2025, through and including April 21, 2025.

4. On June 20, 2025, the Ombudsman filed the *Patient Care Ombudsman's Second Report* [Docket No. 622] (the "Second Ombudsman Report"). The Second Ombudsman Report summarized the quality of patient care for the period from April 21, 2025, through and including June 21, 2025.

5. On August 19, 2025, the Ombudsman filed the *Patient Care Ombudsman's Third Report* [Docket No. 838] (the "Third Ombudsman Report"). The Third Ombudsman Report summarized the quality of patient care for the period from June 21, 2025, through and including August 19, 2025.

6. On October 17, 2025, the Ombudsman filed the *Patient Care Ombudsman's Fourth Report* [Docket No. 1049] (the "Fourth Ombudsman Report"). The Fourth Ombudsman Report summarized the quality of patient care for the period from August 19, 2025, through and including October 17, 2025.

7. On December 18, 2025, the Ombudsman filed the *Patient Care Ombudsman's Fifth Report* [Docket No. 1293] (the "Fifth Ombudsman Report"). The Fifth Ombudsman Report summarized the quality of patient care for the period from October 17, 2025, through and including December 18, 2025.

8.     On February 16, 2026, the Ombudsman filed the *Patient Care Ombudsman's Sixth Report* [Docket No. 1456] (the "Sixth Ombudsman Report"). The Sixth Ombudsman Report summarized the quality of patient care for the period from December 18, 2025, through and including February 16, 2026.

9.     On April 17, 2026, the Ombudsman filed the *Patient Care Ombudsman's Seventh Report* [Docket No. 1644] (the "Seventh Ombudsman Report"). The Seventh Ombudsman Report summarized the quality of patient care for the period from February 16, 2026, through and including April 17, 2026.

10.     During the period covered by this report, the Ombudsman made two unannounced visits to Jackson Hospital, the first on May 14, 2026, and the second on June 11, 2026. At the hospital, the representatives met with the Chief Operating Officer and the Chief Nursing Officer.

## II.     SUMMARY OF OMBUDSMAN'S MONITORING AND OBSERVATIONS

### A.     PCO Representative Unannounced Site Visit on May 14, 2026

11.     On May 14, 2026, the PCO Representatives made an unannounced site visit to Jackson Hospital.

12.     The Chief Operating Officer/Chief Nursing Officer reported that several inpatient departments experienced water intrusion following recent periods of heavy rainfall. Leadership reported that the affected areas had been appropriately contained, Infection Control Risk Assessments (ICRAs) had been completed, and repairs were scheduled for the following week.[2]

---

[2] An Infection Control Risk Assessment (ICRA) is a multidisciplinary process used to identify and mitigate infection risks associated with construction, renovation, maintenance activities, water intrusion events, and other environmental conditions that may affect patient care areas. The assessment is intended to identify potential impacts on patients, staff, and visitors and establish appropriate infection prevention measures before work begins. *See* https://www.cdc.gov/infection-control/hcp/reopen-health-facilities/water-wind-damage.html

3

13. Leadership reported that a recent bariatric accreditation survey had been completed successfully and that accreditation was expected to be renewed.[3]

14. At the time of the visit, leadership was actively preparing for the hospital's upcoming Nursing Skills Fair. The event is designed to support ongoing staff education, competency validation, professional development, and reinforcement of clinical best practices.

15. Hospital Week celebrations were ongoing during the visit. Staff appreciation activities on the day of visit included a cookout with live music, and leadership from across the hospital were present to serve lunch to staff. Leadership reported that multiple employee recognition events had been planned throughout the week.

### B. Emergency Department (ED)

16. At the time of the visit, the Emergency Department census was thirty (30) patients. Thirteen (13) patients were awaiting placement to inpatient beds, and six (6) patients were in the waiting room. The longest boarding patient had been awaiting placement for twenty-eight (28) hours. Leadership reported that the patient was awaiting transfer to a behavioral health facility and required one-to-one observation for safety. It was reported that all patients awaiting placement were clinically stable.

17. The Emergency Department Director reported three (3) vacant registered nurse positions on the day shift and five (5) vacant registered nurse positions on the night shift. Eleven (11) contract nurses were being utilized to support staffing needs. The Director reported that employment offers had recently been extended to two (2) new graduate nurses for the day shift

---

[3] Bariatric Accreditation signifies that a hospital's bariatric surgery program has successfully demonstrated compliance with nationally recognized standards related to patient safety, clinical quality, staff expertise, equipment, outcomes monitoring, and ongoing quality improvement. Accredited programs undergo rigorous review and are required to maintain processes that support safe and effective care throughout the patient's surgical journey. *See* https://www.facs.org/quality-programs/accreditation-and-verification/metabolic-and-bariatric-surgery-accreditation-and-quality-improvement-program

Case 25-30256   Doc 1788   Filed 06/16/26   Entered 06/16/26 11:49:01   Desc Main
Document    Page 4 of 22

and two (2) new graduate nurses for the night shift. Recruitment efforts for experienced emergency nurses remained ongoing.

18. A staff nurse was interviewed during the visit. The nurse described the department's process for assigning patients to treatment areas based on acuity and clinical needs. The nurse stated, "I have worked here for two (2) years, and I love it."

19. The department was observed to be clean and orderly. Corridors were free from clutter and staff were actively engaged in patient care activities. Staff interactions appeared professional, collaborative, and patient-focused.

20. The supply room was clean, organized, and adequately stocked. No expired supplies were identified. Ten (10) code carts were staged throughout the department. Daily inspection logs were reviewed and contained no missing entries. No expired items were identified on the exterior of the carts. The patient nutrition room was clean and organized. The microwave and refrigerator were clean and in good condition. Refrigerator temperature logs were current, and all documented temperatures were within expected ranges.

C. **6 East**

21. 6 East is a medical-surgical unit licensed for eighteen (18) beds. At the time of the visit, the patient census was eighteen (18). Staffing consisted of one (1) charge nurse, two (2) registered nurses, one (1) licensed practical nurse, two (2) patient care technicians, and a shared unit secretary. Nurse-to-patient staffing ratios remained within established staffing parameters for medical-surgical at 1:5.54 compared to the organizational target ratio of 1:6.

22. The unit was observed to be clean and well maintained. The medication dispensing machine located in the hallway was clean and orderly. Workstations on wheels had secured and locked drawers. No unsecured medications, sharps, or needles were observed. The medication

5

room was adequately stocked with supplies, and no expired products were identified. Oxygen cylinders were properly secured, and full and empty tanks were stored separately in accordance with hospital policy. Clinical equipment displayed current preventive maintenance stickers.

23. The code cart was readily available for emergency response. Daily inspection logs were reviewed and contained no missing entries. The patient nutrition room was clean and organized. Refrigerator and freezer temperature logs were reviewed and documented temperatures were within expected ranges; however, one temperature entry was missing from the log. The dirty utility room was clean and free of malodors. The fire extinguisher had been inspected in accordance with hospital policy. Corridors were free from clutter and did not present any apparent safety concerns.

24. A patient was interviewed during the visit. The patient described Jackson Hospital as "the nicest hospital" he had ever visited and stated that it was "so clean – absolutely immaculate!" The patient reported recently undergoing surgery and stated that he had anticipated experiencing significant pain. However, he reported, "I have not had an ounce of anxiety related to pain; the staff have been very attentive and have really managed my pain." The patient further reported that from admission through hospitalization, "everything was perfect." When discussing his care experience, the patient stated, "you couldn't find a nicer group of people; they work together. Nurses are unbelievable. They have a genuine desire to help. If I were to rate it from 0-10 it would be much higher than a 10." The patient reported prior experience working in hospitals and stated, "I would love to come back here to volunteer when I am well – it would be a long drive but worth every minute."

25. **Patient Record Review #1**: A review of one active patient record was conducted. Physician orders were legible and appropriately signed, dated, and timed. Two physician order

sheets were missing height, weight, and allergy documentation in the designated fields. Safety assessments related to falls, skin integrity, and suicidality were completed in accordance with hospital policy. The History and Physical was completed timely and was signed, dated, and timed. The nursing admission assessment was comprehensive, and ongoing reassessments were completed as required. Pain assessments and reassessments were completed and reflected adequate pain management. The patient belongings inventory was completed and documented the location of personal belongings. Consents for treatment and procedures were appropriately signed, dated, and timed.

26. **Patient Record Review #2**: A second patient record was reviewed. Physician orders were legible and appropriately signed, dated, and timed. Height, weight, and allergy information were documented in the required fields. Consents for treatment, surgery, and blood transfusion were completed and appropriately signed, dated, and timed. Patient-controlled analgesia assessments were completed every two (2) hours in accordance with hospital policy. Documentation reflected dual registered nurse verification when medication exchanges occurred. Pain assessments and reassessments reflected effective pain management.

27. Nursing handoff documentation from the Post-Anesthesia Care Unit (PACU) to the inpatient unit was thorough and complete. The History and Physical was completed timely and appropriately signed, dated, and timed. Anesthesia documentation was comprehensive, and all related forms were signed, dated, and timed. Height, weight, and allergy information were documented where indicated.

**D. 6 West (6W)**

28. 6 West is a medical-surgical unit licensed for nineteen (19) beds. At the time of the visit, the patient census was sixteen (16). Staffing consisted of three (3) registered nurses, a shared

unit secretary, and one (1) patient care technician. Nurse-to-patient staffing ratios remained within established staffing parameters for medical-surgical at 1:4.92 compared to the organizational target ratio of 1:6.

29. The unit was observed to be clean and orderly, and corridors were free from clutter. The nursing station located at the rear of the unit had been affected by the recent water intrusion. The impacted area had been appropriately contained behind a plastic barrier and did not affect patient care areas or patient rooms.

30. The clean utility room, dirty utility room, and linen storage areas were clean and organized. The medication room was orderly and well stocked; no expired supplies or medications were identified. The patient nutrition room was clean; however, white residue was noted on the ice and water dispensing machine. The refrigerator/freezer unit was clean, and food items were appropriately sealed and labeled in accordance with hospital policy. Refrigerator and freezer temperature logs were reviewed, and all documented temperatures were within expected ranges; however, one temperature entry was missing. A code cart was readily available for emergency response, and daily inspection logs were complete with no missing entries.

### E. Patient Record Review

31. The record of a discharged patient was reviewed. The History and Physical was current and appropriately signed and dated. Surgical consents were legible and appropriately completed. Height, weight, and allergy information were not documented in the designated fields on the physician order sheets. Provider progress notes and operative reports were present and, although handwritten, were legible. Medication reconciliation was completed by the provider. Anesthesia documentation was complete and legible.

8

32.     The patient's advance directive documentation and release of information forms were present and appropriately signed and dated. Discharge disposition was documented in the medical record. Patient education was completed prior to discharge, and the patient signed documentation indicating understanding of the post-acute plan of care.

**F.   4 West (4W)**

33.     4W is an adult and pediatric medical-surgical unit licensed for nineteen (19) beds. The patient census was eighteen (18). There were no pediatric patients admitted to the unit at the time of the visit. Staffing consisted of three (3) registered nurses, two (2) patient care technicians, and one (1) unit secretary. Nurse-to-patient staffing ratios remained within established staffing parameters for medical-surgical at 1:5.54 compared to the organizational target ratio of 1:6.

34.     There are two supply rooms on the unit, one designated for pediatric supplies and the other for adult supplies. Both supply rooms were clean, organized, and appeared to have adequate stock. Emergency equipment for both pediatric and adult patients was readily available. Emergency equipment inspection logs were reviewed and reflected daily checks with no missing entries.

35.     The clean utility room, dirty utility room, and linen storage areas were neat and organized. The medication room was clean and orderly, and no expired medications or supplies were identified. A pediatric code cart and an adult code cart were available for emergency response. Inspection logs were reviewed, and there were no missing entries.

36.     The record of a discharged patient was reviewed. The History and Physical was current, signed, and dated. Surgical consents were legible, signed, and dated. Height, weight, and allergy information were not documented in the designated fields on the physician order sheets. Three (3) of four (4) provider documents were signed, dated, and timed. The fourth document was

9

signed; however, the date and time were not documented. Height, weight, and allergy information were also not documented in the designated fields on the order sheets.

**G. 4 East**

37. 4 East is a medical-surgical unit licensed for nineteen (19) beds. The patient census was eighteen (18). Staffing consisted of three (3) registered nurses, two (2) patient care technicians, one (1) safety sitter, and one (1) unit secretary. Nurse-to-patient staffing ratios remained within established staffing parameters for medical-surgical at 1:5.54 compared to the organizational target ratio of 1:6.

38. The unit was clean and corridors were free from clutter. Staff were welcoming and engaging. The supply room was clean and organized and appeared to have adequate supplies. No expired items were identified during inspection. The patient nutrition room was clean and organized. Refrigerator and freezer temperature logs were complete, and all documented temperatures were within expected ranges.

39. The PCO Representative observed patient handoff between an Emergency Department nurse and a medical-surgical nurse. The interaction was professional and collegial. Information exchanged appeared thorough, and the receiving nurse asked appropriate questions that were promptly answered.

40. A medical-surgical nurse was interviewed during the visit. The nurse reported having been employed at Jackson Hospital for approximately nine (9) months. She stated that she completed her nursing school clinical rotations at Jackson Hospital and was subsequently hired into the nurse residency program after graduation. She stated, "I knew I wanted to work here. Everyone has been really supportive."

### H. Intensive Care Unit (ICU)

41. The Intensive Care Unit is licensed for twenty-four (24) beds. The patient census was eighteen (18). Staffing consisted of two (1) charge nurse, nine (9) registered nurses. Nurse to patient ration was maintained at 1:1.89 which is lower than the target ratio of 1:2.

42. The department was clean and organized, and the corridors were free from clutter. Oxygen cylinders were stored in accordance with hospital policy. Four (4) code carts designated for pediatric and adult emergency response were staged throughout the department. Review of the inspection logs identified two (2) missing daily code cart checks on the pediatric code cart.

43. The ICU Educator reported an increased focus on documentation and sedation management related to the Richmond Agitation-Sedation Scale (RASS). RASS is a standardized assessment tool used by nurses and providers to evaluate a patient's level of sedation and agitation. The ICU Educator reported that provider orders typically target RASS scores between 0 and -2. In addition to staff education efforts, RASS scores are discussed during daily interdisciplinary rounds to ensure appropriate sedation levels are maintained.

44. Five (5) patient records were reviewed specific to RASS documentation. In all five (5) records reviewed, RASS assessments were documented at the frequency required by hospital policy. All documented scores were within the provider-ordered parameters of 0 to -2.

### I. Cardiac Catheterization Laboratory

45. The Cardiac Catheterization Laboratory was clean and organized. Adequate supplies were available within patient care areas and supply rooms. No expired supplies were identified during inspection.

46. There were no active procedures underway at the time of the visit. Three (3) patients were in the recovery area. One patient record was reviewed. Pre-procedure and post-procedure

documentation was thorough. Documentation entries were appropriately signed, dated, and timed. Provider progress notes were thorough and legible. Anesthesia documentation was complete and signed, dated, and timed. Consents for treatment, the procedure, and anesthesia were present and appropriately signed, dated, and timed.

**J.  <u>Kitchen</u>**

47.    The kitchen was observed to be clean and organized. A floor drain was noted to be blocked, resulting in localized water accumulation. Staff reported that the issue had been identified and was actively being addressed. Wet floor warning signs had been appropriately placed to mitigate the risk of slips and falls.

48.    The tilt cooker, steamer, and fryer had been temporarily removed from service pending scheduled hood cleaning and rewiring of related equipment. Leadership reported that the required work was scheduled to be completed within two (2) days of the site visit. It was further reported that food service operations had not been disrupted, as an alternate kitchen equipped with the necessary equipment was being utilized until the primary equipment was returned to service. The dishwasher was operational at the time of the visit.

49.    Dry storage areas were neat and organized. Food products were appropriately sealed, labeled, and stored in accordance with hospital policy. Refrigerator and freezer temperature logs were reviewed, and there were no missing entries. All documented temperatures were within expected operating ranges.

50.    Reach-in and walk-in refrigerators and freezers were clean, organized, and appropriately stocked. Food items were properly labeled and stored in compliance with hospital policy. Temperature logs were complete, and all recorded temperatures were within acceptable ranges.

51. Staff were actively preparing lunch service for approximately 170 patients. All dietary staff observed during the visit were wearing appropriate hair coverings. Tray line temperatures were obtained and reviewed. All food temperatures exceeded the minimum required hot-holding temperature of 135 degrees Fahrenheit, indicating appropriate food safety practices.[4]

| Food Item | Temperature (°F) |
| --- | --- |
| Okra and Tomatoes | 170 |
| Sweet Potato Casserole | 190 |
| Chicken | 178 |
| Green Beans | 194 |
| Rice | 176 |
| Beef Patty | 181 |

### K. Unannounced PCO Representative Visit June 11, 2026

52. An unannounced visit to Jackson Hospital was conducted on June 11, 2026, by the PCO representative.

53. Notification regarding the potential closure of Jackson Hospital was provided to hospital staff on June 3, 2026. Hospital leadership reported ongoing communication efforts with employees and providers, including routine rounding and direct discussions to provide updates on the current circumstances and reinforce the importance of maintaining focus on the delivery of safe, high-quality patient care. Leadership acknowledged that some employee resignations had occurred due to uncertainty surrounding the hospital's future; however, staffing levels were

---

[4] *See* https://www.fda.gov/food/fda-food-code/food-code-2022

13

reported to remain adequate to support operations. To address vacancies and staffing needs, the hospital has utilized a combination of contract personnel, voluntary extra shifts by existing staff, floating staff between departments, and management personnel assuming patient care assignments when necessary. Leadership provided staffing schedules for clinical departments covering the upcoming two-week period for review by the PCO representative. Review of the schedules did not identify any concerns regarding planned staffing levels, and leadership reiterated that staffing resources remained adequate to support ongoing patient care needs and hospital operations. Leadership further reported that many employees have expressed a commitment to remain with the organization regardless of the outcome of the bankruptcy proceedings. Active recruitment efforts for critical vacant positions were reported to be ongoing and successful despite the current situation. Leadership reported that patient volumes have remained steady, and in fact, that volumes have been slightly higher in the past weeks.

### L. **HR Report**

54.     Hospital leadership reported that an intentional information technology (IT) downtime was initiated (on or about June 7, 2026) following identification of a potential cybersecurity event. Leadership indicated that the decision to temporarily disable certain network-connected systems was made out of an abundance of caution to protect the integrity of hospital information systems and patient data while the matter was investigated. During the downtime period, established downtime procedures were implemented, including the use of manual documentation and alternative communication processes to support continuity of patient care. Leadership reported that clinical operations remained functional throughout the event and that patient care services continued without significant disruption. Situational hospital wide leadership update meetings had been conducted daily to ensure operations were uninterrupted and safe patient

14

care was supported throughout the episode. Leadership stated that information technology was actively assessing the situation and implementing appropriate mitigation measures.

55. Hospital leadership reported that following completion of the cybersecurity assessment and implementation of appropriate mitigation measures, information technology teams began a phased restoration of affected systems; such efforts were ongoing. Leadership indicated that system recovery efforts focused on validating system integrity, restoring functionality, and ensuring the secure reestablishment of interfaces between clinical, financial, operational, and ancillary systems. Leadership reported that clinical and operational departments were engaged throughout the recovery process to verify system performance and address any workflow issues that arose during the transition from manual to electronic processes. Efforts were also undertaken to reconcile documentation generated during the downtime period and ensure that patient information was accurately incorporated into the electronic health record. At the time of the site visit system restoration activities were in progress. Additional personnel from Health Information Management (Medical Records), Pharmacy, Laboratory Services, and Patient Registration were deployed to support recovery efforts and facilitate the transition back to normal operations.

### M. Emergency Department

56. Patient census was seventeen (17) at the time of visit. The EMR had been restored in the ED, and staff were transitioning back to computer documentation. The Director reported that staff had done a "phenomenal" job adjusting to downtime procedures and that approximately 408 patients had been cared for throughout the episode. Staff were welcoming and engaged and appeared to be working well together as a team. In an interview, the Chief Medical Officer, who is also the medical director of the ED, reported that his provider team is "hanging in there." He stated,

15

"everyone is waiting to hear; I just want a resolution for our people. I am worried about them and our community."

57. In an interview, a nurse practitioner who has worked at Jackson for over nine (9) years stated, "I really like it here. This hospital cannot close. Our community needs us – the last time a hospital closed in our area it was devastating."

58. Five (5) patient records were reviewed, all of which consisted of downtime "paper" documentation. During downtime, the Emergency Department uses T-Sheets, which are paper-based templates designed to support comprehensive complaint/system based clinical documentation.[5]

59. Five (5) patient records were reviewed. Provider orders were legible and appropriately dated, timed, and signed. Medication administration records were complete and legible, with corresponding medication administration times and staff signatures documented. Physician and nursing progress notes appeared comprehensive and reflected ongoing patient assessment and care. Laboratory requisition forms were legible, and corresponding laboratory results were present within the medical records reviewed. Two (2) of the patients had been discharged home. For these records, discharge instructions were legible, signed by the patients, and copies of prescribed medications were included in the record.

60. All patient records generated during the downtime period had been collated and organized. Overall, the reviewed records appeared complete, organized, and well-maintained. Staff reported that each completed record underwent a two-step review process to verify that all required documentation, orders, signatures, and supporting forms were complete prior to submission to the Health Information Management (Medical Records) department. Following completion of the

---

[5] *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC3073892; https://corrohealth.com/tsystem/t-sheets

16

review process, records were scanned into the electronic medical record to ensure preservation of the patient record and continuity of documentation.

**N.  Intensive Care Unit**

61.     The ICU is licensed for twenty-four (24) beds; patient census was twenty (20). The unit was bright and clean; corridors were clutter-free. There were three (3) code carts dispersed throughout the department. Daily code cart checks were logged per hospital policy, and there were no missing entries.

62.     The nutrition area was clean and organized. Food items were labeled per hospital policy; there were no expired items located upon inspection. The medication room was clean and organized, and there were no expired supplies. The supply room was clean, organized, and appeared well stocked; there were no expired items.

63.     Two medical records were reviewed. Both records contained a current history and physical examination, nursing assessments, medication administration records, physician and nursing progress notes, vital signs, laboratory and diagnostic test results, care plans, and interdisciplinary documentation. Documentation was legible, complete, and appropriately dated, timed, and authenticated. Evidence of ongoing nursing assessment, treatment, and monitoring was documented throughout the records. Physician orders were legible and appropriately completed; however, review of the documentation identified several instances in which height, weight, and allergy information had not been documented in the designated fields. One of the records contained restraint documentation. Physician orders for restraints were timely, and required restraint documentation, including assessment of clinical necessity, monitoring, patient safety checks, and timely reassessments, was present and completed in accordance with hospital policy.

### O. Family Birthing Center

64. The Family Birth Center (FBC) is licensed for fourteen (14) labor, delivery, recovery, and postpartum (LDRP) beds and seventeen (17) newborn bassinets. Patient census was four (4) mother baby couplets, and one (1) patient in active labor.

65. The clinical environment was observed to be bright, clean, organized, and well maintained. The linen cart was fully stocked and appropriately covered. The medication room and nutrition room were clean; no expired supplies were identified. The ice machine was clean and free of buildup. Refrigerator and freezer temperatures were documented daily and were within acceptable ranges. The code cart was available and documented as checked daily. The supply room was well stocked, and no expired supplies were noted.

66. The Labor and Delivery downtime procedures were reviewed during the site visit. Patient records and documentation packets had been prepared and organized in advance to support the admission and care of laboring patients during the downtime period. The process appeared well-structured and designed to promote comprehensive documentation and the safe delivery of patient care. Staff demonstrated a clear understanding of downtime workflows and described several safety measures implemented during the event, including independent nursing double-checks for high-risk medications and additional documentation safeguards as warranted. Staff reported that experienced charge nurses, managers, and clinical educators had remained actively involved throughout the downtime period, providing ongoing guidance and support. One nurse commented that the presence of seasoned charge nurses familiar with established hospital practices, along with the consistent availability of managers and educators, had contributed to a smooth transition and effective management of patient care during the downtime. She stated, "we are so fortunate to have seasoned charge nurses who know the 'Jackson' way!" Staff reported that

18

charge reconciliation activities were ongoing to ensure services provided during the downtime period were accurately documented and captured, thereby minimizing potential revenue loss and financial impact to the organization.

67. A downtime patient record was reviewed for a patient in active labor who was being prepared for a cesarean section. The obstetrical assessment was comprehensive and appropriately signed, dated, and timed. Consents for treatment, surgery, and procedures were present and completed with the required signatures, dates, and times. Documentation of pre-operative education appeared thorough and reflected discussion of the planned procedure. Advance directive documentation and required consent forms were present within the paper record. Nursing assessments were completed in a timely manner and demonstrated ongoing monitoring of the patient's condition. Documentation throughout the record was legible, organized, and supported continuity of care during the downtime period.

68. A post-partum mother was interviewed. She stated, "It has been wonderful here. This is my second delivery at Jackson. My son was born here in 2019; both experiences were awesome." She reported that her pain had been well controlled and that staff are extremely responsive and helpful.

**P. <u>Kitchen</u>**

69. Staff had just completed lunch preparation and served approximately 165 patient meals. Lunch holding temperature logs were reviewed; all recorded temperatures were within expected ranges.

70. The dishwasher and previously identified blocked floor drain had been repaired since the prior Patient Care Ombudsman representative visit. Hood cleanings and electrical updates had been completed, and all related equipment was back in service. Staff reported that all dietary

19

equipment was functioning properly and in good working order. The dry storage area was clean, neat, and organized, and food items were appropriately sealed and labeled in accordance with hospital policy. Refrigerator and freezer temperature logs were reviewed and showed temperatures within acceptable ranges. No missing log entries were identified during the review.

## Q. <u>Overall Impression</u>

71. Staff were welcoming and engaged throughout the site visit. Despite the uncertainty associated with the potential hospital closure and the operational challenges resulting from the extended electronic medical record downtime, staff appeared resilient, maintained a positive demeanor, and remained focused on patient care responsibilities. No concerns regarding the provision of patient care related to the downtime were identified during the visit.

72. Hospital leadership has remained actively engaged throughout the Chapter 11 process and continues to provide oversight and support necessary to maintain stable hospital operations. During the entire observation period, no concerns attributable to the bankruptcy proceedings were identified regarding the availability of medications, medical supplies, blood products, equipment, or other resources necessary to support the safe and effective delivery of patient care. Leadership reported that vendor relationships have remained stable, and essential clinical and operational resources have continued to be readily available to frontline staff. Throughout site visits, staff consistently demonstrated a strong commitment to patient care, and clinical operations continued without evidence of disruption to patient services. Leadership further reported that payroll obligations have been met without interruption throughout the Chapter 11 proceedings. Observations, staff and provider interviews, patient interviews, and record reviews conducted during the reporting period demonstrated an ongoing organizational commitment to maintaining quality, patient safety, and continuity of care despite the challenges associated with

the bankruptcy process. Patients continued to receive timely and appropriate care, and no systemic issues were identified that would suggest the Chapter 11 proceedings had adversely affected the hospital's ability to provide safe, high-quality healthcare services.

## III.  <u>CONCLUSION</u>

The Ombudsman did not observe any significant concerns during this Report Period. The Ombudsman will submit her next report within sixty days and will inform the Court if there are any critical concerns discovered prior to that time, as necessary.

Dated: June 16, 2026

**PATIENT CARE OMBUDSMAN**

By: <u>*/s/ Suzanne Koenig*</u>
Suzanne Koenig, solely in her capacity as Patient Care Ombudsman of Jackson Hospital & Clinic, Inc., *et al.*

<u>*/s/ Matthew M. Cahill*</u>
Eric L. Pruitt
Matthew M. Cahill
Elise N. Topping
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
1901 Sixth Avenue North, Suite 2600
Birmingham, Alabama 35203
Telephone: (205) 244-3839
epruitt@bakerdonelson.com
mcahill@bakerdonelson.com
etopping@bakerdonelson.com

*Attorneys for Suzanne Koenig, Patient Care Ombudsman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been served on the following by electronic filing with the Clerk of Court using the CM/ECF system on the 16th day of June, 2026.

Derek F. Meek, Esq.
Burr & Forman, LLP
420 N. 20th Street, Suite 3400
Birmingham, AL 35203
(205) 251-3000
dmeek@burr.com
*Debtor's Attorney*

U.S. Bankruptcy Administrator
One Church Street
Montgomery, AL 36104
(334) 954-3800
ba@almb.uscourts.gov
*Bankruptcy Administrator*

R. Scott Williams, Esq.
Renasant Place
2001 Park Place, Suite 1300
Birmingham, AL 35203
swilliams@rumberger.com
*Counsel to Official Committee
of Unsecured Creditors*

*/s/ Matthew M. Cahill*
OF COUNSEL